UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TK BOAT RENTALS, LLC as
owner and operator of the M/V MISS
IDA, for exoneration from or
limitation of liability.

CIVIL ACTION

NO. 17-1545
c/w 17-2446 and 17-3657

SECTION "R" (4)

## ORDER AND REASONS

Before the Court is defendant Extreme Fishing, L.L.C.'s motion for summary judgment on (1) the negligence claim filed by plaintiffs Patrick A. Beck, Justin McCarthy, and Michael Harrell; (2) the negligence crossclaim filed by defendant and plaintiff in limitation TK Boat Rentals, LLC (TKBR); and (3) TKBR's crossclaim for negligent entrustment.[1] The Court denies Extreme Fishing's motion as to the negligence claims brought by TKBR and plaintiffs. The Court also finds as a matter of law that Extreme Fishing was a demise charterer of the vessel on the day of the collision, and grants summary judgment to TKBR on this issue. Finally, the Court grants Extreme Fishing's motion as to TKBR's claim for negligent entrustment.

---

[1] R. Doc. 107.

## I. BACKGROUND

This consolidated action arises out of a boat collision on February 12, 2017.[2] Plaintiffs Tracy Edwards, Charles "Nick" Siria,[3] Justin McCarthy, Michael Harrell, Patrick Beck, and Beck's minor son, C.D.B., scheduled a chartered fishing trip with Extreme Fishing through Troy Wetzel, Extreme Fishing's founder and sole member,[4] for February 12, 2017.[5] Wetzel arranged for defendant Andre Boudreau to captain the Beck trip.[6] On February 11, the M/V KINGFISH, the vessel that was scheduled to be used for the trip, became inoperable.[7] Wetzel and Boudreau discussed how to proceed,[8] and Boudreau ultimately contacted defendant Chase St. Clair about the availability of St. Clair's fishing vessel, the M/V SUPER STRIKE.[9] The SUPER STRIKE was available,[10] and Beck agreed with Wetzel to use the

---

[2] R. Doc. 1.
[3] The claims brought by Edwards and Siria have since been dismissed. R. Doc. 84; R. Doc. 103.
[4] R. Doc. 107-6 at 1 ¶¶ 2-3; R. Doc. 112-8 at 1 ¶¶ 2-3; R. Doc. 113-1 at 1 ¶¶ 2-3.
[5] R. Doc. 1 at 3 ¶ 13 (Case No. 17-2446); *see also* R. Doc. 107-6 at 4 ¶ 15; R. Doc. 112-8 at 2 ¶ 15; R. Doc. 113-1 at 2 ¶ 15.
[6] R. Doc. 107-6 at 5 ¶ 19; R. Doc. 112-8 at 2 ¶ 19; R. Doc. 113-1 at 2 ¶ 19.
[7] R. Doc. 107-6 at 4 ¶ 18; R. Doc. 112-8 at 2 ¶ 18; R. Doc. 113-1 at 2 ¶ 18.
[8] R. Doc. 107-6 at 5 ¶ 19; R. Doc. 112-8 at 2 ¶ 19; R. Doc. 113-1 at 2 ¶ 19.
[9] R. Doc. 107-6 at 5 ¶ 20; R. Doc. 112-8 at 3 ¶ 20; R. Doc. 113-1 at 2 ¶ 20.
[10] *Id.*

SUPER STRIKE.[11]  On the evening of February 11, Boudreau retrieved the SUPER STRIKE and brought it to the launch site in Venice, Louisiana.[12]

On the morning of February 12, 2017, the Beck trip departed Venice on the SUPER STRIKE with Boudreau as captain.[13]  There was considerable fog that reduced visibility to 50 to 70 yards.[14]  Shortly after the trip began, the SUPER STRIKE collided with the M/V MISS IDA, a vessel owned by TKBR.[15]  The plaintiffs allegedly suffered physical and emotional injuries as a result of the accident.[16]  On February 23, 2017, TKBR filed a limitation of liability action related to the collision.[17]  On March 24, 2017, plaintiffs filed suit for damages against multiple defendants, including Extreme Fishing, TKBR, Wetzel, Boudreau, St. Clair, and GEICO Marine Insurance Company, which plaintiffs allege was St. Clair's insurer on the date of the collision.[18]  On April 19, 2017, St. Clair and Boudreau jointly filed a limitation of liability action.[19]

---

[11]     R. Doc. 107-6 at 6 ¶ 23; R. Doc. 112-8 at 3 ¶ 23; R. Doc. 113-1 at 2 ¶ 23.
[12]     R. Doc. 107-6 at 6 ¶ 24; R. Doc. 112-8 at 3 ¶ 24; R. Doc. 113-1 at 3 ¶ 24.
[13]     R. Doc. 107-6 at 6 ¶ 25; R. Doc. 112-8 at 3 ¶ 25; R. Doc. 113-1 at 3 ¶ 25.
[14]     *Id.*
[15]     R. Doc. 107-6 at 7 ¶ 28; R. Doc. 112-8 at 3 ¶ 28; R. Doc. 113-1 at 3 ¶ 28. R. Doc. 1 at 4 ¶ 16 (Case No. 17-2446).
[16]     R. Doc. 1 at 5-7 ¶¶ 17-23 (Case No. 17-2446).
[17]     R. Doc. 1.
[18]     R. Doc. 1 at 7 ¶ 25 (Case No. 17-2446).
[19]     R. Doc. 1 (Case No. 17-3657).

The two limitation actions and plaintiffs' suit for damages were eventually consolidated into this action.[20]

Plaintiffs' complaint alleges that the collision was the result of negligence on the part of Extreme Fishing, TKBR, Boudreau, Wetzel, and St. Clair.[21]  On May 19, 2017, TKBR filed crossclaims against Boudreau, Wetzel,[22] Extreme Fishing, St. Clair, and GEICO.[23]  TKBR alleges that Boudreau's negligence caused the collision, and that "Extreme Fishing, LLC, as the employer of Andre Boudreau, [is] responsible for the collision and resulting damages."[24]  TKBR also alleges that Extreme Fishing is "further responsible for the collision and resulting damages because . . . Extreme Fishing, LLC negligently entrusted the SUPER STRIKE and the passengers to Andre Boudreau."[25]

Extreme Fishing now moves for summary judgment on plaintiffs' and TKBR's claims for negligence and negligent entrustment.[26]  Plaintiffs do not

---

[20]     R. Doc. 6; R. Doc. 16.
[21]     R. Doc. 1 at 7 ¶ 24 (Case No. 17-2446).
[22]     All claims filed by plaintiffs and TKBR against Wetzel in his individual capacity have since been dismissed.  R. Doc. 87.
[23]     R. Doc. 18.
[24]     *Id.* at 12 ¶¶ 20-21.
[25]     *Id.* ¶ 22.
[26]     R. Doc. 107.

oppose the motion.[27] TKBR opposes the motion.[28] St. Clair, Boudreau, and GEICO have jointly submitted an opposition memorandum.[29]

## II.  LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99

---

[27]    R. Doc. 110.

[28]    R. Doc. 113.

[29]    R. Doc. 112.  Extreme Fishing questions whether St. Clair, Boudreau, and GEICO—which have not filed any crossclaims against Extreme Fishing— "have standing" to oppose Extreme Fishing's motions for summary judgment.  R. Doc. 122 at 2 n.2.  "While some courts have precluded co-defendants without crossclaims from filing oppositions to a co-defendant's motion for summary judgment, others have considered a co-defendant's opposition." *Slatten, LLC v. Royal Caribbean Cruises, Ltd.*, No. 13-673, 2014 WL 4186781, at *3 (E.D. La. Aug. 22, 2014) (quotation marks omitted). This Court has previously considered oppositions filed by co-defendants who have not filed a claim against the movant.  *See id.* (citing *Edwards v. Permobil, Inc.*, No. 11-1900, 2013 WL 4094393, at *1 n.2 (E.D. La. Aug. 13, 2013)).  In light of these precedents, the Court will consider the arguments and evidence St. Clair, Boudreau, and GEICO provide in their opposition.

(5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citation omitted). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by

pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III.  DISCUSSION

### A.    Negligence Claims

Extreme Fishing first argues that it cannot be held vicariously liable for Boudreau's alleged negligence because there is no evidence that Boudreau was working as an employee of Extreme Fishing at the time of the collision.[30] In response, TKBR, St. Clair, Boudreau, and GEICO contend that Extreme Fishing can be liable for Boudreau's alleged negligence because Extreme

---

[30]     R. Doc. 107-1 at 13.

Fishing was a demise or bareboat charterer of the SUPER STRIKE on the day of the collision and thus responsible for the negligence of its crewmember, Captain Boudreau.[31] The Court finds as a matter of law that Extreme Fishing was a demise charterer of the SUPER STRIKE.

In a bareboat, or demise, charter, "the vessel owner transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel (thus the term 'bareboat')." *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993); *see also Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993) ("Under a bareboat or demise charter the vessel is transferred without crew, provisions, fuel or supplies, . . . and if[] the charterer operates the vessel he must supply also such essential operating expenses."). The thrust of a bareboat charter, therefore, is the "complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." *Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir. 1979); *see also In re Griffin Marine, Inc.*, No. 00-2683, 2001 WL 936313, at *2 (E.D. La. Aug. 17, 2001) (finding a demise charter existed where the owner had no control over the navigation of the vessel, and the charterer "decided when, where, and with whom to use the boat"). The charter need not be in writing. *Agrico Chem. Co. v. M/V BEN*

---

[31]     R. Doc. 112 at 9; R. Doc. 113 at 2.

*W. MARTIN*, 664 F.2d 85, 91 (5th Cir. 1981); *see also St. Paul Fire & Marine Ins. v. Vest Transp. Co.*, 666 F.2d 932, 939 (5th Cir. 1982) ("[A] charter party may be implied from circumstances concerning the actual possession and use of a vessel."). Because of the demise charterer's extensive control over the vessel, the charterer is considered the owner *pro hac vice* of the vessel for the duration of the contract. *Forrester*, 11 F.3d at 1215. "The demise charterer is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel." *Id.*

The Fifth Circuit has held that a demise charter can exist in the context of a short-term boat rental for a fishing trip. *See O'Donnell v. Latham*, 525 F.2d 650, 652-53 (5th Cir. 1976). In *O'Donnell*, the plaintiff and his fishing party agreed to rent the defendant's vessel for $85, plus the cost of fuel. *Id.* at 651. The defendant owner agreed to leave the vessel tied at the dock and fully fueled for the plaintiff. *Id.* The plaintiff and his party supplied its own fishing supplies, provisions, and operating crew. *Id.* The Fifth Circuit affirmed the district court's determination that the arrangement between the parties amounted to a demise charter, because the "dominant feature of such a charter" was present: that "[p]ossession, command[,] and navigation" of the vessel "rested completely and exclusively" in the plaintiff's party. *Id.* at 653. The court noted that "[t]he fact that the [plaintiffs] were to return the

boat at the end of the day—thus limiting its use to maximum period of time—[was] not a sufficient curtailment of possession and control to negate the demise." *Id.*

Here, no rational trier of fact could dispute that Extreme Fishing was the demise charterer of the SUPER STRIKE. First, St. Clair completely relinquished possession, command, and navigation of the vessel when he agreed to rent it out. It is undisputed that—as Boudreau testified—once the SUPER STRIKE launched, Boudreau was solely responsible for deciding "when and how to proceed" with the fishing trip, and for the safety of the vessel and its passengers.[32] It is also undisputed that Boudreau, rather than St. Clair, provided all of the "rods, reels, fishing nets and other fishing equipment" for the trip.[33] The "dominant feature" of a demise charter—relinquishment of the possession, command, and navigation of the vessel—was therefore present. *See id.* at 653.

Second, an overwhelming amount of evidence shows that Extreme Fishing, rather than Boudreau, rented the SUPER STRIKE and was therefore the demise charterer on the day of the collision. Extreme Fishing concedes that Boudreau was at least its independent contractor and that Boudreau

---

[32]     R. Doc. 112-4 at 5; R. Doc. 107-1 at 15.
[33]     R. Doc. 107-6 at 9 ¶ 41; R. Doc. 112-8 at 4 ¶ 41; R. Doc. 113-1 at 3 ¶ 41.

would frequently run trips for the company.[34]  It is undisputed that Wetzel

enlisted Boudreau to serve as captain for the Beck trip, which Extreme

Fishing booked.[35]  Wetzel testified that prior to the collision, he planned to

charge Beck $2,200, and that he would have paid Boudreau $500 for his

work.[36]  Wetzel also admitted during his deposition that when the

KINGFISH became inoperable, he asked Boudreau to make phone calls to

see if another boat was available to use.[37]  These facts show that Boudreau

contacted St. Clair as a representative of Extreme Fishing.

Testimony from St. Clair, Boudreau, and Beck further confirms that

Extreme Fishing is the party who rented the SUPER STRIKE.  St. Clair

testified that he agreed to rent out the SUPER STRIKE for $500,[38] and both

he and Boudreau testified that the fee was to be paid by Wetzel.[39]  Beck

---

[34]     R. Doc. 107-6 at 3 ¶ 9; R. Doc. 112-2.

[35]     R. Doc. 107-6 at 4 ¶ 17; R. Doc. 112-8 at 2 ¶ 17; R. Doc. 113-1 at 2 ¶ 17.

[36]     R. Doc. 112-1 at 12.

[37]     *Id.* at 7 (Wetzel testifying that he said to Boudreau, "you run multiple boats, [w]hat can we do, [w]e got people down here in Venice that's fishing tomorrow").  Boudreau's testimony about this phone call differed slightly. He stated that Wetzel specifically asked him to reach out to St. Clair because Wetzel knew that the SUPER STRIKE was available.  R. Doc. 112-4 at 3.

[38]     R. Doc. 112-5 at 2.

[39]     *Id.*; R. Doc. 113-4 at 3 (St. Clair testifying that "[w]hen it came to Troy and Andre, [he] would assume that [Wetzel] would pay [him]"); R. Doc. 112-4 at 3 ("Q: So Mr. Wetzel was going to pay Chase St. Clair $500 to lease his boat for the— [Boudreau]: Yes.  Q: —Sunday trip with the—the Becks and the other— [Boudreau]: Yes.")

testified that he expected to pay Wetzel the $2,200 trip fee even though they were no longer using one of Wetzel's boats.[40] Beck further testified that when Wetzel called him to ask if he would be willing to use a different boat, Wetzel did not disclose who owned the new boat.[41] This suggests that Wetzel did not tell Beck that he was going to be fishing with a different charterer. Finally, Beck testified that he initially chose to book the trip with Wetzel and Extreme Fishing because he had previously been on trips through Extreme Fishing and trusted Wetzel.[42] Beck explained that he would not have brought his minor son on the trip had he not fished with Wetzel before.[43] This testimony further suggests that Beck would not have agreed to transfer his fishing trip to a different charter company, and that he thus believed his trip was still booked with Wetzel and Extreme Fishing on the day of the collision.

The totality of this evidence establishes that Extreme Fishing, rather than Boudreau, rented the SUPER STRIKE and retained control of the Beck trip on the day of the collision. Extreme Fishing was therefore the demise charterer. *See O'Donnell*, 525 F.2d at 652-53; *Theriot v. Dawson Prod. Servs., Inc.*, No. 97-1900, 1998 WL 637384, at *9 (E.D. La. Sept. 16, 1998)

---

[40] R. Doc. 113-5 at 3-4.
[41] *Id.* at 6.
[42] *See id.* at 5.
[43] *Id.*

(party that had physical control of a barge was not a demise charterer when its custody was simply in connection with its obligation "to carry out the tasks it was hired to do" by the party who rented the barge); *In re Suard Barge Servs., Inc.*, No. 96-3185, 1998 WL 2846, at *3 (E.D. La. Jan. 5, 1998) (party renting two barges could still be found to be a demise charterer even though the contract was made through an intermediary).

The only evidence that suggests Extreme Fishing is not the party who rented the SUPER STRIKE is Wetzel's testimony that he "gave the trip away" to Boudreau once the KING FISH became inoperable.[44]  The Court finds that this self-serving and implausible testimony is insufficient to create a genuine dispute as to whether Extreme Fishing was the demise charterer.  *See United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) ("[S]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment."  (internal quotation marks omitted)); *Galindo*, 754 F.3d at 1221 (noting that "mere statements of conclusions of law or ultimate fact cannot shift the summary judgment burden to the nonmovant").  Wetzel stood to make a profit of $1,200 for the Beck trip after renting the SUPER STRIKE for $500 and paying Boudreau $500.[45]  It makes

---

[44]     R. Doc. 112-1 at 11.
[45]     *Id.* at 12; R. Doc. 112-5 at 2; R. Doc. 112-4 at 3.

no economic sense for Wetzel and Extreme Fishing to have simply foregone this profit by turning the trip entirely over to Boudreau. Indeed St. Clair, Boudreau, and Beck all testified that Wetzel did no such thing. Wetzel's testimony makes economic sense only as a post-collision argument to escape liability. This type of testimony is not sufficient to create a genuine dispute of a material fact. *See Lawrence*, 276 F.3d at 197; *Halmekangas v. State Farm Fire & Cas. Co.*, No. 06-3942, 2008 WL 5110711, at *5 (E.D. La. Nov. 25, 2008) (nonmovant's "irrational" testimony that he may not have received his entire insurance declaration, despite evidence that he received the first page, was not sufficient to defeat summary judgment), *vacated on other grounds*, 603 F.3d 290 (5th Cir. 2010).

Extreme Fishing's other arguments for why it was not the demise charterer are similarly unavailing. Extreme Fishing points out that there are no "texts or written agreements" between St. Clair and Wetzel concerning the SUPER STRIKE.[46] But a demise charter need not be in writing, and can be assumed from the circumstances surrounding the use of the vessel. *See Agrico Chem. Co.*, 664 F.2d at 91; *St. Paul Fire & Marine Ins.*, 666 F.2d at 939. Because no rational trier of fact would disagree that Boudreau contacted St. Clair as a representative of Extreme Fishing, the lack of contact

---

[46] R. Doc. 122 at 4.

between Wetzel and St. Clair is immaterial. That Boudreau, rather than Wetzel, was in command and control of the SUPER STRIKE is similarly immaterial to whether Extreme Fishing was the demise charterer.[47] A party renting a vessel can still be a demise charterer even if that party is not physically commanding the boat. *See In re Suard Barge Servs., Inc.*, 1998 WL 2846, at *3 (a finding that a party is a demise charterer "does not depend upon whether" the party is "physically present at the job site, supervising and controlling" the vessel); *Theriot*, 1998 WL 637384, at *9.

Extreme Fishing also argues that St. Clair did not actually relinquish control of the SUPER STRIKE because "St. Clair stored the vessel in a shed under lock and key," and Boudreau needed to notify St. Clair before he retrieved the vessel.[48] Extreme Fishing seems to suggest that this is inconsistent with a demise charter because Boudreau and Extreme Fishing did not have a standing agreement with St. Clair to freely use the SUPER

---

[47]     *See* R. Doc. 107-1 at 15-16 (Extreme Fishing arguing that because Boudreau commanded the SUPER STRIKE, plaintiffs and TKBR cannot prove that Extreme Fishing exercised a sufficient "indicia of control" over the vessel to be held liable). Extreme Fishing's position would appear to immunize it from any liability stemming from Boudreau's actions *even if the parties used the KING FISH*, which Extreme Fishing charters from Wetzel on a demise basis. R. Doc. 107-6 at 2 ¶ 6. This position conflicts with the clear law that a demise charterer is responsible *in personam* for the negligence of its crew. *See Forrester*, 11 F.3d at 1215.

[48]     R. Doc. 122 at 4.

STRIKE when they needed it. *See In re Griffin Marine, Inc.*, 2001 WL 936313, at *2 (finding a demise charter when charterer "freely removed and returned the boat from [owner's] facility"). But as *O'Donnell* instructs, a demise charter can exist when a party rents a fishing vessel for a single voyage. *See* 525 F.2d at 652-53 ("The fact that the fishermen were to return the boat at the end of the day—thus limiting its use to a maximum period of time—is not a sufficient curtailment of possession and control to negate the demise."). In any demise charter of any length, the charterer has to initiate his command and control somehow. That Boudreau had to arrange with St. Clair to pick up the SUPER STRIKE on behalf of Extreme Fishing does not change the Court's analysis.

The Court finds that when taking into account the whole record, no rational trier of fact could disagree that Extreme Fishing was the demise charterer of the SUPER STRIKE. *See EEOC*, 767 F.3d at 481. The Court therefore grants summary judgment to TKBR on this question. Granting summary judgment to TKBR *sua sponte* is consistent with Federal Rule of Civil Procedure 56(f). *See* Fed. R. Civ. P. 56(f) (a court may "grant summary judgment for a nonmovant" after giving the nonmovant "notice and a reasonable time to respond"); *Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2011) (affirming district court's grant of summary judgment *sua sponte*

without formal notice to the litigants because the party against whom summary judgment was granted "was aware [the legal issue] was at play and had a full opportunity to argue against it and present whatever evidence he had"); *cf. Luig v. N. Bay Enters., Inc.*, 817 F.3d 901, 905 (5th Cir. 2016) (suggesting that a district court may have violated Rule 56(f) when it granted summary judgment for the nonmovant on a legal issue not briefed by either party). Here, TKBR, St. Clair, Boudreau, and GEICO all argue that Extreme Fishing's motion should be denied because Extreme Fishing was a demise charterer of the SUPER STRIKE,[49] and St. Clair, Boudreau, and GEICO explicitly argue that the evidence in the record is sufficient to grant summary judgment for the nonmovants.[50] Extreme Fishing had the opportunity to refute these arguments by presenting evidence to support its position that it was not a demise charterer.[51] The Court thus finds that Extreme Fishing was on sufficient notice that the Court could grant summary judgment on this question, and that the question has been fully briefed. Granting summary judgment *sua sponte* to TKBR is therefore warranted. *See Atkins*, 677 F.3d at 681.

---

[49] R. Doc. 112 at 9; R. Doc. 113 at 2.
[50] R. Doc. 112 at 1.
[51] R. Doc. 122 at 4-6.

The Court denies Extreme Fishing's motion with respect to plaintiffs' negligence claim. Because the Court finds that Extreme Fishing was the demise charterer as a matter of law, the Court must deny Extreme Fishing's motion, even though plaintiffs have not opposed it. *See John v. State of La.*, 757 F.2d 698, 708 (5th Cir. 1985) (noting that on summary judgment, "[i]f the moving party fails to discharge" his burden, the motion must be denied "even if the nonmoving party has not responded to the motion").

### B.   Negligent Entrustment Crossclaim

Extreme Fishing also moves for summary judgment on TKBR's crossclaim for negligent entrustment. A claim for negligent entrustment in the maritime context requires evidence "that the boat owner knew or should have known that the person to whom the boat was entrusted . . . was likely to use it in a dangerous manner." *Regan v. Starcraft Marine, LLC*, 719 F. Supp. 2d 690, 696 n.9 (W.D. La. 2010) (quoting *In re Fun Time Boat Rental & Storage, LLC*, 431 F. Supp. 2d 993, 1001 (D. Ariz. 2006)).

Extreme Fishing has presented considerable testimonial evidence demonstrating Boudreau's qualifications for captaining the SUPER STRIKE. The evidence shows that Boudreau (1) is licensed by the U.S. Coast Guard to captain trips of six or fewer passengers within 100 miles offshore;[52] (2) had

---

[52]   R. Doc. 107-4 at 9-10, 39-40, 59.

never been in an accident reported to the U.S. Coast Guard;[53] (3) had never had his license revoked by the U.S. Coast Guard;[54] (4) had been privately navigating the Mississippi River for up to six years before receiving his Coast Guard license, taking 65 to 100 trips each year with a boat and equipment similar to the SUPER STRIKE;[55] (5) and had captained the SUPER STRIKE on chartered fishing excursions approximately nine times before the Beck trip.[56] Wetzel also testified that he closely observed Boudreau captain vessels on the Mississippi for three years before enlisting him as a captain for Extreme Fishing.[57] Wetzel stated that from his interactions with Boudreau, Boudreau "seemed like a very responsible [and] good captain."[58]

TKBR does not refute any of this testimonial evidence. TKBR instead solely argues that Extreme Fishing can be held liable for negligent entrustment because it allowed Boudreau to captain the SUPER STRIKE after he had fewer than six hours of sleep, supposedly in violation of 46 U.S.C. § 8104(a). Section 8104(a) states that

> [a]n owner, charterer, managing operator, master, individual in charge, or other person having authority may permit an officer to take charge of the deck watch on a vessel when leaving or

---

[53]     *Id.* at 42.
[54]     *Id.* at 12.
[55]     *Id.* at 37-38.
[56]     *Id.* at 23-24, 48.
[57]     R. Doc. 112-1 at 3.
[58]     *Id.*

immediately after leaving port only if the officer has been off duty for at least 6 hours within the 12 hours immediately before the time of leaving.

While a breach of a statutory provision or regulation can support a parallel tort claim if the violation causes the plaintiff's injury, *see, e.g.*, *Bass v. Stryker Corp.*, 669 F.3d 501, 510-11 (5th Cir. 2012), TKBR fails to establish how this statutory provision applies to a small fishing vessel like the SUPER STRIKE.

But even if Section 8104(a) were to apply, TKBR has not provided evidence establishing a connection between the collision and Boudreau's failure to sleep a full six hours the night before the trip. In other words, TKBR has failed to show that its injury resulted from Extreme Fishing's supposed violation of the statute. *See Rodriguez v. Am. Med. Sys., Inc.*, 597 F. App'x 226, 230 (5th Cir. 2014) (dismissing tort claim based on an alleged violation of FDA regulations because complaint failed to allege "any causal connection between a violation of federal requirements and [plaintiff's] injuries"). TKBR has not, for instance, provided evidence suggesting that Boudreau's lack of sleep caused him to make poor decisions that led to the collision. Boudreau in fact testified that he did not feel tired or fatigued on the morning of the collision, and that he does not know what else he could

have done "to be more evasive" of the MISS IDA in the foggy conditions.[59]

TKBR has not provided evidence sufficient to dispute this testimony.

Extreme Fishing's uncontested evidence establishes that Boudreau had the proper credentials to operate the SUPER STRIKE, that he had experience operating the SUPER STRIKE and similar vessels on the Mississippi, and that Wetzel had enlisted Boudreau as a captain only after multiple years of observing him and ensuring he was qualified. The Court therefore finds that a trier of fact could not reasonably infer that Extreme Fishing knew or had reason to know that Boudreau was likely to use the SUPER STRIKE in a dangerous manner. *See Regan*, 719 F. Supp. 2d at 696 n.9 (granting summary judgment when plaintiff failed to present evidence that boat operator was incapable of operating the vessel); *see also In re Marquette Transp. Co. Gulf-Inland, LLC*, No. 13-5114, 2016 WL 1587382, at *3 (E.D. La. Apr. 20, 2016) (granting defendants' motion for judgment on the pleadings when plaintiff failed to plead that boat captain was "reckless" or "incompetent" when hired); *Penski v. Jarriel*, No. 91-501, 2001 WL 65695, at *2 (D. Del. Jan. 16, 2001) (granting defendant's motion for summary judgment when uncontested evidence showed captain was "licensed, qualified," and had "operated the boat involved in the accident before and

---

[59] R. Doc. 112-4 at 5.

was familiar with its instrumentation"). The Court accordingly grants Extreme Fishing's motion for summary judgment on TKBR's negligent entrustment crossclaim.

## IV. CONCLUSION

For the foregoing reasons, Extreme Fishing's motion is GRANTED IN PART and DENIED IN PART. TKBR's crossclaim for negligent entrustment against Extreme Fishing is DISMISSED. The Court finds that Extreme Fishing was a demise charterer of the SUPER STRIKE as a matter of law, and grants summary judgment to TKBR on this question.

New Orleans, Louisiana, this __21st__ day of August, 2018.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE