# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF TK BOAT RENTALS, LLC, AS OWNER AND OPERATOR OF THE M/V MISS IDA PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | C.A. NO. 2:17-cv-01545 Consolidated with 2:17-cv-02446, 17-cv-3657 |

**C.A. NO. 2:17-cv-01545**
**Consolidated with 2:17-cv-02446,**
**17-cv-3657**

**SECTION: "R" – SARAH S. VANCE**

**DIVISION: "4" – KAREN WELLS ROBY**

**This Document relates to Beck, et al v. TK Boat Rentals, LLC, et al, 2:17-cv-02446**

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF ANDRE D. BOUDREAU AND GEICO MARINE INSURANCE COMPANY

**MAY IT PLEASE THE COURT:**

The Court has previously ruled that Andre D. Boudreau is an insured entitled to defense under the Allianz Global Corporate and Specialty Insurance Company policy ("AGCS Policy") issued to Troy Wetzel.[1] Boudreau and GEICO Marine Insurance Company ("GEICO Marine") now move for summary judgment for coverage under the AGCS Policy for Boudreau's alleged negligence arising from the operation of M/V SUPER STRIKE on behalf of Extreme Fishing on February 12, 2017. Boudreau has met both of the conditions required to establish coverage under the Temporary Substitute Watercraft clause in the AGCS Policy: 1) the insured vessel, M/V KINGFISH, was out of normal service on the date of the collision due to a covered loss and 2) M/V SUPER STRIKE is of a similar type, value and length as M/V KINGFISH. AGCS cannot meet its burden of proof that the terms of its Temporary Substitute Watercraft clause have

---

[1] R. Doc. No. 191.

not been met.  Furthermore, the "Other Insurance" clauses in the GEICO Marine and AGCS Policies make clear that AGCS provides primary coverage for Boudreau and the GEICO Marine Policy provides excess coverage.  GEICO Marine is therefore entitled to recover its costs for defending Boudreau in this case.

**Facts**

a.  **The Collision**

The facts of this case are generally set forth in *In re: TK Boat Rentals*.[2]  M/V KINGFISH is a vessel owned by Troy Wetzel.  Wetzel bareboat charters M/V KINGFISH to Extreme Fishing, L.L.C., of which Wetzel is the sole member.  Extreme Fishing had a contract to take a customer fishing on that vessel, with Andre Boudreau as the operator, on February 11, 2017.  During that trip, M/V KINGFISH's port propeller spun off its shaft and into the marsh and the vessel had to be towed back to Venice Marina.[3]  M/V KINGFISH was out of commission because of the lost prop and could not be used the following day to take out the Extreme Fishing charter booked by Patrick Beck.[4]  Boudreau, on behalf of Extreme Fishing, leased M/V SUPER STRIKE, a 32' twin vee catamaran, from Chase St. Clair as a substitute vessel for the Beck charter.[5]  Wetzel admits that M/V SUPER STRIKE is similar to M/V KINGFISH, which is 40' in length, and his other vessel, M/V KINGFISH II, a 36' twin vee.[6]  Both vessels were capable of tuna fishing in East Lump where Boudreau intended to take the Beck party.[7]  Beck "expected to pay Wetzel the $2,200 trip fee even though they were no longer using one of Wetzel's boats."[8]

---

[2] R. Doc. No. 186.
[3] Exhibit A, deposition testimony of Andre Boudreau at pp. 71-73.
[4] Exhibit B, deposition testimony of Troy Wetzel at p. 42.
[5] Exhibit A, deposition testimony of Andre Boudreau at pp. 51, 73-74.
[6] Exhibit B, deposition testimony of Troy Wetzel at pp. 46, 64, and 74.
[7] Exhibit B, deposition testimony of Troy Wetzel at pp. 74-75.
[8] R. Doc. No. 186, pp. 11-12.

On February 12th, Boudreau, while operating M/V SUPER STRIKE with the Beck party on board, was involved in a collision with M/V MISS IDA.

Boudreau does not know why the prop backed off M/V KINGFISH's shaft on February 11th.[9] Wetzel does not know why the prop backed off either, but testified "I do know one thing. The boat's in great shape… I loaded the boat personally the day before, fueled it, iced it, baited it, did everything… I wanted everything to be perfect that day.  It was working perfect the day before."[10] Wetzel does not believe that Boudreau did anything to intentionally cause the prop to come off.[11]

### b. Wetzel Notifies AGCS of the Collision

Four days after the collision, Wetzel, through his attorney, advised The Hogans Agency ("Hogans") that Boudreau was operating a charter fishing trip for Extreme Fishing using M/V SUPER STRIKE when the collision occurred and requested defense counsel be appointed.[12] Hogans did not forward this request to AGCS.  Instead, Hogans advised Wetzel's attorney that the claim should fall back on the owner of the substitute vessel because it did not believe that the AGCS Policy provided coverage for this claim.[13]

Plaintiffs filed suit against the defendants on March 24, 2017.[14]  Wetzel's attorney sent the Complaint to Hogans and again requested a defense on May 1, 2017.[15]  Hogans completed an AGCS First Notice of Loss ("FNOL") form which, contrary to Wetzel's February 16th letter,

---

[9] Exhibit A, deposition testimony of Andre Boudreau at p. 72.
[10] Exhibit B, deposition testimony of Troy Wetzel at pp. 37- 38.
[11] Exhibit B, deposition testimony of Troy Wetzel at p. 73.
[12] Exhibit C, *in globo.*
[13] Exhibit C, *in globo.* Neither Wetzel nor his attorney ever contacted St. Clair or GEICO Marine about coverage.
[14] R. Doc. No. 1, Case No. 17-3657.
[15] Exhibit D, *in globo.*

states that Wetzel "gave trip to another captain." Hogans forwarded the FNOL and Complaint to a representative of AGCS on May 2nd.[16]

On May 10th, AGCS issued a reservation of rights letter ("ROR") to Wetzel through his attorney. The ROR questioned whether there is coverage for this loss under the Policy's Temporary Substitute Watercraft clause, which states:

> 2. **Temporary Substitute Watercraft** — If your Watercraft is out of normal use because of a covered loss, we will cover damages you are legally obligated to pay for **bodily injury** or **property damage** arising from the maintenance, use, or control of a temporary substitute Watercraft. The temporary substitute Watercraft must be of a similar type, value, and length as the Watercraft that is out of normal use. But we do not cover temporary substitute Watercraft being used for any purpose other than replacing your Watercraft while it is out of normal use due to a covered loss.[17]

AGCS advised that it needed to investigate whether the insured vessel, mistakenly referred to as M/V KINGFISH II, was out of service due to a covered loss. On June 14, 2017, counsel for AGCS issued a second ROR letter to Wetzel's attorney.[18] That ROR letter again questioned whether there was coverage for this loss under the Temporary Substitute Watercraft clause. This ROR letter also stated that AGCS did not know if the insured vessel, again referred to as M/V KINGFISH II, was out of service due to a covered loss, or if M/V SUPER STRIKE was of a similar type, value and length as that vessel. AGCS agreed to provide a defense to Wetzel under a reservation of rights.

## Procedural History

The owners of M/V MISS IDA and M/V SUPER STRIKE each filed limitation of liability actions relating to the collision.[19]   Plaintiffs filed claims in these limitation actions against Extreme Fishing and Wetzel, as well as against Boudreau, St. Clair and their insurer,

---

[16] Exhibit D, *in globo*.
[17] Exhibit E, p. 3.  See also AGCS Charter Value Vessel Policy, Policy No. OHL92005573-Wetzel TR 01 attached hereto as Exhibit F, p. 10.
[18] Exhibit G.  M/V KINGFISH II is a different vessel owned by Wetzel and insured by AGCS.
[19] R. Doc. No. 1, Case No. 17-3657.

GEICO Marine.[20]  AGCS provided a defense to Wetzel[21] and continues to provide a defense to Extreme Fishing.  Plaintiffs amended their original complaint to add AGCS as a defendant.[22]

St. Clair, Boudreau and GEICO Marine filed a Cross-Claim against AGCS.[23]   The Cross-Claim alleges that M/V KINGFISH lost a propeller and could not be used to take Plaintiffs fishing on February 12, 2017 as planned.[24]   The Cross-Claim alleges that the lost prop is a covered loss under the AGCS Policy.[25]  The Cross-Claim alleges that Extreme Fishing used M/V SUPER STRIKE as a temporary substitute vessel at the time of the collision.[26]  The Cross-Claim alleges that the Temporary Substitute Watercraft provision provides coverage to Boudreau while operating M/V SUPER STRIKE at the time of this incident.[27]  The Cross-Claim alleges that Boudreau is entitled to coverage under the AGCS Policy.[28]

AGCS filed an Answer to the Cross-Claim on March 14, 2018.[29]  AGCS denies that the lost propeller is a covered loss under its Policy.[30]  AGCS denies that M/V SUPER STRIKE is a temporary substitute Watercraft as defined in its Policy.[31]  AGCS denies that that Boudreau is an insured entitled to coverage under its policy.[32]  AGCS pled no specific Policy exclusions in its Answer.

## AGCS's Coverage Defenses

On March 19, 2018, Boudreau propounded discovery to AGCS.  Specifically, AGCS was asked to identify the factual bases for its denial that the lost prop is a covered loss and all

---

[20] R. Doc. Nos. 5 and 17.
[21] The claims against Wetzel were dismissed on summary judgment.  R. Doc. No. 87.
[22] R. Doc. 54.
[23] R. Doc. No. 79.
[24] R. Doc. No. 79, Paragraph 1.
[25] R. Doc. No. 79, Paragraph 24.
[26] R. Doc. No. 79, Paragraph 25.
[27] R. Doc. No. 79, Paragraphs 23-25 and 29.
[28] R. Doc. 79, Paragraph 28.
[29] R. Doc. No. 83.
[30] R. Doc. No. 83, Paragraph XXV.
[31] R. Doc. No. 83, Paragraph XXVI.
[32] R. Doc. No. 83, Paragraph XXIX.

coverage defenses it is asserting against Boudreau.   AGCS maintained that these facts were subject to various privileges, but nevertheless provided evasive responses.   The Court ordered AGCS to provide answers to these interrogatories.[33]   AGCS provided these answers on August 13th.[34]

AGCS reasserted its overruled objections and provided revised/supplemental Answers to Interrogatories that remain evasive and/or non-responsive.   AGCS's remaining coverage defenses[35], however, can be summarized as follows: 1) Wetzel provided late notice of this claim to AGCS and had M/V KINGFISH repaired before AGCS could inspect the vessel to determine if the lost prop is a covered loss under its Policy and 2) "the terms and conditions of the Temporary Substitute Watercraft provision in [its] Policy have not been established."   AGCS also maintains that if there is coverage for Boudreau under its Policy, the GEICO Marine Policy provides primary coverage and the AGCS Policy provides excess coverage.[36]

The uncontested facts establish that M/V KINGFISH was out of service on February 12, 2017 due to a covered loss and that M/V SUPER STRIKE meets the definition of "a temporary substitute Watercraft" under the AGCS Policy because it is of a similar type, value and length as M/V KINGFISH.   The Other Insurance clauses in the two policies establish that the AGCS Policy provides primary coverage for Boudreau and the GEICO Marine Policy provides excess coverage. For these reasons, Boudreau's Motion for Summary Judgment should be granted.

---

[33] R. Doc. No. 185.
[34] Exhibit H, AGCS's Revised/Supplemental Answers to Interrogatories.
[35] One basis for AGCS's denial of coverage to Boudreau was Wetzel's testimony that he "gave away" the Beck charter to Boudreau.  Exhibit H, Revised/Supplemental Answers to Interrogatories Nos. 3 and 4(5).  See also R. Doc. No. 142, pp. 2 and 7.  The Court has since found that testimony to be "self-serving and implausible" and which 'makes economic sense only as a post-collision argument to escape liability".  The Court ruled that Extreme Fishing is, as a matter of law, the demise charterer of M/V SUPER STRIKE.  R. Doc. No. 186.  That coverage defense is therefore moot.
[36] Exhibit H, AGCS's Revised/Supplemental Answers to Interrogatories Nos. 2, 4(4), (6) and (7).

## Law and Analysis

### I. Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[38] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[39] "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."[40]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[41] The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[42] If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient

---

[37] Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[38] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[39] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); see also *Little*, 37 F.3d at 1075.
[40] *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).
[41] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citation omitted).
[42] *Id.* at 1265.

with respect to an essential element of the nonmoving party's claim.[43]   The burden then shifts to

the nonmoving party, who must, by submitting or referring to evidence, set out specific facts

showing that a genuine issue exists.[44]   The nonmovant may not rest upon the pleadings, but must

identify specific facts that establish a genuine issue for trial.[45]

## II.   Louisiana Law on Contracts

"Under Louisiana law, 'an insurance policy is a contract that must be construed in

accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil

Code.'"[46]   The Civil Code instructs that a court, in interpreting a contract, must ascertain the

common intent of the parties.[47]   "When the words of a contract are clear and explicit and lead

to no absurd consequences, no further interpretation may be made in search of the parties'

intent."[48]   The words in a contract are assumed to carry their "generally prevailing meaning,"

unless the words have acquired a technical meaning.[49]   Moreover, "[e]ach provision in a

contract must be interpreted in light of the other provisions so that each is given the meaning

suggested by the contract as a whole."[50]   Interpretation of an insurance contract generally

involves a question of law.[51]

"An insurance policy should not be interpreted in an unreasonable or a strained

manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated

---

[43] See *Celotex*, 477 U.S. at 325.
[44] See *Id.* at 324.
[45] *See, e.g., Id.; Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."
[46] *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 516 (5th Cir. 2005) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 262 (5th Cir. 2003)).
[47] La. Civ. Code art. 2045; *Coleman*, 418 F.3d at 516; *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994).
[48] La. Civ. Code art. 2046.
[49] La. Civ. Code art. 2047; *La. Ins. Guar. Ass'n*, 630 So.2d at 763.
[50] La. Civ. Code art. 2050.
[51] *In re: Katrina Canal Breaches Litig.*, 495 F.3d 191, 207 (5th Cir. 2007).

by its terms or so as to achieve an absurd conclusion."[52]   "Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and enforce reasonable conditions upon the policy obligations they contractually assume."[53]   That being said, if ambiguities remain after the court applies the general rules of contractual interpretation, the ambiguities must be construed in favor of the insured.[54]   When confronted by an ambiguous provision in an insurance policy, the court will construe the provision as a "reasonable insurance policy purchaser would ... at the time the insurance contract was entered."[55]

"With respect to coverage, the insured bears the burden of proving that the incident giving rise to a claim falls within the policy's terms."[56]   But the insurer bears the burden of proving that an exclusion to coverage applies.[57]   Exclusions "are construed strictly against the insurer and in favor of coverage."[58]   "A policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage."[59]

---

[52] *La. Ins. Guar. Ass'n*, 630 So.2d at 763.

[53] *Id.*

[54] *Id.* at 764; see also La. Civ. Code art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text."); *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So.2d 975, 976 (La.1991) ("Equivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured had no voice in the preparation.").

[55] *Breland v. Schilling*, 550 So.2d 609, 610–11 (La. 1989).

[56] *Coleman*, 418 F.3d at 517 (citing *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000)).

[57] *Id.*

[58] *Id.*; accord *Garcia*, 576 So.2d at 976.

[59] *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 & n. 11 (5th Cir. 1990).

"A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent on chance.  It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties."[60]   The insured's burden of showing a fortuitous loss is "not a particularly onerous one."[61]   Indeed, courts have recognized that "all risks insurance arose for the very purpose of protecting the insured in those cases where difficulties of logical explanation or some mystery surround the (loss of or damage to) property."[62]   Therefore, the insured need not prove "the precise cause of the loss or damage" to demonstrate fortuity.[63]

### III.     The Loss of M/V KNGFISH's Port Prop on February 11, 2017 is a Covered Loss

#### a. AGCS Fails to Meet its Burden of Proof that the Loss of M/V KINGFISH's Propeller is not a Covered Loss Under its Policy

The AGCS Policy is an "all risks" policy.   The AGCS Policy defines **Insured Watercraft** as the vessel described on the Declarations Page, including its propellers, that is owned by the named insured (Wetzel).[64]  The **Insured Watercraft** is M/V KINGFISH.[65]  Under the Section entitled **COVERAGE FOR DAMAGE TO YOUR WATERCRAFT** (hereinafter "hull coverage"), the AGCS Policy provides as follows:

#### A. Losses Covered

We will pay for direct physical loss or damage to the **Insured watercraft**, its equipment, trailers, and personal effects unless:

1.  The cause of the loss is identified as not covered below;  or

---

[60] *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 431 (5th Cir.1980).
[61] *Id.* at 430.
[62] *Id.*
[63] *Id.*
[64] Exhibit F, p. 2, Paragraph 7(a) and (c)(2).
[65] Exhibit F, p. 1.

2. An insured's action is in violation of the terms and conditions identified in **Restrictions on the Use of the Watercraft and Duties Required to Preserve Coverage found under GENERAL RULES AND CONDITIONS.**

*\*\*\*\*\**

**C.      Losses Not Covered**

We will not pay for loss:

**1.** Intentionally caused by you or with your consent.

**2.** Caused by your failure to use reasonable care in the maintenance of the property covered.

**3.** That results from wear and tear, gradual deterioration, overheating, ice or freezing, electrolysis, galvanic action, osmosis, changes in temperature wet or dry rot, mold, dampness, mildew, corrosion, weathering, marring, scratching, denting, vermin, animals or marine life. However, this exclusion does not apply to total loss of the **insured Watercraft** that is caused by any of these.

**4.** Caused by or resulting from blistering, or delamination.

**5.** To any main engine or auxiliary machinery or generators or appurtenances that at the time of a loss is greater than seven (7) years from its original date of manufacture or **remanufacture** unless directly caused by stranding, sinking, fire, lightning or collision with another vessel or a fixed or floating object. This exclusion, however, does not apply to the propeller and propeller shaft, nor shall this exclusion apply to damage to main engines that is directly caused by the intake of any foreign objects into the engine cooling system

**6.** To any part defectively manufactured or designed. However, this exclusion does not apply to indirect physical loss or damage caused by any hidden defect in the machinery, the hull, or other defective part. We will not, however, pay for the cost of replacing or repairing the defective part.

**7.** Caused directly or indirectly by incomplete, improper or faulty repair, maintenance or renovation.

**8.** Due to loss of use (except loss of charter hire provided in Section B.6), loss of value or obsolescence.

**9.** To the **Insured Watercraft's** fishing or trolling machinery, and all related appurtenances including but not limited to cables, lines or winches, while being used in fishing or trolling operations.

**10.**      Due to unexplained disappearance of **fishing equipment and personal effects** from the **Insured Watercraft.** But this exclusion does not apply if the **Insured Watercraft** shows signs of forced entry or forcible removal.

**11.**      Of wages for the captain or crew or the cost of food, fuel, or other consumables.[66]

"Loss" and "direct physical loss" are not defined in the AGCS Policy. Accordingly, those terms must be given their ordinary, generally-accepted meanings.[67]  In general, a "loss" means a "destruction," "ruin," or "deprivation." Merriam–Webster's Collegiate Dictionary 736

---

[66] Exhibit F, pp. 4, 5.

[67] *Mangerchine v. Reaves*, 63 So.3d 1049, 1056 (La. App. 1st Cir. 3/25/11).

(11th ed. 2008)."[68]   Neither Boudreau nor Wetzel know why the port prop came off.  The loss of

the port prop on February 11, 2017, which caused M/V KINGFISH to be out of normal use on

February 12th, is "direct physical loss or damage" and thus, a Covered Loss under the AGCS

Policy.

The burden therefore shifts to AGCS to prove that 1) the cause of the loss is identified in

the AGCS Policy as not covered or 2)  or "an insured" violated the terms and conditions of the

AGCS Policy required to preserve coverage.  Failure to meet either of these conditions would

preclude coverage under the AGCS Policy for not only Boudreau, but also Wetzel and Extreme

Fishing.  AGCS defended Wetzel until the claims against him were dismissed.  AGCS continues

to defend Extreme Fishing.  AGCS has only denied coverage to Boudreau.

In AGCS's March 14, 2018 Answer to Boudreau's Cross-Claim, it specifically denied

that the lost prop is a covered loss under its Policy.[69]   AGCS, however, admits that it had no

basis to deny this allegation.  Three months after filing its Answer, AGCS filed an opposition to

Boudreau's Motion for Partial Summary Judgment on its duty to defend.  There, AGCS admitted

that "the investigation into the alleged "covered loss" (the basis of the vessel being down, as this

is required for the Temporary Substitute Watercraft provision to potentially apply) is ongoing."[70]

This begs the question of why AGCS denied that the lost prop is a covered loss in the first place.

Additionally, AGCS submitted a Rule 56(d) affidavit attesting that "[A]dditional

discovery, including potential depositions of previous/additional fact witnesses, as well as the

aforementioned depositions, will provide evidence regarding why the M/V KINFISH I (sic) was

allegedly "out of service" on the date of the incident, which is critical to Boudreau's claim for

---

[68] Id.

[69] See R. Doc. No. 79, Paragraph 24 of the Cross-Claim and R. Doc. No. 83, Paragraph XXV of AGCS's Answer.

[70] R. Doc. No. 142, p. 11.

defense."[71]   AGCS further admitted that "[U]ntil AGCS has had the opportunity to conduct such discovery, it will not be able to fully assess whether a covered loss occurred under the AGCS Policy."[72]

This represents a fundamental misunderstanding of AGCS's Policy.   AGCS already knows that M/V KINGFISH was out of service on that date due to a lost prop, which constitutes direct physical loss or damage to the insured vessel, and thus, a covered loss under its Policy. Additional discovery is therefore "not critical to Boudreau's claim for defense".   Rather, additional discovery is only "critical" to AGCS's coverage defense because it must prove that the cause of the loss is identified as not covered under its Policy.   Moreover, Wetzel testified that he did not know why the port prop spun off and that the vessel was in great condition the day before.   Boudreau testified that he did not know why the propeller spun off either.   It is therefore unclear what information may be gleaned by AGCS re-deposing these witnesses. AGCS also had the opportunity to take an examination under oath of its named insured Wetzel and to inspect M/V KINGFISH to determine the cause of the loss more than one year ago.[73]  It did not do so.

AGCS's Court ordered Answers to Interrogatories likewise fail to establish that the cause of the lost propeller is identified in the AGCS Policy as not covered.   Even though its objections were overruled, AGCS nevertheless continued to object to this interrogatory on the grounds it is premature.   AGCS, however, stated that by the time that it had received notice of the loss on May 2, 2017, "the KINGFISH had long been repaired and AGCS did not have an opportunity to inspect the vessel to directly determine whether it was or was not out of normal use because of an alleged covered loss under the Temporary Substitute Watercraft provision" in its Policy.[74]

---

[71] R. Doc. No. 142-5, Paragraph 12.
[72] R. Doc. No. 142-5, Paragraph 13.
[73] Exhibit F, p. 14, paragraph B(5)(d) and (e).
[74] Exhibit H, AGCS's Revised/Supplemental Answer to Interrogatory No. 2.

AGCS seems to represent that it has been prejudiced by Wetzel's late notice, thereby making it impossible for to determine if the cause of the loss is identified as not covered under its Policy.  As discussed below, however, any late notice by Wetzel is not a basis to deny coverage to Boudreau.  AGCS, however, has also argued that its investigation into the cause of the loss is ongoing, and its investigation will eventually reveal the cause of the loss.  AGCS did not have any factual basis whatsoever to deny that the loss of M/V KINGFISH's prop is a covered loss under its Policy when it denied coverage to Boudreau on March 14, 2018.  It has no facts to support its denial of coverage now.  The Court should therefore find that M/V KINGFISH was out of normal use on February 12, 2017 due to a covered loss under the AGCS Policy.

**b. Wetzel's Late Notice does not Preclude Coverage for Boudreau**

AGCS maintains that it did not receive notice of the February 12, 2017 collision from its named insured until May 2, 2017.  AGCS claims that this represents late notice, and that timely notice is a condition precedent to coverage under its Policy.  AGCS therefore claims that Wetzel's late notice is a basis to deny coverage to Boudreau without demonstrating actual prejudice.[75]  Again, such late notice would likewise preclude coverage for Extreme Fishing, which is being defended by AGCS.  There is no merit to AGCS's late notice defense against Boudreau.

The **Definitions** section of the AGCS Policy states that words and phrases defined therein "are **bold-faced**" when used".[76]  The AGCS Policy provides four separate definitions of what **Insured** means.[77]  Under that definition, **insured** is specifically defined as "the persons or

---

[75] R. Doc. No. 142 at pp. 8-9.  The cases cited by AGCS are inapplicable because they only apply to policyholders who are "sophisticated businesses" and not individual policyholders like Wetzel.
[76] Exhibit F, p. 2.
[77] Exhibit F, p. 2, paragraph 6(a) – (d).

organizations named as the **insured** on the Declaration", i.e., Wetzel.[78]  In addition to the named insured, **Insured** also means "[O]ther persons or organizations using the Watercraft with your prior permission."[79]  Here, that definition includes both Extreme Fishing and Boudreau.[80]

The AGCS Policy, however, does not define the terms "insured", "an insured", "the insured" or "the Insured".  The AGCS Policy variously uses the terms "the insured" (9 times)[81], "the **insured**" (9 times)[82], "the **Insured**" (5 times)[83] and "the Insured" (3 times)[84] a total of 26 times.  The AGCS Policy also uses the terms "an insured" (6 times)[85], "an **insured**" (15 times)[86] and "any insured" (once)[87] a total of 22 times.  All of these haphazardly used terms are ambiguous.

"An insured" is interpreted to mean any unspecified insured.[88]  "The article "the" is singular and is used to particularize the subject spoken of.  "The" is a word of limitation. Black's Law Dictionary (6th ed.).  Hence, "the" insured means only one insured."[89]  Because **Insured** has four separate definitions under the AGCS Policy, the article "the" cannot particularize any single **Insured**.  As Wetzel, Extreme Fishing and Boudreau all meet the definition of **Insured**, the term "the **Insured**" ambiguous.  Similarly, the term "**insured**" is defined as the named insured on the Declaration, i.e., Wetzel.  Yet, 15 different times, the AGCS Policy makes reference to "an **insured**".  The AGCS Policy also uses the term "an insured", which could be interpreted to mean "any insured".  "An **insured**" and "an insured" are thus not

---

[78] Exhibit F, p. 2, paragraph 6(a).
[79] Exhibit F, p. 2, paragraph 6(d).
[80] R. Doc. No. 186.
[81] Exhibit F, pp. 3, 4, 8, 9, 10, 11 and 13.
[82] Exhibit F, pp. 2, 3, 11 and 13.
[83] Exhibit F, pp. 8, 13, 14 and 15.
[84] Exhibit F, pp. 6 and 8.
[85] Exhibit F, pp. 4, 8, 9 and 10.
[86] Exhibit F, pp. 8, 9, 10, 11, 12, 14 and 17.
[87] Exhibit F, p. 9.
[88] *Osbon v. Nat'l Union Fire Ins. Co.*, 93-1975 (La. 2/28/94), 632 So.2d 1158, 1160.
[89] *Id.* at 1159-1160.

synonymous terms. Using the indefinite article "an" before the singular "**insured**" renders this defined term ambiguous. Moreover, "an insured" is used in the Policy interchangeably with "an **insured**", thereby making both terms ambiguous.

The ambiguity does not stop there. M/V KINGFISH's lost prop is covered under the hull coverage section of the AGCS Policy. Under the aforementioned **Losses Covered** provision, it states that AGCS will pay damages "an insured" is legally required to pay unless "[A]n insured's action is in violation of the terms and conditions identified in **Restrictions on the Use of the Watercraft and Duties Required to Preserve Coverage found under GENERAL RULES AND CONDITIONS**."[90] AGCS maintains that Wetzel provided late notice of the collision, not the lost prop, which is covered under the P&I coverage section of the AGCS Policy. Under that **Losses Covered** provision, it states that AGCS will pay damages "an **insured**" is legally required to pay unless "[A]n **insured**'s action is in violation of the terms and conditions..."[91]

The Policy language relied upon by AGCS to deny coverage to Boudreau for Wetzel's untimely notice uses the terms "the **Insured**", "an **insured**" and/or "an insured", rendering the notice requirement ambiguous.[92] The notice provision provides:

> 5. We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:
>
> (a) The **Insured** shall within forty-eight hours after arrival in port, report any loss or damage and shall give prompt notice thereof by telegraph and mail to the Broker of Record, **Ocean Marine Insurance Agency, Inc., Bldg #10, Warwick, RI 02886 1-800-767-6687** and in no event will any claim be admitted by this company unless such notice in writing has been presented within sixty days from the **occurrence** of same.[93]

---

[90] Exhibit F, p. 4.
[91] Exhibit F, p. 8.
[92] *Brown v. Meszner*, 200 WL 1210824, *4 (E.D. La. 2000)(exclusionary clause for intentional acts of "the insured", not "any insured". Other policy exclusions refer to "any insured", at best making the policy language ambiguous); *Morris v. Coker*, 923 F.Supp.2d 863, 870-874 (W.D. La. 2013).
[93] Exhibit F, p. 14.

The duty to provide notice of loss or damage falls on the ambiguous term "the **Insured**", which AGCS interprets to mean Wetzel, but not Extreme Fishing or Boudreau. The term "an **insured**" is ambiguous because **insured** is defined as the named insured (Wetzel), but not Extreme Fishing or Boudreau. The term "an insured" is not defined, but could mean "any insured" or the insured who provided the late notice, here, Wetzel. Nevertheless, with respect to Wetzel's untimely notice, AGCS interprets "an **insured**" and/or "an insured" to mean only Boudreau, but neither Wetzel nor Extreme Fishing. Due to the ambiguity in the AGCS Policy, it cannot be reasonably interpreted to mean that late notice by Wetzel can serve as a basis to deny coverage to Boudreau (and only Boudreau).

## IV.   M/V SUPER STRIKE is a Temporary Substitute Watercraft Because it is of a Similar Type, Value, and Length as M/V KINGFISH

Boudreau has established that M/V KINGFISH was out of normal service due to a covered loss as defined in the AGCS Policy. Therefore, to deny coverage to Boudreau, AGCS must prove that M/V SUPER STRIKE is not "a temporary substitute Watercraft" because it is not of a similar type, length and value as M/V KINGFISH. The ambiguity in the Temporary Substitute Watercraft provision makes this impossible.

"Similar" is not defined in the AGCS Policy. "Similar" may be used in English to mean the "same" or "identical" though it is defined as "showing some resemblance; related in appearance or nature; alike though not identical.[94] "It is difficult to imagine being called upon to interpret a more imprecise term. This inherent vagueness fully justifies the conclusion that the term "similar" is ambiguous."[95]

---

[94] *Weddborne v. Doe*, 194 So.3d 80, 91 (La. App. 4th Cir. 5/4/16).
[95] *Id.*; See also *Bitton v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 3061674, *16 (E.D. La. 2012).

The term "type" is also not defined in the AGCS Policy.  "Type" is defined as "a particular kind, class, or group."[96]  Both M/V SUPER STRIKE and M/V KING FISH are boats used for charter fishing trips from Venice, Louisiana to the East Lump area.  Wetzel admitted that M/V SUPER STRIKE and M/V KINGFISH are similar.  M/V SUPER STRIKE is therefore "of a similar type" as M/V KINGFISH.  "Value" is not defined in the AGCS Policy.  "Value" can be defined as "a fair return or equivalent in goods, services, or money for something exchanged" and "relative worth, utility, or importance."[97]  This Court noted that Patrick Beck "expected to pay Wetzel the $2,200 trip fee even though they were no longer using one of Wetzel's boats."[98]  M/V SUPER STRIKE and M/V KINGFISH are therefore "of a similar value."  Finally, M/V SUPER STRIKE is 32' in length.  M/V KINGFISH is 40' in length.  Because "similar" is inherently ambiguous, and ambiguity must be resolved in favor of the insured, M/V SUPER STRIKE is "of a similar length" as M/V KINGFISH.

M/V SUPER STRIKE meets the definition of "a temporary substitute Watercraft" under the AGCS Policy.  AGCS admittedly has no facts to support its conclusion that "the terms and conditions of the Temporary Substitute Watercraft provision have not been established."[99]  The AGCS Policy provides coverage to Boudreau for this collision.  Indeed, it is clear that the AGCS Policy provides primary coverage for Boudreau and the GEICO Marine Policy provides excess coverage.

---

[96] "Type".  Merriam-Webster.com. 2011. https://www.merriam-webster.com (September 7, 2018).
[97] "Value".  Merriam-Webster.com. 2011. https://www.merriam-webster.com (September 7, 2018).
[98] R. Doc. No. 186, pp. 11-12.
[99] Exhibit H, AGCS's Revised/Supplemental Answer to Interrogatory No. 4(6).

**V.**      **The AGCS Policy Provides Primary Coverage and the GEICO Marine Policy Provides Excess Coverage for Boudreau**

    **a.**   **The Other Insurance Clauses in the GEICO Marine and AGCS Policies**

GEICO Marine issued a Charter Boat Policy to St. Clair that provides coverage to him, as owner, and Boudreau, as operator, of M/V SUPER STRIKE.[100] The **General Conditions** in the GEICO Marine Policy contains an **Other Insurance** clause which provides:

> If there is any other available insurance that would apply in the absence of this policy, this insurance shall be excess over the other insurance…. When this policy and any other policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our policy bears to the total limits of all the policies covering on the same basis.
> When this insurance is excess, we will have no duty to defend an insured against a claim or suit if any other insurer has a duty to defend an insured against that claim or suit.[101]

The **GENERAL RULES AND CONDITIONS** in the AGCS Policy provides:

    **O. Other Insurance**

> If, at the time of a covered loss or damage, there is any other insurance that would apply to *the property* in the absence of this policy, the insurance under this policy will apply only as excess insurance over the other insurance. (Emphasis added).[102]

    **b.**   **"The Property" in AGCS's Other Insurance Clause Means M/V KINGFISH**

"Property" is not defined in the AGCS Policy. It is clear, however, that "the property" means the **Insured Watercraft**, i.e. M/V KINGFISH, and not "a temporary substitute Watercraft". The AGCS Policy defines the **Insured Watercraft** as "(a) the vessel(s) described on the Declarations Page that is owned by the named insured, for which a specific limit of liability shows there is coverage".[103] The **Insured Watercraft**, therefore, by its own terms, does not mean "a temporary substitute Watercraft". "A temporary substitute Watercraft" has a

---

[100] Exhibit I, GEICO Marine Charter Boat Policy, Policy No, CBT 1008950-00.
[101] Exhibit I, p. 10.
[102] Exhibit F, pp. 17-18.
[103] Exhibit F, p. 2, 7(a).

specific definition that is used consistently throughout the AGCS Policy.[104]  Furthermore, the **Loss Settlement** provision in the hull coverage section addresses payment for damage to the **Insured Watercraft**.  Paragraph 5 of this provision states "For other losses covered by this policy, including losses to temporary substitute [] Watercraft, we pay..."[105]  The AGCS Policy never refers to "a temporary substitute Watercraft" as "property".

That is because the term "property" only refers to the **Insured Watercraft.**  For example, in the **Definitions** section of the AGCS Policy, **Actual Cash Value** for a newly acquired vessel by the named insured, as referenced in the definition of the **Insured Watercraft**[106], "means the amount it would currently cost to repair or replace covered *property* with new material of like kind and quality..."[107] (Emphasis added).

Additionally, the term "property" is used throughout the hull coverage section, which only applies to the **Insured Watercraft.**[108]  Under Section C, **Losses Not Covered**, it states that AGCS will not pay for losses caused by the named insured's "failure to use reasonable care in the maintenance of the *property* covered."[109]  Section D provides in part:

6.  If a Loss Payee or Additional Insured/Joint Owner is shown on the Declaration page, the loss payment will be made to the Insured, the Loss Payee, and the Additional Insured/Joint Owner as their interests may appear.

7.  But even if more than one person has an insurable interest in the covered *property*, we will not pay...

*****

10.  If you or we recover any *property* for which we have made a payment under this policy, you or we will notify the other of the recovery.  At your option, *the property* will be returned to or retained by you or it will become our *property*.  If the recovered *property* is

---

[104] Exhibit F, pp. 9 (Section D (5)), 11 (Section G (2)(b)), and 12 (Section G(6)).
[105] Exhibit F, p. 6, paragraph D(5).
[106] Exhibit F, p. 2, paragraph 7(b)(2).
[107] Exhibit F, p. 2, **Definitions**.
[108] Exhibit F, p. 4.
[109] Exhibit F, p. 5, paragraph C(2).

returned to or retained by you, the loss payment will be adjusted based upon the amount you received for the recovered *property*.[110] (Emphasis added).

The **GENERAL RULES AND CONDITIONS**, which contains the Other Insurance clause, never uses the term "a temporary substitute Watercraft". Section B under the **GENERAL RULES AND CONDITIONS** addresses restrictions on the use of "the Watercraft".[111] This section interchangeably uses the terms "the Watercraft" (3 times), "the **insured watercraft**" (6 times), "your Watercraft" (3 times), "the insured vessel" (2 times), "the vessel" (two times), "the insured watercraft" (once) and "the **Insured watercraft**" (once) a total of 18 times.[112] All of these terms, however, are synonymous with the **Insured Watercraft**, and the term "property" as used in section B clearly means the **Insured Watercraft**, M/V KINGFISH. Section B(5) requires the named insured to:

(c) Take all reasonable steps to protect *the property* from further damage. This includes making reasonable and necessary repairs and keeping an accurate record of repair expenses.

(d) As often as we reasonably require, make *the Watercraft and other damaged property* available for our inspection. Keep any damaged parts, machinery and maintenance records available for inspection. (Emphasis added).[113]

The **GENERAL RULES AND CONDITIONS** further provide:

K.     **Abandonment of Property**

We need not accept any *property* abandoned by an insured. (Emphasis added).[114]

*****

---

[110] Exhibit F, pp. 6-7.
[111] Exhibit F, p. 12.
[112] Exhibit F, pp. 12-14.
[113] Exhibit F, p. 14.
[114] Exhibit F, p. 17.

**N.     No Benefit to Bailee**

> We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing, or moving *property* for a fee, regardless of any other provision of this policy. (Emphasis added).[115]

The term "the property" clearly means the **Insured Watercraft** under the AGCS Policy. AGCS's Other Insurance clause, therefore, can be properly read as follows: "If, at the time of a covered loss or damage, there is any other insurance that would apply to M/V KINGFISH in the absence of this policy, the insurance under this policy will only apply as excess."

Under the GEICO Marine Policy, **Insured Boat** means the vessel named on the Declarations Page, M/V SUPER STRIKE.[116]  M/V KINGFISH is not the **Insured Boat** under the GEICO Marine Policy.  The GEICO Marine Policy, therefore, does not "apply to M/V KINGFISH."

**c.  Law and Analysis**

When two entities provide insurance coverage for the same risk, a typical "other insurance" situation is presented and the Court must determine how the two coverages coordinate to pay for the loss.[117]  Under Louisiana law, the Court must determine the priority of the two coverages by attempting to give effect to any "other insurance" clauses.[118]  Louisiana law recognizes "three basic types of other insurance clauses: (1) pro rata, (2) excess and (3) escape.... Excess clauses provide that the coverage of the policy will be excess over other valid and collectible insurance so that the insurer will have no obligation to pay until the coverage of the other policy or policies has been exhausted."[119]

---

[115] Exhibit F, p. 17.
[116] Exhibit I, Declarations Page and p. 1, **Definitions**. The Declarations Page identifies the **Insured Boat** as a 2005 32' Twin Vee Runabout, i.e., M/V SUPER STRIKE.
[117] See *Graves v. Traders & Gen. Ins. Co.*, 214 So.2d 116, 117 (La. 1968).
[118] *Id.*; *Truehart v. Blandon*, 884 F.2d 223, 226 n. 7 (5th Cir. 1989).
[119] *Citgo Petroleum Corp. v. Yeargin, Inc.*, 690 So.2d 154, 167 (La. App. 3rd Cir. 1997).

In dealing with the two "other insurance" clauses, this Court must attempt to reconcile the two clauses and give both effect.[120]  If two or more "other insurance" clauses are of a nature that a court, to give effect to the intent of each clause simultaneously, must leave the insured with no coverage for which premiums have been paid, then the clauses are mutually repugnant and each policy is considered to provide primary coverage.[121]

"The 'pro-rata' policy always contemplates paying first dollar coverage, either full, when no other valid and collectible insurance exists, or part, when it will share with the other valid and collectible insurance. The 'excess' other insurance, however, pays first dollar coverage only in the absence of other valid and collectible insurance."[122]  If one policy provides primary coverage and another policy provides excess coverage, the "other insurance" clauses are not mutually repugnant because the insured is not left without coverage if effect is given to the excess clause.[123]

The decision in *Markey* is instructive. There, the Louisiana Citizens policy contained a pro rata clause, and the American Security policy an excess clause. The court held the Louisiana Citizens policy was primary and the American Security policy excess; the two clauses were not mutually repugnant.[124]  Similarly, both the GEICO Marine and AGCS Policies provide coverage for any damages caused by Boudreau, the operator of M/V SUPER STRIKE.  The AGCS Policy, however, must be classified as "primary" and the GEICO Marine Policy as "excess".

---

[120] *Id.* (noting "[t]he courts are often called upon to reconcile the other insurance clauses in multiple policies in order to apportion the responsibility for the insured's liability among the insurers.").
[121] See *Lamastus & Assoc., Inc., v. Gulf Ins. Co.*, 260 So.2d 83 (La. App. 4ᵗʰ Cir. 1972); *Penton v. Hotho*, 601 So.2d 762 (La. App. 1ˢᵗ Cir. 1992).
[122] *Markey v. Louisiana Citizens Fair Plan*, 2007 WL 1974332, *2 (E.D. La. 7/3/07), reconsidered on other grounds, 2008 WL 638613 (E.D. La. 3/5/08), citing *Shaffer v. Stewart Const. Co., Inc.*, 865 So.2d 213, 222 (La. App. 5ᵗʰ Cir. 2004).
[123] *Id.* See also *Juan v. Harris*, 279 So.2d 187, 191 (La. 1973).
[124] *Markey, supra,* at *4.

The Other Insurance clause in the GEICO Marine Policy provides that it is excess over any other available insurance that would apply in the absence of this policy. This clause makes clear that the GEICO Marine Policy will only come into effect as primary coverage *if* there is no other "available insurance". Otherwise, the GEICO Marine Policy will be considered excess, and will only go into effect if the other primary policy limits are exhausted. The AGCS Policy is "available insurance" for Boudreau. The AGCS Policy, on the other hand, provides that "if… there is any other insurance that would apply to the property [M/V KINGFISH] in the absence of this policy, the insurance under this policy will only apply as excess." Because the GEICO Marine Policy does not apply to M/V KINGFISH, there is no other insurance that would apply to M/V KINGFISH in the absence of the AGCS Policy.

The AGCS Policy, therefore, must be considered primary with respect to the Plaintiffs' claims asserted against Boudreau in this case. As such, AGCS, not GEICO Marine, has the duty to defend Boudreau in this case. GEICO Marine, therefore, is entitled to recover the costs it incurred in defending Boudreau in this litigation.[125] With respect to indemnity, the GEICO Marine Policy is excess over the AGCS Policy and will therefore only go into effect if and when the AGCS Policy limits of $1,000,000 have been exhausted.

AGCS notes that its Other Insurance clause is contained under the GENERAL RULES AND CONDITIONS section, which states "[T]hese rules and conditions apply to all coverage provided by this policy".[126] AGCS argues that this general statement about coverage serves to expand its more narrowly drafted Other Insurance clause to provide excess coverage for Extreme Fishing.[127] AGCS's argument is unavailing.

---

[125] *Liberty Mut. Fire Ins. Co. v. Fluor Enterprises, Inc.*, 2012 WL 255763 (E.D. La. 2012).
[126] R. Doc. No. 142, p. 10. See also Exhibit F, p. 12.
[127] *Id.*

In contract interpretation in the context of insurance policies, "the specific controls the general."[128]   The Court, therefore, must only look to the actual language of AGCS's Other Insurance clause to determine whether the AGCS or GEICO Marine Policy provides primary coverage for Boudreau.   AGCS's Other Insurance clause specifically uses the term "the property".   This Court must adhere "to Louisiana principles of contractual interpretation as articulated by the state's highest court, declining to 'change or alter' the clear terms of the two policies 'under the guise of interpretation.'"[129]

### Conclusion

Boudreau and GEICO Marine have established that Boudreau is entitled to coverage under the AGCS Policy by satisfying all of the requirements of the Temporary Substitute Watercraft clause.   Boudreau and GEICO Marine have further established that the AGCS Policy provides primary coverage and the GEICO Marine Policy provides excess coverage for Boudreau.   AGCS, therefore, has the duty to defend Boudreau under its Policy and GEICO Marine is entitled to recover the costs it has incurred in defending Boudreau in this litigation.

Respectfully submitted,

/s/ Jedd S. Malish
JEDD S. MALISH #23846
KING & JURGENS, L.L.C.
201 St. Charles Avenue, Suite 4500
New Orleans Louisiana 70170
Telephone:  (504) 582-3800
Facsimile:  (504) 582-1233
jmalish@kingjurgens.com
Attorneys for Chase St. Clair, Andre D.
Boudreau and GEICO Marine Insurance
Company

---

[128] *In re: Matter of Complaint of Settoon Towing, L.L.C.*, 720 F.3d 268, 279 (5th Cir. 2013).
[129] *American Intern. Specialty Lines Ins. Co., supra*, at 261.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading was electronically filed with the Clerk of Court by using the CM/ECF system, which will send a notification of such filings to all counsel of record on this 10th day of September, 2018.

/s/ Jedd S. Malish
JEDD S. MALISH