UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TK BOAT RENTALS, LLC, as
owner and operator of the *M/V Miss Ida,*
for exoneration from or limitation of
liability

CIVIL ACTION

NO. 17-1545
c/w 17-2446 and 17-3657

SECTION M (4)

## ORDER & REASONS

Before the Court are the following motions:

(1) the motion of defendants Andre Boudreau and GEICO Marine Insurance Company ("GEICO") for summary judgment on their crossclaim against defendant Allianz Global Corporate and Specialty Marine Insurance Company ("AGCS") for insurance coverage.[1] AGCS opposes the motion,[2] Boudreau and GEICO file a reply in support of the motion,[3] and AGCS files a surreply;[4]

(2) AGCS's motion for summary judgment on its crossclaim against GEICO for insurance coverage.[5] GEICO opposes the motion,[6] and AGCS files a reply in support of the motion;[7]

(3) GEICO's motion to strike certain of AGCS's summary judgment exhibits.[8] AGCS opposes the motion,[9] GEICO files a reply in support of the motion,[10] and AGCS files a surreply;[11] and

(4) a motion of Extreme Fishing, LLC ("Extreme Fishing") for summary judgment on its right to limitation of liability,[12] to which claimants respond in opposition,[13] and in further support of which Extreme Fishing replies.[14]

---

[1] R. Doc. 192.
[2] R. Doc. 195.
[3] R. Doc. 201.
[4] R. Doc. 205.
[5] R. Doc. 211.
[6] R. Doc. 213.
[7] R. Doc. 221.
[8] R. Doc. 219.
[9] R. Doc. 224.
[10] R. Doc. 229.
[11] R. Doc. 235.
[12] R. Doc. 247.
[13] R. Docs. 251, 253, 254.
[14] R. Doc. 257.

Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

# I.    BACKGROUND

This case arises out of a boating accident.  Patrick Beck booked a fishing trip out of Venice, Louisiana, with Extreme Fishing through Troy Wetzel, Extreme Fishing's founder and sole member,[15] for February 12, 2017.[16]  Wetzel generally books fishing trips by phone and hires a captain to operate one of the boats that he owns and leases to Extreme Fishing.[17]  For Beck's trip, Wetzel hired Boudreau, a licensed captain[18] whom he had observed at work on scores of occasions over the course of three or four years, to captain Wetzel's *M/V Kingfish*.[19]  However, on February 11, 2017, the *M/V Kingfish* became inoperable when its port propeller inexplicably spun off into the marsh on another fishing trip.[20]  As a consequence, instead of using the *M/V Kingfish* for Beck's trip, Wetzel asked whether Boudreau could secure another vessel.  Knowing that Chase St. Clair owned a fishing vessel, Boudreau received permission to use the *M/V Super Strike* for the trip.[21]

On the morning of February 12, 2017, Boudreau captained the *M/V Super Strike* for passengers Beck, his minor son, C.D.B., Justin McCarthy, Michael Harrell (collectively, "Plaintiffs"), Tracy Edwards, and Charles "Nick" Siria.[22]  Upon leaving the Venice Marina, fog

---

[15] R. Docs. 107-6 at 1; 112-8 at 1; 113-1 at 1.

[16] R. Doc. 1 at 3 (Case No. 17-2446).

[17] R. Doc. 247-2 at 18-24.

[18] Since June 5, 2014, Boudreau has held a U.S. Coast Guard license as operator of uninspected passenger vessels as defined in 46 U.S.C. § 2101(42)(B) upon near coastal waters not more than 100 miles offshore.  R. Doc. 247-3 at 94, 100.

[19] R. Docs. 87 at 6; 56-1 at 4-5, 8; 247-2 at 14, 16.

[20] R. Doc. 192-1 at 2.  Boudreau and Wetzel testified that they did not know why the propeller broke.  R. Docs. 192-2 at 4; 192-3 at 2-3.  Wetzel said the boat was "in great condition" and "working perfect the day before."  R. Doc. 192-3 at 2-3.

[21] R. Docs. 186 at 2, 11; 192-3 at 4; 192-10 at 1; 247-2 at 19-21; 247-3 at 23-24.  This Court previously determined that Extreme Fishing was the demise or bareboat charterer for the fishing trip.  R. Doc. 186 at 8-17.

[22] R. Doc. 191.  The Court previously dismissed the claims asserted by Tracy Edwards and Charles "Nick" Siria.  R. Docs. 84, 103.

limited visibility to approximately 50 to 75 yards.[23] Boudreau operated boats in similar conditions approximately 15 to 20 times per year.[24] His hired deckhand, Mitchell Rogers, acted as lookout for the trip while Boudreau navigated using radar.[25] Boudreau testified in his deposition that he had expected the fog but that he was not concerned about visibility conditions.[26] The *M/V Super Strike*'s lights were operational and illuminated for the trip.[27]

To access the Gulf of Mexico, Boudreau planned to leave the Venice Marina, enter the Mississippi River from an area known as "The Jump," proceed downriver off the right descending bank (the West Bank), and then cross the river to the East Bank just south of Andres Pond so as to avoid an area of known dredging activity and to exit the river and enter the Gulf through Pass a Loutre.[28] Before crossing the river, the *M/V Super Strike*'s port engine had stalled between four and six times.[29] Boudreau testified that, after the third time, he called St. Clair to inquire about the condition of the engine, but could not reach him.[30] Boudreau further testified that he was able to restart the engine each time after it stalled,[31] and that both engines were operational as he crossed the river.[32] The passengers testified that only the starboard engine was fully operational as they crossed the river.[33]

As the *M/V Super Strike* entered the Mississippi River, Boudreau testified that visibility was approximately 20 yards due to fog, and that visibility ranged between 10 and 20 yards

---

[23] R. Doc. 247-3 at 26.
[24] *Id.* at 68.
[25] *Id.* at 29.
[26] *Id.* at 26-27, 68-69.
[27] *See* R. Docs. 247-6 at 1; 251-7 at 2; 253-1 at 1; 254-1 at 1.
[28] R. Doc. 247-3 at 44-45.
[29] Boudreau testified that it stalled as many as four times, *id.* at 35-40, 44, whereas the passengers testified that it stalled as many as six times. *See* R. Doc. 253-5 (excerpting deposition testimony of Harrell, Siria, McCarthy, and Edwards).
[30] R. Doc. 247-3 at 39-40.
[31] *Id.* at 35, 40.
[32] *Id.* at 47. Rogers also testified that both engines were operational as they crossed. R. Doc. 251-5 at 3.
[33] R. Doc. 253-5.

throughout the remainder of the voyage.[34]  About three-quarters of the way across the river, Boudreau observed an unidentified object appear and then disappear on his radar, which prompted him to reduce his speed.[35]  Boudreau then observed another radar contact, what he later learned to be the *M/V Miss Ida*, proceeding in a westerly direction.  Based on the radar signals, Boudreaux believed that the *M/V Miss Ida* was then crossing the river heading to the West Bank.[36]  Boudreaux testified that, by then, he had reduced the speed of the *M/V Super Strike* to about 20 miles per hour and that visibility was about 15 yards.[37] As Boudreau continued to monitor the radar, he noticed that the *M/V Miss Ida* was then moving in a northerly, not westerly, direction.  Boudreaux testified that he then put the *M/V Super Strike* in neutral, assuming that the vessels would pass each other starboard-to-starboard (with the *M/V Super Strike* nearer the East Bank).[38]  About 30 seconds later according to Boudreaux's estimate and before he could take evasive action, the *M/V Miss Ida* collided with the *M/V Super Strike*, which had drifted with the current about 75 feet.[39]  Deckhand Rogers testified, on the other hand, that the *M/V Super Strike* was in reverse when the *M/V Miss Ida* broke through the fog within 300 yards of the *M/V Super Strike*.[40]  Boudreau testified that if he would have attempted a port-to-port passing, he believed he would have created a head-on collision.[41]  Shane Leblanc, captain of the *M/V Miss Ida*, testified that he never reduced his speed of 15 to 20 miles per hour from the time he observed the *M/V Super Strike* on his radar up until the moment of impact, because he assumed each vessel would turn to starboard to effect a port-to-port passing.[42]  Toward this end, Leblanc veered his vessel to starboard, but the *M/V Miss Ida*

---

[34] R. Doc. 247-3 at 42.
[35] *Id.* at 51-53, 73.
[36] *Id.* at 54-57.
[37] *Id.* at 58-59.
[38] *Id.* at 59-60, 74.
[39] *Id.* at 62-63, 65.
[40] R. Doc. 251-5 at 5.
[41] R. Doc. 247-3 at 90.
[42] R. Doc. 247-5 at 39-42.

struck and mounted the starboard bow of the *M/V Super Strike* at a perpendicular angle.[43]  Plaintiffs

allege they sustained serious injuries as a result of the accident.[44]

On February 23, 2017, TK Boat Rentals, owner and operator of the *M/V Miss Ida*, filed a

limitation-of-liability action related to the accident.[45]  On March 24, 2017, Plaintiffs instituted an

action for damages against several defendants, including Extreme Fishing, TK Boat Rentals,

Wetzel, Boudreau, St. Clair, and GEICO (which Plaintiffs allege was St. Clair's insurer on the date

of the collision).[46]  On April 19, 2017, St. Clair and Boudreau, owner and operator of the *M/V

Super Strike*, jointly filed a limitation-of-liability action.[47]  The two limitation actions and

Plaintiffs' suit for damages were consolidated into this action.[48]  Plaintiffs eventually added a claim

against AGCS, the alleged insurer of Wetzel[49] and Extreme Fishing.[50]

On February 15, 2018, Boudreau and GEICO filed a crossclaim against AGCS, alleging

that AGCS's policy provided coverage to Boudreau for Extreme Fishing's use of St. Clair's

vessel.[51]  On September 5, 2018, AGCS filed a crossclaim against GEICO, asserting that Extreme

Fishing is entitled to coverage under GEICO's policy as the bareboat charterer of the *M/V Super

Strike*, and that AGCS is the excess insurer and entitled to reimbursement from GEICO for all

defense costs incurred to date related to the defense of Extreme Fishing.[52]  In granting AGCS leave

to file its crossclaim against GEICO, the Court noted that it was not then deciding whether AGCS

had standing to assert the claim.[53]

---

[43] *Id.* at 39; R. Doc. 251-1 at 17.
[44] R. Docs. 1 (Case No. 17-2446), 5 & 54 (Case No. 17-1545).
[45] R. Doc. 1.
[46] R. Doc. 1 at 7 (Case No. 17-2446).
[47] R. Doc. 1 (Case No. 17-3657).
[48] R. Docs. 6 & 16.
[49] The Court previously dismissed the claims against Wetzel in his individual capacity.  R. Doc. 87 at 10.
[50] R. Docs. 52 & 53.
[51] R. Doc. 79.
[52] R. Doc. 190.
[53] R. Doc. 189 at 4-5.

### A. The AGCS Policy

It is undisputed that Wetzel carried an insurance policy issued by AGCS for the *M/V Kingfish* that was in effect on the date of the collision.[54] The policy defines the term "insured" to include "persons or organizations using the Watercraft with [Wetzel's] prior permission."[55] The AGCS policy provides additional coverage for a "temporary substitute watercraft" as follows:

> 2. **Temporary Substitute Watercraft** – If your Watercraft is out of normal use because of a covered loss, we will cover damages you are legally obligated to pay for **bodily injury** or **property damage** arising from the maintenance, use, or control of a temporary substitute Watercraft. The temporary substitute Watercraft must be of a similar type, value, and length as the Watercraft that is out of normal use. But we do not cover temporary substitute Watercraft being used for any purpose other than replacing your Watercraft while it is out of normal use due to a covered loss.[56]

Based upon the foregoing provisions and the allegations of Plaintiffs' complaint against Boudreau, the Court previously determined that AGCS has a duty to defend Boudreau.[57]

In the section entitled "General Rules and Conditions," the AGCS policy lists several duties of the insured purporting to be preconditions to coverage,[58] including the insured's obligations to report to the insurer any loss or damage within 48 hours after arrival in port, provide notice in writing of the claim within 60 days of the occurrence, and make the watercraft and other damaged property available for AGCS's inspection when reasonably required by AGCS.[59] The AGCS policy also contains an "other insurance" clause that states: "If, at the time of a covered loss or

---

[54] R. Docs. 192-11 at 1; 192-7; 195-2; 195-6 at 1.

[55] R. Docs. 192-7 at 7; 195-2 at 5. The term "insured watercraft" is defined to include "the vessel[] described on the Declarations Page … owned by the named Insured," R. Docs. 192-7 at 7; 195-2 at 5, which is the *M/V Kingfish*. R. Docs. 192-7 at 3; 195-2 at 1.

[56] R. Docs. 192-7 at 15; 195-2 at 13 (bolded terms in original).

[57] R. Doc. 191.

[58] R. Docs. 192-7 at 17-19; 195-2 at 15-17.

[59] R. Docs. 192-7 at 19; 195-2 at 17.

damage, there is any other insurance that would apply to the property in the absence of this policy, the insurance under this policy will only apply as excess insurance over the other insurance."[60]

## B. The GEICO Policy

It is also undisputed that St. Clair carried an insurance policy issued by GEICO for the *M/V Super Strike* that was in effect on the date of the collision.[61] The GEICO policy provides coverage for a bareboat charterer as follows:

> While the **Insured Boat** is under **Charter Use**, then **"you"**, **"your"**, **"insured"**, and **"insured person"** are defined as the **Named Insured(s)** on the Declarations Page and any operator that **you** designate that holds all required Federal, State, and local licenses and permits. While the **insured boat** is in service as a **Bareboat Charter** …, then **"you"**, **"your"**, **"insured"**, and **"insured person"** also include a charterer operating the **insured boat**, a licensed captain, a certified instructor, and the Management Company named on this endorsement.
>
> \* The definition of **Charter Use** is deleted in its entirety and replaced with the following:
>
> > \* is defined as the use of the boat for:
> > - **Bareboat Charters**,
> > - crewed charters carrying six (6) or less passengers for the purpose of charter fishing, sightseeing, or dinner cruises only.
> > All other Commercial use is excluded. [62]

Under the policy, the term "bareboat charter" means "a legal bareboat charter as defined by the United States Coast Guard in the Code of Federal Regulations and any applicable endorsement to these regulations."[63] The Court has previously ruled as a matter of law that Extreme Fishing was the bareboat charterer of the *M/V Super Strike* at the time of the collision.[64]

The GEICO policy also contains an "other insurance" clause that states:

> If there is any other available insurance that would apply in the absence of this policy, this insurance shall apply as excess over the other insurance. However, with respect to Coverage A and Coverage E, the combined amount of available insurance

---

[60] R. Docs. 192-7 at 22-23; 195-2 at 20-21.
[61] R. Docs. 192-10; 195-1; *see* R. Docs. 192-11 at 2; 195-6 at 2.
[62] R. Docs. 192-10 at 19; 195-1 at 19 (bolded terms in original).
[63] R. Docs. 192-10 at 5; 195-1 at 5.
[64] R. Doc. 186.

shall not exceed the applicable limits of this policy for any loss. When this policy and any other policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our policy bears to the total of the limits of all the policies covering on the same basis.

When this insurance is excess, we will have no duty to defend an **insured** against a claim or suit if any other insurer has a duty to defend an insured against that claim or suit.[65]

## II.     PENDING MOTIONS

### A.  Insurance Coverage Claims

Boudreau and GEICO now move for summary judgment against AGCS for insurance coverage under the AGCS policy issued to Wetzel.[66]  Boudreau and GEICO contend that the undisputed facts establish that Boudreau and the *M/V Super Strike* fall within the express terms of the "temporary substitute watercraft" clause.[67]  Further, Boudreau and GEICO contend that any coverage GEICO owes to Boudreau is excess to AGCS's coverage under GEICO's "other insurance" clause.[68]  In response, AGCS argues that several disputed facts exist to preclude coverage for Boudreau under the "temporary substitute watercraft" clause.  AGCS first suggests that GEICO judicially admitted being a co-primary insurer with AGCS in its crossclaim and discovery answers, and, in any event, AGCS's policy excludes primary coverage where other primary insurance exists.[69]

In AGCS's motion, AGCS seeks summary judgment on its crossclaim that GEICO provides the primary layer of insurance for Extreme Fishing and that AGCS is the excess insurer.[70]

---

[65] R. Docs. 192-10 at 14; 195-1 at 14 (bolded term in original).

[66] R. Doc. 192.

[67] R. Doc. 192-1 at 10-18.

[68] *Id.* at 19-25.  In GEICO's reply, GEICO also argues that the Court should deem the facts listed in GEICO's statement of material facts to be admitted because AGCS's statement of disputed material facts inadequately responds to GEICO's statement under Local Rule 56.2.  R. Doc. 201 at 1-2. The Court disagrees; AGCS has supplied "a separate and concise statement of material facts which [it] contends present a genuine issue" as required by Local Rule 56.2.

[69] R. Doc. 205.

[70] R. Doc. 211.

GEICO responds that AGCS lacks standing to pursue a coverage claim on behalf of Extreme Fishing because AGCS is not an insured, additional insured, or third-party beneficiary.[71]  In reply, AGCS attaches a declaration of Extreme Fishing's attorney that purports to evidence Extreme Fishing's assignment to AGCS of the insured's rights against GEICO for payments made or to be made by AGCS under its policy.[72]

GEICO moves to strike AGCS's reply as impermissibly asserting a new argument and to strike the exhibits submitted with the reply as incompetent summary judgment evidence.[73]  AGCS responds that it had already addressed the assignment-of-rights argument in its original memorandum in support of its motion for summary judgment, but AGCS does not directly address GEICO's contention that the exhibits are inadmissible.[74]

### B.  Limitation of Liability

Extreme Fishing moves for summary judgment on its right to limit its liability.  As the bareboat charterer of the *M/V Super Strike* at the time of the collision,[75] Extreme Fishing contends it has a right to limit its liability under 46 U.S.C. § 30505 because no evidence exists to show that it had privity or knowledge of any of Boudreau's negligent acts in navigation that caused or contributed to the collision.[76]  Extreme Fishing summarizes Boudreau's credentials, clean record, and experience in navigating offshore fishing vessels to emphasize that Wetzel, who had observed Boudreau working for several years, chose a competent captain.[77]  Furthermore, Extreme Fishing argues that Boudreau was particularly qualified for this trip because he had operated the *M/V Super*

---

[71] R. Doc. 213.
[72] R. Doc. 221.
[73] R. Docs. 219-1 at 1-2; 229.
[74] R. Docs. 224 at 1-2; 235; *see* R. Docs. 224 & 235.
[75] R. Doc. 186 at 8.
[76] R. Doc. 247-1 at 1-2.
[77] *Id.* at 18-19.

*Strike* itself on nine other chartered fishing trips with another company.[78]  Extreme Fishing invokes prior orders of the Court it claims to have "substantially narrowed" the scope of its potential liability to navigational error.[79]  Thus, because the Court dismissed Plaintiffs' claims of unseaworthiness[80] and TK Boat Rentals' claim for Extreme Fishing's negligent entrustment of the vessel to Boudreau,[81] and because no evidence can prove Extreme Fishing's knowledge of Boudreau's negligent navigation, Extreme Fishing contends it is entitled to limit its liability to the post-casualty value of the *M/V Super Strike*.[82]

In opposition, Plaintiffs contend that Boudreau's negligence in failing to check for and identify unseaworthy conditions of the *M/V Super Strike* caused or contributed to the collision. Specifically, Plaintiffs argue that Boudreau's failure to inspect the vessel's engines and Extreme Fishing's failure to enforce a policy of regularly inspecting vessels for such defects contributed to the collision, but never explain how.[83]  Plaintiffs also argue that Boudreau's failure to sound his horn in violation of Inland Navigation Rule 34,[84] which addresses maneuvering and warning signals, also contributed to the collision.  Plaintiffs point to Boudreau's testimony that he admitted to violating this rule on this occasion and that he had never before removed the horn from the center console to be within his reach in the wheelhouse when operating a vessel.[85]  Plaintiffs contend that Wetzel's experience with Boudreau should have given him knowledge of this

---

[78] *Id.* at 19.
[79] *Id.* at 4.
[80] *Id.* (citing R. Doc. 84 at 5-6).
[81] *Id.* (citing R. Doc. 186 at 18-22).
[82] *Id.* at 15 (citing R. Doc. 4 in case no. 17-3657) (noting that the Court has approved an Ad Interim Stipulation for Value filed by St. Clair for the *M/V Super Strike* in the amount of $12,500 as the post-casualty value of the vessel, and that no party has challenged this valuation).
[83] R. Doc. 251 at 6-11.
[84] 33 C.F.R. § 83.34.
[85] R. Doc. 251 at 11-12 (citing R. Doc. 251-2 at 11-12).

practice.[86]  Nonetheless, Plaintiffs do not contend that the *Pennsylvania* Rule applies or explain how failure to sound the horn would have prevented the accident in these circumstances.

Also in opposition to Extreme Fishing's motion to limit its liability, GEICO, Boudreau, and St. Clair briefly argue that "[t]here are issues of fact concerning whether any alleged problems with the port engine were a cause of this collision," as would point to Extreme Fishing's knowledge of Boudreau's negligent operation of or failure to inspect the vessel, or Extreme Fishing's own failure to implement inspection policies.[87]  In support of this argument, GEICO, Boudreau, and St. Clair cite the deposition testimony of several Plaintiffs who, in contrast to Boudreau and Rogers, contend that only the port engine was operating when the *M/V Super Strike* crossed the river.[88]

TK Boat Rentals also opposes Extreme Fishing's motion, re-urging an argument the Court previously rejected in dismissing TK Boat Rentals' negligent entrustment claim.  TK Boat Rentals contends that it now presents summary judgment evidence that Extreme Fishing violated 46 U.S.C. § 8104(a) in having Boudreau captain the *M/V Super Strike*, but points to the same deposition testimony that he slept only about five and a half hours the night before the accident.  TK Boat Rentals makes no new argument to support applying the statute to "a small fishing vessel"[89] or to explain how Boudreau's sleeplessness influenced his decisions on the day of the accident.[90]

In reply, Extreme Fishing argues that, as previously held by the Court, it owes no duty to provide a seaworthy vessel to passengers like Plaintiffs.[91]  With regard to its alleged duty to discover purported defects in the *M/V Super Strike*'s engines prior to sailing, Extreme Fishing argues that no respondent to the motion to limit liability has met its burden to show that the

---

[86] *Id.*
[87] R. Doc. 523.
[88] *Id.* at 3 (citing R. Doc. 523-2).
[89] R. Doc. 186 at 20.
[90] R. Doc. 254.
[91] R. Doc. 257 at 1.

condition of the engines caused or contributed to the collision. "Whether or not the port engine on the [*M/V Super Strike*] was operating properly … is ultimately a red herring because there has been no evidence produced by the opposing parties that the condition of the [*M/V Super Strike*'s] port engine had anything to do with the collision. It is only those acts of negligence or defective conditions aboard the vessel that contribute to the collision that 'are relevant to determining whether the shipowner is entitled to limitation.'"[92] Extreme Fishing further contends that St. Clair testified the vessel had been recently serviced and in good operating condition, and that TK Boat Rentals' argument regarding Boudreau's sleeplessness should be rejected absent any evidence to demonstrate causation or to rebut Boudreau's specific testimony "that he did not feel tired or fatigued on the morning of the collision."[93]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets

---

[92] *Id.* at 2 (quoting *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 81 F.2d 634, 639 (4th Cir. 1987)).
[93] *Id.* at 3-4.

that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some

metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the movant will bear the burden of proof at trial on the dispositive issue, the movant "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quotation omitted). Then, the nonmovant may defeat the motion by showing a genuine dispute of material fact or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

## B. Boudreau and GEICO's Motion for Summary Judgment

### 1. Boudreau's Coverage Under the AGCS Policy

Boudreau and GEICO seek primary insurance coverage for Boudreau under the AGCS policy issued to Wetzel for the *M/V Kingfish* under the "temporary substitute watercraft" clause, which states in pertinent part: "If your Watercraft is out of normal use because of a covered loss, we will cover damages you are legally obligated to pay for bodily injury or property damage arising from the maintenance, use, or control of a temporary substitute Watercraft. The temporary substitute Watercraft must be of a similar type, value, and length as the Watercraft that is out of normal use."[94] Boudreau and GEICO assert that both conditions for coverage under the temporary substitute watercraft clause in the AGCS policy are satisfied: first, the *M/V Kingfish* was out of

---

[94] R. Docs. 192-7 at 15; 195-2 at 13 (bold removed).

normal service on the date of the collision due to a covered loss; and, second, the *M/V Super Strike* is of a similar type, value, and length as the *M/V Kingfish*.[95]

The qualities of the substitute vessel are genuinely disputed. The AGCS policy requires that a temporary substitute watercraft be of "similar type, value, and length as the Watercraft that is out of normal use."[96] In support of its argument that the *M/V Super Strike* was of similar value to the *M/V Kingfish*, Boudreau and GEICO merely contend that Extreme Fishing charged the Plaintiffs the same amount for the charter of the substitute *M/V Super Strike* as for the original *M/V Kingfish*.[97] But, as AGCS points out, the value of the vessels may not be measured by the value of a chartered trip.[98] Extreme Fishing may not have charged Plaintiffs a different rate for a different vessel substituted at the last minute in order to preserve its good business reputation, for example. In addition, AGCS disputes whether Boudreau and GEICO have provided sufficient evidence to demonstrate that the *M/V Super Strike* was of similar type and length to the *M/V Kingfish*. Accordingly, summary judgment for Boudreau and GEICO is not warranted at this time on the question of Boudreau's coverage under the "temporary substitute watercraft" clause of the AGCS policy.[99]

---

[95] R. Doc. 192-1 at 1.

[96] R. Docs. 192-7 at 15; 195-2 at 13.

[97] R. Doc. 192-1 at 18.

[98] R. Doc. 205 at 5. AGCS presents evidence to show that the *M/V Super Strike* was insured with a hull value of $95,000, whereas the *M/V Kingfish* had a fair market value of $250,000 in 2016. *Id.*

[99] The first condition for coverage under the "temporary substitute watercraft" clause is also disputed. On the one hand, Boudreau and GEICO assert that there is no dispute that the *M/V Kingfish* was out of normal use due to a covered loss because its propeller broke the day before Beck's scheduled fishing trip. Boudreau and GEICO read the language of the AGCS policy as covering "direct physical loss," which they say includes the "destruction, ruin, or deprivation" of the propeller. They contend that AGCS had no basis to deny (as it did) that the damaged propeller amounted to a covered loss because AGCS had admitted in its answer to Boudreau and GEICO's crossclaim that it was still investigating the basis of Wetzel's insurance claim. R. Doc. 192-1 at 11-13. In Boudreau and GEICO's view, an insurer should refrain from denying coverage until its investigation has provided a basis for it to do so.

On the other hand, AGCS argues that Wetzel's failure to satisfy its notice obligations under the policy forecloses a determination that the injury to the propeller was a covered loss, because AGCS was not afforded the opportunity to inspect the vessel. R. Docs. 195 at 2, 8-10; 192-7 at 19; 195-1 at 17 ("The Insured shall within forty-eight hours after arrival in port, report any loss or damage and shall give prompt notice thereof by telegraph and mail to the Broker of Record, … and in no event shall any claim be admitted by this company unless such notice in writing has been presented within sixty days from occurrence of same[.]"). In addition, AGCS says that Boudreau failed to

15

### 2. GEICO's Primary or Excess Coverage

Boudreau and GEICO assert that the GEICO policy's "other insurance" clause renders AGCS the primary insurer for Boudreau and GEICO the excess. However, Boudreau and GEICO acknowledge AGCS's competing "other insurance" provision and allege in their crossclaim against AGCS that "[b]oth the [GEICO] and AGCS Policies provide ***primary*** coverage to Andre D. Boudreau for the February 12, 2017 incident involving the M/V SUPER STRIKE."[100] AGCS argues that Boudreau and GEICO's unamended pleading and corresponding interrogatory answer, which state that "[GEICO] and AGCS policies provide co-primary coverage for Andre Boudreau operating M/V SUPER STRIKE on February 12th on a 50-50 basis,"[101] constitute judicial admissions that GEICO is the primary insurer.[102] AGCS also submits that GEICO has waived its coverage defense by assuming continued defense of Boudreau without having reserved its rights against Boudreau.[103] Alternatively, AGCS says that AGCS's "other insurance" clause at least renders GEICO the excess insurer and AGCS's and GEICO's clauses irreconcilable and mutually repugnant, resulting in prorated liability under Louisiana law.[104]

### a. Judicial Admission

"A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's La., Inc.*, 244 F.3d 474,

---

give AGCS timely notice of his claim for coverage under the AGCS policy, which AGCS suggests arose at the latest on November 27, 2017, when GEICO received a copy of the AGCS policy, because Boudreau and GEICO did not file their crossclaim until February 15, 2018. R. Doc. 195 at 10.

     Boudreau and GEICO do not provide sufficient summary judgment evidence to show that either Wetzel or Boudreau gave timely notice of the propeller damage so as to establish a covered loss. Rather, Boudreau and GEICO rely on conclusory assertions like "AGCS already knows" the propeller loss was covered by the AGCS policy. R. Doc. 192-1 at 13. These assertions fail because they do not resolve the threshold issue of whether the propeller damage was a covered loss. Therefore, a genuine dispute also exists as to whether the *M/V Kingfish* was inoperable due to a covered loss.

[100] R. Doc. 79 at 6 ¶31 (emphasis added).
[101] R. Doc. 195-3 at 7.
[102] R. Doc. 195 at 4.
[103] *Id.* at 4-6.
[104] *Id.* at 11-12.

476 (5th Cir. 2001). "A judicial admission 'has the effect of withdrawing a *fact* from contention.'" *Blankenship v. Buenger*, 653 F. App'x 330, 335 (5th Cir. 2016) (quoting *Martinez*, 244 F.3d at 476) (emphasis in original). Accordingly, judicial admissions generally concern issues of fact and are inapplicable to questions of law. *See Blankenship*, 653 F. App'x at 335 & n.15. "To qualify as a judicial admission, the statement must be (1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based." *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 n.2 (5th Cir. 2014) (quoting *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001)). Courts retain discretion to treat statements in briefs as judicial admissions, *City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990), as well as to relieve a party of the binding consequences of its judicial admission where justice requires. *See, e.g.*, *Kiln Underwriting, Ltd. v. Jesuit High Sch. of New Orleans*, 2008 WL 4724390, at *12 (E.D. La. Oct. 24, 2008) (even if statements were construed as judicial admissions, binding effect waived for counsel's "honest mistake" and lack of prejudice to opposing party).

AGCS maintains that GEICO has judicially admitted that GEICO is Boudreau's primary insurer through GEICO's unamended crossclaim and interrogatory answer. This is only true if the Court were to accept a crimped reading of GEICO's pleading, which, fairly read, alleges that both GEICO and AGCS are Boudreau's primary insurers. The Court fails to see how such an allegation differs from AGCS's own alternative argument that the irreconcilable and mutually repugnant nature of GEICO's and AGCS's "other insurance" clauses, where each is said to be excess of the other, requires prorated liability under Louisiana law. If true, as a matter of law, both insurers would provide primary coverage to Boudreau, which is precisely what GEICO has alleged.

Accordingly, the doctrine of judicial admission is not applicable. *See Buenger*, 653 F. App'x at 335 n.15 ("The scope of judicial admissions is restricted to matters of fact which otherwise would require evidentiary proof, and does not include counsel's statement of his conception of the legal theory of a case.") (quoting *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)).

### b. Waiver

AGCS cites *Steptore v. Masco Construction Co.*, 643 So. 2d 1213 (La. 1994), for the proposition that GEICO has waived its coverage defense that it is excess because GEICO assumed the defense of Boudreau without obtaining a reservation of rights.[105] AGCS contends that, with GEICO's claim to excess status, GEICO's interests are no longer completely aligned with Boudreau's, so counsel for GEICO and Boudreau has a conflict in the dual representation that is prohibited by *Steptore*.[106] In response, GEICO argues that seeking primary insurance coverage for Boudreau under the AGCS policy is not a "coverage defense" barred by *Steptore* because GEICO seeks to obtain rather than deny insurance coverage for Boudreau.[107] GEICO cites no law in support of this position but instead claims that more is needed to meet the "high standard of proof" to deprive Boudreau of his chosen counsel and show a conflict of interest as defined by Rule 1.7 of the Louisiana Rules of Professional Conduct.[108]

In *Steptore*, the Louisiana supreme court precluded an insurer from asserting a coverage defense when the insurer had already assumed defense of the insured without obtaining a reservation of rights or separate counsel. 643 So. 2d at 1215, 1217. Six months after the same counsel began representing the insured and the insurer, the insurer denied coverage for the insured due to the insured's breach of a warranty in the policy, and counsel withdrew representation from

---

[105] R. Doc. 195 at 4-6.
[106] *Id.* at 6.
[107] R. Doc. 201 at 7.
[108] *Id.* at 8.

the insured.  *Id.*  The question before the court was whether the insurer had waived its coverage defense.  *Id.* at 1214.  The court noted that, under Louisiana law, an insurer is charged with knowledge of the terms of its own policy.  *Id.* at 1216.  An insurer also has a duty to investigate facts of which it has notice and which would cause a reasonable person to inquire further, and the insurer's failure to investigate "constitutes a waiver of all powers or privileges which a reasonable search would have uncovered."  *Id.*  Reasoning that these waiver principles must be "applied stringently" to protect against potential conflicts of interests between insurer and insured (and citing Rule 1.7 of the Louisiana Rules of Professional Conduct), the court found the insurer's knowledge of facts that prompted its duty to investigate constituted a waiver of any coverage defenses when the insurer did not obtain a reservation of rights or separate counsel.  *Id.* at 1217.  The court reasoned that, from the beginning of litigation, the insurer, attorneys representing the insurer, and the insured had knowledge of the location of the insured's vessel, a fact that would breach the warranty.  *Id.*  The insurer's retention of the same counsel to defend it and the insured, without reserving its rights, constituted a waiver of this coverage defense.  *Id.*

Unlike the warranty in *Steptore*, the "other insurance" clauses at issue here do not aim to deprive the insured of coverage.  Rather, the "other insurance" clauses in the AGCS and GEICO policies merely govern the relationship between the two insurance providers in determining which will cover the insured in what capacity and percentage.  *See N. Am. Capacity Ins. Co. v. Brister's Thunder Karts, Inc.*, 2001 WL 766970, at *2-3 (E.D. La. July 9, 2001) (applying *Steptore* to waive insurer's denial of coverage based upon untimely submission of claim but not to analysis of competing "other insurance" clauses); *see also Citgo Petroleum Corp. v. Yeargin, Inc.*, 690 So. 2d 154, 167 (La. App. 1997) (quoting 15 WILLIAM SHELBY MCKENZIE & ALSTON JOHNSON, III, LOUISIANA CIVIL LAW TREATISE, INSURANCE LAW AND PRACTICE § 288, at 499 (2d ed. 1996)) (the

effect of an excess clause is that "the insurer will have no obligation to pay until the coverage of the other policy or policies has been exhausted").  GEICO's invocation of its "other insurance" clause against AGCS is a "dispute between two insurers" that does not implicate the potential conflicts addressed in *Steptore*.  *See Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 269-70 (5th Cir. 2010).

      **c.**   **GEICO's and AGCS's Competing "Other Insurance" Clauses**

GEICO contends that its "other insurance" clause makes it Boudreau's excess insurer. While GEICO acknowledges that AGCS's "other insurance" clause also purports to make AGCS Boudreau's excess insurer, GEICO points to specific language in the AGCS clause to urge that it does not apply, quoting the following: "If, at the time of a covered loss or damage, there is any other insurance that would apply to ***the property*** in the absence of this policy, the insurance under this policy will apply only as excess insurance over the other insurance."[109]  GEICO construes the term "property" as used in AGCS's clause to mean only "the insured watercraft" and not the "temporary substitute watercraft," because the term "property" is used only in connection with "the insured watercraft."  As a result, GEICO argues that the AGCS clause applies only when other insurance coverage exists for the *M/V Kingfish*, as opposed to the *M/V Super Strike*.[110]  Because the GEICO policy covers the *M/V Super Strike*, not the *M/V Kingfish*, GEICO says that the AGCS "other insurance" clause does not apply, AGCS is Boudreau's primary insurer under the "temporary substitute watercraft" provision, and GEICO's excess clause can be given effect.[111]

AGCS denies that the term "property" should be so narrowly construed, urging the Court to employ the ordinary definition of property: "something owned or possessed."[112]  AGCS argues

---

[109] R. Doc. 192-1 at 19 (quoting 192-7 at 22-23) (emphasis added).
[110] *Id.* at 19-22.
[111] *Id.* at 22-25.
[112] R. Doc. 195 at 7-8.

that GEICO's interpretation absurdly creates greater coverage for a temporary substitute vessel than for the insured vessel and thereby renders the "other insurance" clause meaningless.[113]  Thus, AGCS argues that the ordinary definition of property it champions conforms with the object of the "other insurance" clause in its policy: namely, to avoid primary coverage where other insurance is available.[114]

Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code.  *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003) (citations omitted).  Contracts are interpreted "to ascertain the common intent of the parties to the contract."  *Id.* (citations omitted).  "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning."  *Id.* (citations omitted). An insurance policy "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion."  *Id.* (citations omitted).  A court cannot exercise "inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent."  *Id.* (citations omitted).  Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written.  *Id.*

On the other hand, ambiguous provisions and "equivocal provisions seeking to narrow an insurer's obligation" are strictly construed against the insurer and in favor of coverage.  *Id.* (citations omitted).  However, the rule of strict construction applies only if the ambiguous policy provision is susceptible to more than one reasonable interpretation.  *Id.* (citations omitted).  "The

---

[113] *Id.* at 6-7; R. Doc. 205 at 2-3.
[114] *Id.* at 3.

determination of whether a contract is clear or ambiguous is a question of law." *Id.* (citation omitted). While the insured has the burden of proving that the circumstances constitute a covered claim, the insurer has the burden of proving that any exclusions apply. *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000).

The term "property" is not defined by the AGCS policy. Under the general principles of contract interpretation under Louisiana law, then, the Court will use the "ordinary and generally prevailing meaning." La. Civ. Code art. 2046; *Cadwallader*, 848 So. 2d at 580. The Court must not "create an ambiguity where none exists" where "the terms express with sufficient clearness the parties' intent." *Cadwallader*, 848 So. 2d at 580 (citations omitted). The ordinary definition of property in this context is "a (usually material) thing belonging to a person, group of persons, etc.; a possession; (as a mass noun) that which one owns; possessions collectively; a person's goods, wealth, etc." OXFORD ENGLISH DICTIONARY, "property, n.," (3d ed. 2007). Unlike the terms "the insured vessel" and "temporary substitute watercraft," which are defined and have specific meanings in the policy, the ordinary meaning of "property" includes both vessels involved in this case. Thus, AGCS's excess clause applies when other insurance exists to cover either vessel. This reading makes sense of the "temporary substitute watercraft" provision, where AGCS extends additional coverage to loss related to a vessel other than the specifically-insured vessel and would understandably expect to avoid primary coverage for the substitute vessel where other coverage was in place for it. To interpret the term "property" in the narrow manner suggested by GEICO would "restrict its provisions beyond what is reasonably contemplated by unambiguous terms" and "achieve an absurd conclusion" of providing less coverage to the insured vessel than to a substitute vessel. *Cadwallader*, 848 So. 2d at 580 (citations omitted). Such an interpretation would also prevent the excess clause's application to a substitute vessel, thus frustrating a major

purpose of the excess clause. *See* La. Civ. Code art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."). Thus, the Court agrees with AGCS that the term "property" should have its ordinary meaning, "a thing belonging to a person" or "a possession." Therefore, under the AGCS excess clause, assuming that the conditions for coverage under the "temporary substitute watercraft" provision can be shown, the *M/V Super Strike* qualifies as "property," and GEICO's policy for the *M/V Super Strike* would constitute "other insurance."

"'Other insurance' clauses in one policy may or may not be harmonious with the 'other insurance' clauses contained in another policy or policies providing coverage for a particular claim." *Theriot v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 2731396, at *3 (La. App. June 6, 2018). There are three basic kinds of other insurance clauses: pro rata, excess, and escape. *Citgo Petroleum Corp.*, 690 So. 2d at 167 (quotation omitted). A pro rata clause requires insurers to apportion liability among themselves, usually in proportion to each policy's limits of liability or by contribution of equal shares up to policy limits. *Id.* An excess clause requires that, when other valid and collectible insurance exists (the primary layer), coverage may only be provided when the limits of the primary layer are exhausted. *Id.* An escape clause restricts coverage to instances when no other valid and collectible insurance is available. *Id.*

In reconciling competing "other insurance" clauses, Louisiana law teaches that courts should attempt to give both clauses effect and find them mutually repugnant if doing so leaves the insured with no coverage. *Graves v. Traders & Gen. Ins. Co.*, 214 So. 2d 116, 117 (La. 1968). To enforce conflicting provisions that deprive the insured of coverage "would render all insurance nugatory and produce an absurdity which neither the insured nor the insurers contemplated." *Id.* at 118. When clauses are found to be mutually repugnant, Louisiana courts have held each insurer

liable in proportion to the policy limits or treated each insurer as the co-primary insurer.  *See, e.g.*, *Shelter Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 993 So. 2d 236, 239 (La. App. 2008) (excess vs. excess); *Penton v. Hotho*, 601 So. 2d 762, 768 (La. App. 1992) (excess vs. pro rata); *Dette v. Covington Motors, Inc.*, 426 So. 2d 718, 720 (La. App. 1983) (escape vs. excess); *Lamastus & Assoc. v. Gulf Ins. Co.*, 260 So. 2d 83, 86 (La. App. 1972) (excess vs. pro rata). However, Louisiana courts have not established a blanket equitable remedy that would rewrite potentially conflicting provisions; rather, courts adhere to the terms of the policies as written.  *See Am. Int'l Specialty Lines Ins. Co.*, 352 F.3d at 265-68.

Here, AGCS's policy plainly provides an excess clause, as it states: "If, at the time of a covered loss or damage, there is any other insurance that would apply to the property in the absence of this policy, the insurance under this policy will apply only as excess insurance over the other insurance."[115]  GEICO's policy, on the other hand, includes both an excess clause and a pro rata clause:

> If there is any other available insurance that would apply in the absence of this policy, this insurance shall apply as excess over the other insurance.  However, with respect to Coverage A and Coverage E, the combined amount of available insurance shall not exceed the applicable limits of this policy for any loss.  When this policy and any other policy covers on the same basis, either excess or primary, we will pay only our share.  Our policy bears to the total of the limits of all the policies covering on the same basis.[116]

However, GEICO's pro rata clause applies only when other insurance, either excess or primary, covers a loss on the same basis; it does not provide primary coverage.  The pro rata rate is further delineated as the proportion of GEICO's policy limits as compared to all other applicable policy

---

[115] R. Docs. 192-7 at 22-23; 195-2 at 20-21.
[116] R. Docs. 192-10 at 14; 195-1 at 14.  *See Great Divide Ins. Co. v. Lexington Ins. Co.*, 2017 WL 5148354, at *2 (D. Mass. Nov. 6, 2017) (language identical to the last two sentences described as "a textbook statement of pro rata coverage").

limits.  Thus, GEICO's pro rata clause applies when GEICO's policy and AGCS's policy extend coverage "on the same basis, either excess or primary."

Reading the two "other insurance" clauses together, application of GEICO's excess clause conflicts with AGCS's excess clause, in that each clause purports to make that insurer excess over the other as primary, and thus leaves Boudreau with no primary coverage.  As a result, the excess clauses are mutually repugnant and ineffective, and the Court must treat each insurer as co-primary, determining liability from the remaining provisions of the "other insurance" clauses.  15 WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, LOUISIANA CIVIL LAW TREATISE: INSURANCE LAW & PRACTICE § 7:19 (4th ed. 2018); *Graves*, 214 So. 2d at 118; *see also Gaskin v. Jowers*, 775 F.2d 621, 627 (5th Cir. 1985) (after determining excess clauses were incompatible, analyzed compatibility between apportionment clauses).  The only remaining verbiage of the "other insurance" clauses here is GEICO's pro rata clause.  Application of GEICO's pro rata clause would require GEICO and AGCS to pay in proportion to their policy limits, which is precisely the result under Louisiana law even in the absence of a pro rata clause.  Therefore, assuming each policy provides insurance coverage, the Court holds that the excess clauses are mutually repugnant and cancel each other, making GEICO and AGCS co-primary insurers responsible for their pro rata share of the loss.

### C.  AGCS's Motion for Summary Judgment

AGCS seeks summary judgment on its crossclaim that GEICO owes insurance coverage to Extreme Fishing.  GEICO raises both procedural and substantive arguments in opposition to the motion.

### 1. GEICO's Motion to Strike

As a preliminary matter, the Court will address GEICO's motion to strike AGCS's reply and attached exhibits filed in support of its motion for summary judgment. GEICO initially argues that the reply and exhibits should be stricken because AGCS impermissibly raises in its reply the "new" argument that Extreme Fishing assigned its rights to AGCS.[117] GEICO is wrong. AGCS briefed its assignment-of-rights theory in its original memorandum in support of the motion for summary judgment.[118]

GEICO next argues that the exhibits must be stricken because they are not competent evidence to support AGCS's motion for summary judgment.[119] Attacks on the competency of evidence to support a summary judgment motion should be made in an objection under Rule 56(c)(2) of the Federal Rules of Civil Procedure rather than in a motion to strike. *See Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012). Nevertheless, the Court will consider GEICO's motion as an objection. *See, e.g.*, *Mays v. Bd. of Comm'rs Port of New Orleans*, 2015 WL 13529948, at *1-3 (E.D. La. Oct. 22, 2015) (treating motions to strike summary judgment evidence as objections).

Rule 56(c)(2) permits a party to object to exhibits submitted with a motion for summary judgment when they "cannot be presented in a form that would be admissible in evidence." The exhibits at issue are (1) emails between counsel for Extreme Fishing and AGCS that discuss Extreme Fishing's assignment of rights to AGCS,[120] and (2) a declaration by Michael McMahon, counsel for Extreme Fishing, confirming the authenticity and content of the emails.[121] GEICO

---

[117] R. Doc. 219-1 at 1-2.
[118] R. Doc. 211-1 at 7-8.
[119] R. Doc. 219-1 at 2.
[120] R. Doc. 221-1 at 3-5.
[121] *Id.* at 1-2.

submits that the exhibits "constitute[] double hearsay" because "these emails represent what Extreme Fishing purportedly told its attorney about its acceptance of an offer which was purportedly made by AGCS through its attorney."[122]  GEICO notes that no contract of assignment has been submitted, even though language in the email indicates that "formal documentation of this assignment" was contemplated.[123]  In opposition, AGCS asserts that Extreme Fishing assigned its rights orally through its attorney, as is routine in the insurance industry and as was required by the subrogation provision of the insurance contract.[124]

"'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is not admissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide an exception. Fed. R. Evid. 802.  Rule 56(c)(1)(A) & (4) of the Federal Rules of Civil Procedure is such an exception, as it permits affidavits and declarations to be used by the Court in determining a motion for summary judgment when the affidavit or declaration is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "On a motion for summary judgment, the district court should disregard only those portions of an affidavit [or declaration] that are inadequate and consider the rest."  *Akin v. Q-L Invs.*, 959 F.2d 521, 531 (5th Cir. 1992).

Here, assuming the assignment was confected by counsel as agents for the parties, the email exchange may not be hearsay at all to the extent it effectively embodies, like any other contract,

---

[122] R. Doc. 219-1 at 2.

[123] *Id.* at 2.

[124] R. Doc. 224 at 3-4.  The subrogation provision provides: "1.  An insured may waive in writing before a loss all right of recovery against any person.  If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.  2.  If an assignment is sought, an insured must sign and deliver all related papers and cooperate with us."  R. Doc. 195-2 at 20.

Extreme Fishing's assignment of rights to AGCS. Regardless, the content of the emails may be presented at trial by the testimony of their authors, as agents of the contracting parties and having personal knowledge of the assignment. *See, e.g., Pritchard v. S. Co. Servs.,* 92 F.3d 1130, 1135 (11th Cir. 1996) (an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness). Because the content of the emails may be presented in a form admissible at trial, McMahon's declaration and the emails are competent summary judgment evidence.

### 2. AGCS's Standing

GEICO contends that the Court need not consider the merits of AGCS's motion for summary judgment because AGCS lacks standing to seek insurance coverage for Extreme Fishing under GEICO's policy.[125] GEICO states that AGCS has submitted no evidence to show that AGCS is an insured (as is St. Clair), an additional named insured (as is Extreme Fishing), or an intended third-party beneficiary of the GEICO policy.[126] Although AGCS claims that it has standing because Extreme Fishing assigned its rights against GEICO to AGCS,[127] GEICO insists that AGCS has put forth no competent summary judgment evidence to prove the existence of the assignment.[128] AGCS responds that, in accordance with the subrogation provision of its insurance policy, Extreme Fishing gave AGCS an oral and partial assignment of rights under Louisiana Civil Code of Procedure article 698, as evidenced by the email exchange between counsel and by McMahon's declaration.[129]

The Court has concluded that the email exchange and declaration are competent summary judgment evidence, but the existence of an assignment of rights is not dispositive in determining

---

[125] R. Doc. 213.
[126] *Id.* at 2.
[127] R. Docs. 211-1 at 7-8; 221 at 1-2.
[128] R. Doc. 213.
[129] R. Doc. 221 at 1-2.

AGCS's standing to pursue its claim of coverage for Extreme Fishing under the GEICO policy. Article III of the Constitution of the United States specifies that a federal court's "power extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1547 (2016). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," which developed in the jurisprudence "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Id.* (citation omitted). The standing "doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* (citations omitted).

A plaintiff must establish standing as to each claim asserted. *Town of Chester v. Laroe Estates, Inc.*, __ U.S. __, 137 S. Ct. 1645, 1650 (2017). The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180-81 (2000)).

"In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984). Generally, the plaintiff "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Here, GEICO cites *Williams v. Certain Underwriters of Lloyd's of London*, 398 F. App'x 44, 47 (5th Cir. 2010), and *Brown v. American Modern Home Insuranc Co.*, 2017 WL 2290268, at *4 (E.D. La. May 24, 2017), for the proposition that an insured, an additional named insured,

and a third-party beneficiary of an insurance policy are the only persons who can bring suit against the insurer for coverage under the policy.[130]  Under *Williams*, "[a] plaintiff has standing to sue under an insurance policy if the plaintiff is a named insured or an additional named insured, or if the plaintiff is an intended third-party beneficiary of the policy."  398 F. App'x at 47 (citing *Joseph v. Hosp. Serv. Dist. No. 2. of the Par. of St. Mary*, 939 So. 2d 1206, 1211 (La. 2006), and La. Civ. Code art. 1978).  But *Williams* dealt with a "force-placed" or "lender-placed" flood insurance policy acquired by a mortgagee when the mortgagors had failed to maintain their flood insurance policy.  *Id.* at 45.  There, the mortgagors sought coverage under the force-placed insurance policy that specifically excluded any insurable interests of the owner or any other persons in the insured property, such as the mortgagors.  *Id.* at 46.  The court found the mortgagors lacked standing to assert a coverage claim under the terms of the policy.  *Id.* at 49.  GEICO does not argue that AGCS lacks standing because its policy by its terms excludes recovery by AGCS on behalf of its own insured, Extreme Fishing.  Therefore, *Williams* is inapposite.

The *Brown* decision is more instructive.  There, the court read *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 593 (5th Cir. 2016), which was decided after *Williams*, as holding that a non-insured and non-third-party beneficiary had standing to pursue a coverage claim where the plaintiffs alleged they would be harmed "by underpayment of insurance proceeds and they would indirectly benefit from judgment against the insurers."  *Brown*, 2017 WL 2290268, at *3.  Here, AGCS alleges that it has incurred and will continue to incur costs in defending Extreme Fishing that it would avoid as the excess insurer of Extreme Fishing if GEICO were held to owe primary coverage.[131]  In doing so, AGCS alleges an indirect injury that results

---

[130] R. Doc. 213 at 2 & n.4.
[131] R. Doc. 190 at 3 ¶ 10 ("Because Extreme Fishing is afforded coverage under the GMIC Policy, AGCS is therefore the excess insurer of Extreme Fishing and entitled to reimbursement from GEICO for all defense costs incurred to date related to the defense of Extreme Fishing.").

from GEICO's refusal to insure Extreme Fishing as the primary insurer, and AGCS would benefit by a judgment on coverage against GEICO. Therefore, even though AGCS is not the named or additional insured or a third-party beneficiary under the GEICO policy, AGCS has Article III standing to pursue its claim against GEICO. *See id.*

### 3. Oral, Partial Assignment of Rights

Having determined that AGCS has standing, the Court turns to the merits of AGCS's summary judgment motion. AGCS attempts to meet its burden of demonstrating an entitlement to recover under the GEICO policy by arguing that it steps into the shoes of Extreme Fishing – an additional insured named in the GEICO policy endorsement as bareboat charterer – through an oral, partial assignment of rights. Under Louisiana law, an assignment of rights may be made by oral contract. *La. Mobile Imaging, Inc. v. Ralph L. Abraham, Jr., Inc.*, 21 So. 3d 1079, 1082 (La. App. 2009). To prove the existence of an oral contract valued at more than $500, there must be "at least one credible witness and other corroborating circumstances." La. Civ. Code art. 1846. While the plaintiff may serve as the witness, the plaintiff cannot also supply the corroborating circumstances. *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 58 (La. 2005). "'[C]orroborating circumstances' may be general and need not prove every detail." *Klein v. ABC Ins. Co.*, 2015 WL 8479017, at *5 (La. App. Dec. 9, 2015).

As proof of the oral assignment, AGCS offers emails exchanged between its counsel and counsel for Extreme Fishing, as confirmed by McMahon's declaration, and the subrogation clause of its contract. This evidence suggests that McMahon, as agent for Extreme Fishing, served as witness to the contract of assignment. The email exchange begins with Frederick Swaim, attorney for AGCS, proposing that Extreme Fishing make an assignment of rights: "How about assigning rights to AGCS for amounts paid/to be paid, *as required by the policy*. We will then stand in your

client's shoes on a crossclaim and no issues with whether AGCS can assert directly and under what theory."[132]  McMahon replied with two emails confirming Extreme Fishing's "assignment of its claims for defense and indemnity from GEICO Marine Insurance Company to AGCS Marine Insurance Company."[133]  Further, the insurance contract provides corroborating circumstances to establish the assignment, as it states: "An insured may waive in writing before a loss all right of recovery against any person.  If not waived, we **_may require_** an assignment of rights of recovery for a loss to the extent that payment is made by us."[134]  Thus, the AGCS policy requires an insured to assign its rights to AGCS when AGCS asks.  Certainly, Swaim's email to McMahon would be such a request, and McMahon's affirmative replies represent Extreme Fishing's acknowledgement of its obligation under the policy.  Thus, in the context of this litigation and the AGCS policy, there is no other reasonable conclusion than that Extreme Fishing assigned to AGCS its rights against GEICO for amounts paid or to be paid by AGCS on behalf of its insured.  Consequently, AGCS stands in the shoes of Extreme Fishing to assert coverage as a bareboat charterer under the GEICO policy.

GEICO contends, though, that Extreme Fishing's assignment of rights to AGCS was complete rather than partial, thus precluding Extreme Fishing from judicially enforcing any rights under the GEICO policy, and so creating a conflict.[135]  Under Louisiana Code of Civil Procedure article 698, "[a]n incorporeal right which has been assigned … shall be enforced judicially by: (1)

---

[132] R. Doc. 221-1 at 3 (emphasis added).

[133] *Id.* at 4.

[134] R. Docs. 192-7 at 22; 195-2 at 20 (emphasis added).

[135] R. Docs. 219-1 at 3-4; 229 at 3.  GEICO also contends that the purported assignment is properly characterized as a sale of litigious rights under Louisiana Civil Code article 2652 which requires payment, but that none was given.  R. Doc. 229 at 3.  As noted by AGCS, GEICO makes this argument for the first time in its reply brief, which is impermissible.  R. Doc. 235 at 1-2.  Nevertheless, GEICO's argument is without merit, as the subrogation provision does not require additional payment.  *See* R. Docs. 192-7 at 22; 195-2 at 20.  Moreover, a right is litigious under Louisiana Civil Code article 2652 when it is contested in a suit already filed.  Here, the right was not contested at the time it was assigned; AGCS filed its crossclaim against GEICO on September 5, 2018, after Extreme Fishing assigned its rights to AGCS on July 16, 2018.  *See* R. Docs. 190; 221-1 at 3-4.

The assignor and the assignee, when the assignment is partial; or (2) The assignee, when the entire right is assigned." GEICO oddly asserts that the emails do not reflect a partial assignment of rights,[136] but the emails plainly state that Extreme Fishing only assigns its rights against GEICO "for amounts paid/to be paid, as required by the policy."[137] Thus, Extreme Fishing would be free to pursue its right to indemnity and defense against GEICO for litigation expenses not covered by the AGCS policy. Although the Court previously determined that AGCS has a duty to defend Extreme Fishing,[138] it turns now to the separate question of coverage under the GEICO policy.

### 4. Insurance Coverage

In its motion, AGCS seeks a summary judgment recognizing that Extreme Fishing, as bareboat charterer, and Wetzel, Extreme Fishing's owner, are entitled to primary coverage against Plaintiffs' claims under the GEICO policy issued to cover the *M/V Super Strike*. AGCS argues that the plain language of the policy provides coverage for a charterer when the insured vessel is used for a bareboat charter. Because the Court has previously ruled that Extreme Fishing was a bareboat charterer of GEICO's insured vessel, the *M/V Super Strike*, on the day of the collision,[139] AGCS contends that Extreme Fishing and Wetzel are covered by GEICO's policy.[140] The Court agrees.

The GEICO policy states in pertinent part:

While the **insured boat** is in service as a **Bareboat Charter** …, then **"you"**, **"your"**, **"insured"**, and **"insured person"** also include a charterer operating the **insured boat**, a licensed captain, a certified instructor, and the Management Company named on this endorsement.[141]

---

[136] R. Doc. 219-1 at 3.
[137] R. Doc. 221-1 at 3.
[138] R. Doc. 191.
[139] R. Doc. 186 at 16.
[140] R. Doc. 211-1 at 4-7.
[141] R. Docs. 192-10 at 19; 195-1 at 19.

Under the policy, the term "bareboat charter" means "a legal bareboat charter as defined by the United States Coast Guard in the Code of Federal Regulations and any applicable endorsement to these regulations."[142]  The GEICO policy clearly and unambiguously provides coverage for "a charterer operating the insured boat" – Extreme Fishing – when the "insured boat is in service as a Bareboat Charter" – as the *M/V Super Strike* was on the day of the collision.[143]  As decided above, GEICO's layer of coverage for Extreme Fishing and Wetzel is co-primary with the coverage AGCS owes to them.

### D. Extreme Fishing's Motion for Summary Judgment – Limitation of Liability

Under the Limitation of Liability Act, "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight."  46 U.S.C. § 30505(a).  Claims subject to limitation include "any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without privity or knowledge of the owner."  *Id.* § 30505(b).  The protections of the Limitation of Liability Act extend not only to vessel owners but to bareboat or demise charterers, who are considered vessel owners for the purposes of the act.  *See id.* § 30501; *see also Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir. 1979) ("A complete transfer of possession, command, and navigation of the vessel from the owner to the charterer is required in order to constitute a demise charter.  It is therefore tantamount to, though just short of, an outright transfer of ownership.") (citations and quotation omitted); *In re Martell*, 742 F. Supp. 1147, 1152 (S.D. Fla. 1990) ("To seek the benefits afforded under the Limitation of Liability Act it is necessary, as

---

[142] R. Docs. 192-10 at 5; 195-1 at 5.  "*Demise charter* means a legally binding document for a term of one year or more under which for the period of the charter, the party who leases or charters the vessel, known as the demise or bareboat charterer, assumes legal responsibility for all of the incidents of ownership, including insuring, manning, supplying, repairing, fueling, maintaining and operating the vessel. The term demise or bareboat charterer is synonymous with 'owner pro hac vice.'"  46 C.F.R. § 169.107.

[143] *See* R. Doc. 186 at 8-17.

a threshold, that the party establish itself as either the owner or bareboat charterer of the vessel in question.") (citations omitted).  In this case, the Court has previously held that Extreme Fishing was the bareboat charterer of the *M/V Super Strike* on the day of the collision.[144]  Therefore, Extreme Fishing may seek to limit its liability under the act.

To determine whether a vessel owner is entitled to limitation, a court conducts a two-step analysis:

> First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident.  Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness.  Knowledge or privity of any fact or act causing the accident is not enough for denial of limitation; it is only knowledge or privity of negligent acts or unseaworthy conditions which trigger a denial of limitation.  And, although the petitioner in limitation bears the burden of proving lack of privity or knowledge, the initial burden of proving negligence or unseaworthiness rests with the libellants.

*Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976) (citations omitted).  However, where the accident was caused by a navigational error or other negligence committed by the master or crew at sea, the vessel owner is entitled to limit liability so long as the owner exercised reasonable care in selecting the master.  *In re Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996) (quoting *Cont'l Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.15 (5th Cir. 1983), and *Mac Towing, Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982)).

As previously determined by the Court, Extreme Fishing owes no duty of seaworthiness to its passengers.[145]  As a consequence, the scope of Extreme Fishing's potential liability is narrowed to allegations of negligence under general maritime law.  *See In re Kristie Leigh*, 72 F.3d at 481 n.2 (unseaworthiness not considered in limitation analysis where duty to provide seaworthy vessel did not extend to claimants).

---

[144] *Id*. at 16.
[145] R. Doc. 84 at 6.

The claimants here (including Plaintiffs, GEICO, Boudreau, St. Clair, and TK Boat Rentals) contend that Extreme Fishing had privity or knowledge of Boudreau's acts of negligence in operating the vessel and in failing to inspect the vessel for defects.[146] Owners and bareboat charterers have "a duty to inquire about conditions and practices likely to produce or contribute to loss, unless appropriate means are adopted and adhered in order to prevent loss." *Gabarick v. Laurin Mar. (Am.), Inc.*, 900 F. Supp. 2d 669, 677 (E.D. La. 2012) (citing *Avera v. Fla. Towing Corp.*, 322 F.2d 155, 156 (5th Cir. 1963)). "Privity and knowledge are deemed to exist where the owners had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection." *Id.* (citing *China Union Lines, Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966)). Negligent failure to maintain equipment aboard a vessel, where such failure contributes to the accident, generally precludes limitation. *See Brister v. A.W.I., Inc.*, 946 F.2d 350, 356 (1991) (citing *In re Read*, 224 F. Supp. 241, 251 (S.D. Fla. 1963) (negligent failure to inspect could preclude limitation), and *Verdin v. C & B Boat Co.,* 860 F.2d 150, 156 (5th Cir. 1988) (failure to inspect equipment on regular basis constituted "continuing act of negligence" sufficient to preclude limitation)).

On this record, the Court cannot resolve the first prong of the limitation analysis: it cannot determine whether the engine's failure or Boudreau's failure to sound the horn caused or contributed to the collision. While Boudreau testified that he intended to put the *M/V Super Strike* in neutral, other passengers testified that the vessel never changed speed.[147] Also contrary to Boudreau and Rogers' testimony, the passengers testified that only the starboard engine was fully

[146] TK Boat Rentals also argues that Extreme Fishing had privity and knowledge of Boudreau's failure to get the hours of sleep mandated by statute. The Court is unpersuaded that Boudreau's sleeplessness is relevant to the incident for the reasons previously stated by the Court in denying TK Boat Rentals' negligent entrustment claim. R. Doc. 186 at 19-20.

[147] R. Docs. 247-3 at 25, 58-65, 73 (Boudreau testimony); 251-1 at 13 (Siria testified that he believed the *M/V Super Strike* crossed the river at five to ten miles per hour, and that the vessel was never adrift); 251-3 at 8-9 (Edwards testified that, seconds prior to the collision, the *M/V Super Strike* had slowed).

operational as the *M/V Super Strike* crossed the river.[148]  Additionally, Rogers' testimony that the engines were in reverse just prior to the collision conflicts with Boudreau's testimony that the *M/V Super Strike* was in neutral.[149]  These disputed facts, together with the undisputed testimony about the earlier occurrences of engine stalling, raise questions about whether the engine failure contributed to the collision.  Furthermore, it is undisputed that Boudreau did not use his horn to signal his intentions, that he never kept the horn within his reach in the wheelhouse, and that Wetzel hired Boudreau because of his experience fishing with Boudreau.[150]  It would be reasonable to infer from these facts that Extreme Fishing may have had knowledge of at least one of Boudreau's allegedly negligent practices, which compromises its ability to limit liability at this juncture.  But, of course, Extreme Fishing rejects any such inference.  Given the foregoing disputes, the Court cannot conclude on summary judgment that either Boudreau's failure to inspect the vessel or his failure to sound the horn was or was not a cause of the collision.  Therefore, granting Extreme Fishing the right to limit its liability is inappropriate at this time.  *See Howard v. Offshore Liftboats, LLC*, 2016 WL 74448, at *2 (E.D. La. Jan. 6, 2016) ("summary judgment is not available on claims for limitation of liability before it has been determined which acts of negligence or conditions of unseaworthiness caused the incident-in-question") (citing *In re OMI Envtl. Sols.*, 2014 WL 2158492 (E.D. La. May 23, 2014)).

---

[148] R. Docs. 247-3 at 47; 251-5 at 3; 253-5.

[149] R. Docs. 247-3 at 62-63, 65; 251-5 at 5.

[150] R. Docs. 251-2 at 10-12; 251-6 at 4.  Although Boudreau's failure to sound the horn would constitute a rule violation, *see* 33 C.F.R. § 83.34, Plaintiffs do not argue that the *Pennsylvania* Rule applies.  Nonetheless, the Court is cognizant that the *Pennsylvania* Rule may well apply in these circumstances, shifting the burden to Extreme Fishing to show that Boudreau's violation, and, by extension, Extreme Fishing's negligent hiring of Boudreau, could not have contributed to the accident.  *See, e.g., Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d 724, 736-37 (5th Cir. 1969) (applying the *Pennsylvania* Rule in an unseaworthiness case to preclude limitation).

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion of Andre Boudreau and GEICO Marine Insurance Company for summary judgment (R. Doc. 192) is DENIED.

IT IS FURTHER ORDERED that the motion of Andre Boudreau and GEICO Marine Insurance Company to strike (R. Doc. 219) is DENIED.

IT IS FURTHER ORDERED that the motion of AGCS Marine Insurance Company for summary judgment (R. Doc. 211) is GRANTED IN PART.  On the issue of competing "other insurance" clauses, the Court concludes that GEICO and AGCS are co-primary insurers responsible for their pro rata share of the loss.  To the extent AGCS seeks relief in its motion for summary judgment at variance with the Court's ruling that AGCS and GEICO are co-primary insurers for the loss, the motion is DENIED IN PART.

IT IS FURTHER ORDERED that Extreme Fishing's motion for summary judgment on its right of limitation of liability (R. Doc. 247) is DENIED.

New Orleans, Louisiana, this 7th day of August, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE