## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN THE MATTER OF THE COMPLAINT OF TK BOAT RENTALS, LLC, AS OWNER AND OPERATOR OF THE M/V MISS IDA**<br><br>**PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY** | **CIVIL ACTION**<br><br>**NUMBER:  2:17-cv-01545**<br>          **c/w 2:17-cv-02446 and**<br>                **2:17-cv-3657**<br><br>**SECTION:**<br>**JUDGE BARRY W. ASHE ("M")**<br><br>**DIVISION:**<br>**MAGISTRATE JUDGE KAREN WELLS ROBY ("4")**<br><br>*This Document Relates to:  ALL CASES* |

## <u>PRETRIAL ORDER</u>

1.   **DATE**

A pretrial conference was held before the Honorable Barry W. Ashe, United States District Judge on Wednesday, September 11, 2019, at 10:30 a.m.

2.   **APPEARANCES**

For Claimants/Plaintiffs, Patrick A. Beck, individually and as the father and administrator of the estate of his minor son, C. D. B., Justin McCarthy, and Michael Harrell (hereinafter "Plaintiffs"):

> Irving J. Warshauer
> La. Bar. No. 13252
> Brittany R. Wolf
> La. Bar No. 36733
> Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
> 2800 Energy Centre
> 1100 Poydras Street
> New Orleans, Louisiana 70163
> Telephone: (504) 522-2304

For Plaintiff, Andre D. Boudreau (hereinafter "Captain Boudreau"):

> Ross F. Lagarde
> La. Bar No. 27542
> Ross F. Lagarde, APLC
> 2250 Gause Boulevard East, Suite 301
> Slidell, Louisiana 70461
> Telephone: (985) 605-0527

For Complainants/Defendants, Andre D. Boudreau, GEICO Marine Insurance Company, and Chase B. St. Clair (hereinafter "Captain Boudreau," "GEICO," "St. Clair" or "Defendants"):

> Jedd S. Malish
> La. Bar No. 23846
> King & Jurgens, LLC
> 201 St. Charles Avenue, 45th Floor
> New Orleans, Louisiana 70170
> Telephone: (504) 582-3800

For Defendant, Extreme Fishing, L.L.C. (hereinafter "Extreme Fishing"):

> Michael W. McMahon
> La. Bar No. 23987
> Kirk N. Aurandt
> La. Bar No. 25336
> Daigle, Fisse & Kessenich
> 227 Highway 21
> Madisonville, Louisiana 70447
> Telephone: (985) 871-0800

For Complainant/Defendant, TK Boat Rentals, LLC as the owner and operator of the M/V MISS IDA (hereinafter "TK Boat Rentals" or "Defendant"):

> Harry E. Morse, VI
> La. Bar No. 31515
> Martin S. Bohman T/A
> La. Bar No. 22005
> Bohman Morse, LLC
> 650 Poydras Street, Suite 2710
> New Orleans, Louisiana 70130
> Telephone: (504) 930-4009

For Defendant, AGCS Marine Insurance Company (hereinafter "AGCS"):
Frederick W. Swaim, III
La. Bar No. 28242
Emmitt L. DuBose, III
La. Bar No. 35113
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
Telephone: (504) 525-6802

3.   DESCRIPTION OF PARTIES

Plaintiff, Patrick A. Beck, is a person of the full age of majority and resident of and domiciled in Maumelle, Arkansas. Mr. Beck is the lawful father of his minor son, C. D. B., who is now seventeen years old. Plaintiff, Justin McCarthy, is a person of the full age of majority and is a resident of and domiciled in Conway, Arkansas. Plaintiff, Michael Harrell, is a person of the full age of majority and is a resident of and domiciled in Conway, Arkansas. Mr. Beck, individually and as the father and administrator of the estate of C. D. B., Mr. McCarthy, and Mr. Harrell,[1] filed a lawsuit against TK Boat Rentals, Captain Boudreau, Extreme Fishing, St. Clair, GEICO, and AGCS for their injuries and damages arising out the collision between the M/V MISS IDA and the M/V SUPER STRIKE, on which Plaintiffs were passengers, that occurred in the Mississippi River on February 12, 2017. They also filed claims in the limitation actions of St. Clair, Captain Boudreau, and TK Boat Rentals.

Captain Boudreau was operating M/V SUPER STRIKE on behalf of Extreme Fishing at the time of the collision with M/V MISS IDA.

GEICO is defending St. Clair and Captain Boudreau against the claims asserted by the Claimants and counterclaims of TK Boat Rentals.  GEICO was named as a defendant by the

---

[1] The original Plaintiffs were Patrick A. Beck, individually and as the father and administrator of the estate of his minor son, C.D.B., Tracy L. Edwards, Justin McCarthy, Michael Harrell, and Charles N. "Nick" Siria.  *See* Complaint for Damages at ¶¶1–5 (Doc. 1 in consolidated action No. 17-02446).  The claims of Tracy L. Edwards and Charles N. "Nick" Siria have since been dismissed on summary judgment, *see* Order and Reasons (Doc. 84 in

Claimants under the direct-action statute.   GEICO and Captain Boudreau have asserted a crossclaim against AGCS for defense and indemnity under its policy.   GEICO is defending the counter crossclaim of AGCS for defense and indemnity for Troy Wetzel (hereinafter "Wetzel") and Extreme Fishing for defense and indemnity under its policy.

St. Clair was the owner of M/V SUPER STRIKE.   GEICO issued a Charter Boat Policy providing hull and P&I coverage to St. Clair.   Captain Boudreau chartered M/V SUPER STRIKE on behalf of Extreme Fishing.

Defendant, Extreme Fishing, is a single member limited liability company organized and existing under the laws of the State of Louisiana.

TK Boat Rentals was the owner and operator of the M/V MISS IDA. TK Boat Rentals has filed a Complaint for Exoneration from or Limitation of Liability.

AGCS is an admitted insurance carrier named as a defendant in this matter by Plaintiffs under the Louisiana Direct Action Statute as the alleged insurer of Wetzel and Extreme Fishing. Co-defendants St. Clair, Boudreau, and GEICO subsequently filed a Cross-Claim against AGCS alleging the AGCS policy also provides co-primary coverage for Captain Boudreau. AGCS then filed a Cross-Claim against GEICO alleging the GEICO policy provided coverage to Mr. Wetzel and Extreme Fishing.

**4.   JURISDICTION**

    a)    With respect to Plaintiffs' claims, jurisdiction in this matter is based upon 28 U.S.C. § 1333(1) for claims arising under federal maritime law and diversity of citizenship under 28 U.S.C. § 1332(a)(1). The parties stipulate that the amount in controversy exceeds $75,000.

    b)    Jurisdiction over the limitation actions is based upon 28 U.S.C. § 1333(1) for claims arising under 46 U.S.C. § 30505 of the federal maritime law.  The question

---

No. 17-01545), and those dismissals were affirmed on appeal to the U.S. Fifth Circuit, *see In re TK Boat Rentals, L.L.C.*, 738 Fed. Appx. 826 (5th Cir. 2018) (per curiam) (Doc. 217 in No. 17-01545).

of Limitation of Liability is one that is cognizable only under the Court's admiralty or maritime jurisdiction. 28 U.S.C. § 1333(1).

c)    This Court has jurisdiction over AGCS's claims under 28 U.S.C. §1333 because the claims fall within maritime jurisdiction. The Court has already granted AGCS's claims through summary judgment.

d)    Factual Basis Supporting the Claims of St. Clair, Captain Boudreau and GEICO - Captain Boudreau and GEICO have asserted a crossclaim against AGCS for defense and indemnity under its policy issued to Wetzel. Captain Boudreau is an insured under the AGCS Policy.  The AGCS provides primary coverage to Captain Boudreau for the casualty.  GEICO also seeks to recover from AGCS the portion of the $82,500 it paid to St. Clair for the total loss of M/V SUPER STRIKE as a result of the collision with M/V MISS IDA which may be attributable to the negligence of Captain Boudreau.  This claim is brought pursuant to the Court's admiralty jurisdiction.  GEICO has a counterclaim against TK Boat Rentals to recover the $82,500 it paid to St. Clair for the total loss of M/V SUPER STRIKE as a result of the collision with M/V MISS IDA.  This claim is brought pursuant to the Court's admiralty jurisdiction.

e)    Jurisdiction is established and is not contested.

## 5.   MOTIONS

a)    There are no motions currently pending before the Court.

b)    The parties may file motions in limine concerning evidentiary issues that may arise during the trial and on exhibit objections noted in this pretrial order. These motions and any other motions in limine must be filed by September 9, 2019. Responses to motions in limine must be filed by September 16, 2019.

    a.    Extreme Fishing anticipates filing the following motions in limine concerning: (1) the applicability of 46 U.S.C. §8104; (2) evidence of Extreme Fishing's alleged privity or knowledge being presented to the jury; and, (3) to exclude evidence of inapplicable Inland Rules of the Road.

c)    In its Order and Reasons of August 9, 2019, the Court instructed AGCS to file a motion regarding the amount of defense costs that AGCS must reimburse Captain Boudreau if AGCS and Captain Boudreau were not able to resolve the issue amicably.[2]  Despite such efforts, GEICO refuses to compromise on this issue, and AGCS is pursuing summary judgment per the Court's Order and Reasons requesting that the Court define the amount of defense costs AGCS must reimburse to Captain Boudreau. Meaning, AGCS is asking the Court to rule on what portion of Captain Boudreau's counsel's fees AGCS is responsible for, given that Captain Boudreau's counsel also represents two other defendants and

---

[2] Rec. Doc. 279, at 6.

performed a significant amount of coverage work in addition to defending Captain Boudreau on the merits. Additionally, AGCS is filing a motion to strike several irrelevant statements and allegations inserted into this Pretrial Order by GEICO and Captain Boudreau concerning issues that have already been adjudicated by the Court and a bad faith claim that GEICO and Captain Boudreau never pled in the litigation.

6. **BRIEF SUMMARY OF MATERIAL FACTS CLAIMED BY THE PARTIES:**

   a) **<u>Plaintiffs</u>**

This case arises from a boating collision between the M/V SUPER STRIKE and the M/V MISS IDA in the early morning of February 12, 2017. Prior to February 12, 2017, Plaintiff, Patrick Beck, made arrangements with Extreme Fishing, through its owner, Wetzel, for Plaintiffs' fishing trip in Louisiana. On the morning of February 12, 2017, Plaintiffs, along with two of their friends, Tracy Edwards and Charles "Nick" Siria, were supposed to depart from the Venice Marina on one of Extreme Fishing's vessels, the KINGFISH, operated by one of its captains, Defendant, Captain Boudreau. However, that fishing vessel became inoperable the previous day when its port propeller inexplicably spun off. Consequently, Captain Boudreau, on behalf of Extreme Fishing, made arrangements for Plaintiffs to be taken on a fishing boat, the M/V SUPER STRIKE, owned by Defendant, St. Clair, and to be operated by Captain Boudreau. There is no evidence to suggest that Captain Boudreau conducted an inspection of the M/V SUPER STRIKE, particularly its two motors, to ensure the vessel was in working order before departing with Plaintiffs. The weather that morning was very cool, and visibility was limited to about 300 feet at the marina due to dense fog. The M/V SUPER STRIKE left the marina at approximately 7:00 a.m. with Captain Boudreau as the operator and Mitchell Rogers as the deckhand. Once the M/V SUPER STRIKE reached the Mississippi River, the temperature dropped even lower, and the fog became thicker, reducing visibility to about 150 feet.

6

From the time the M/V SUPER STRIKE departed the marina to the time of the collision, one of its two motors died numerous times.  At some point before reaching the Mississippi River, Captain Boudreau pulled the vessel next to an oil and gas structure to inspect and to attempt to fix the faulty motor.   Believing the motor to be operable, Captain Boudreau continued to the Mississippi River.  After reaching the Mississippi River, the M/V SUPER STRIKE picked up speed until the faulty motor failed again, causing the vessel to lurch sharply to the right.  Captain Boudreau attempted to restart the motor, and the vessel idled in the River as other boats sped past.  At that point, Captain Boudreau made the decision to cross the Mississippi River, instead of returning to the Venice Marina.  The M/V SUPER STRIKE proceeded to cross the River with only one fully operational motor.  At no point during the crossing of the Mississippi River did Captain Boudreau use the vessel's horn to warn other vessels of the M/V SUPER STRIKE's presence, despite the reduced visibility.

As the M/V SUPER STRIKE was crossing the Mississippi River, another vessel, later identified as the M/V MISS IDA, owned by TK Boat Rentals and captained by its employee, Shane LeBlanc (hereinafter "Captain LeBlanc"), emerged from the dense fog about 150 feet away from the M/V SUPER STRIKE. The M/V MISS IDA was traveling at a fast rate of speed without any lights or a lookout in the severely reduced visibility conditions.  Shortly thereafter, the M/V MISS IDA violently collided with the M/V SUPER STRIKE at a perpendicular angle with enough force for the M/V MISS IDA to travel up onto the bow of the M/V SUPER STRIKE and to rip the captain's console from the vessel.  Plaintiffs, Patrick Beck and C. D. B., who were lying on bean bags at the bow of the M/V SUPER STRIKE, were trapped beneath the M/V MISS IDA as the M/V SUPER STRIKE began to take on water.

At first, Mr. Siria attempted to pull C. D. B. free by his legs, but the weight of the M/V MISS IDA prevented C. D. B. from moving. Once C. D. B. was submerged by the water gathering at the bottom of the M/V SUPER STRIKE, the M/V MISS IDA had gained enough buoyancy for Mr. Siria to slide C. D. B. out from underneath that vessel's bow. However, Mr. Beck remained trapped in the rising water. The passengers and crewmembers of the M/V SUPER STRIKE kept trying to push the M/V MISS IDA back and telling Captain LeBlanc to reverse the M/V MISS IDA off of Mr. Beck, but the vessel would not move. With the efforts of the passengers and crewmembers of the M/V SUPPER STRIKE and Captain LeBlanc reversing the boat, the M/V MISS IDA finally receded from the M/V SUPER STRIKE, and Mr. Siria was able to pull Mr. Beck from the water. After Mr. Beck and C. D. B. were freed from beneath the bow of the M/V MISS IDA, the passengers of the M/V SUPER STRIKE, along with Captain Boudreau and Mitchell Rogers, boarded the M/V MISS IDA and were transported to the nearest Coast Guard station.

The evidence has established that both Captains Boudreau and LeBlanc were negligent in their operation of the M/V SUPER STRIKE and M/V MISS IDA, respectively, and that their negligence caused this boating casualty and Plaintiffs' injuries and damages. Both captains violated several U.S. Coast Guard Inland Rules of the Road. In addition, the owners, bareboat charterer, and operators of these vessels are not entitled to limitation of liability because they had knowledge or privity of the negligence of the captains and the defective conditions of the two vessels. Moreover, TK Boat Rentals, as the owner of the M/V MISS IDA and employer of Captain LeBlanc, was at fault for having unsafe practices and policies with respect to the operation of its vessels, including not requiring a lookout in severely restricted visibility conditions.

### (1)     Patrick Beck

As above stated, Mr. Beck was trapped underneath the bow of the M/V MISS IDA as the M/V SUPER STRIKE was quickly taking on water.  After a period of time, others on the fishing boat were finally able to pull Mr. Beck from beneath the M/V MISS IDA and out of the water. At that time, he did not appear to be breathing, and he had a substantial amount of blood coming from his face and head area.  Fortunately, he eventually took a gasp of air, threw up a lot of blood and water, and started breathing.  As a result of the boating casualty, Mr. Beck suffered numerous, severe cranial facial fractures and other injuries.

Mr. Beck has required extensive treatment, including surgeries, for his injuries.  He was hospitalized at University Medical Center – New Orleans from February 12–21, 2017.  He then came under the care of numerous physicians at University of Arkansas for Medical Sciences (UAMS).  On February 22, 2019, Mr. Beck had surgery at UAMS for the diplopia in his right eye in an effort to expand his peripheral vision to lessen his requirement for face turn.  Two of the more severe residuals of Mr. Beck's injuries are the total loss of hearing and constant tinnitus (i.e., ringing) in his left ear.  He had left middle ear reconstruction surgery for these problems on December 14, 2017, which proved unsuccessful.  He then underwent a cochlear implant in his left ear on March 28, 2019.  As of this date, the cochlear implant has not significantly reduced the tinnitus in Mr. Beck's left ear and has actually caused other complications.

Mr. Beck has undergone neuropsychological testing and assessment on two separate occasions.  The test results and data, which were determined to be valid, have established that Mr. Beck has permanent mild-moderate impairments in several areas of brain functions, and he is at risk for future development of neurologically based cognitive disorders, such as seizures and/or early onset dementia.

9

To date, Mr. Beck's medical and hospital bills have totaled $243,368. However, Mr. Beck is still undergoing treatment and is incurring additional medical expenses. The present values of his projected future medical costs range from $144,157 to $317,332. Furthermore, based on a vocational analysis by Tanya Owen, Ph.D., Dr. Randy Rice computed the present values of Mr. Beck's loss of earning capacity to range from $55,865 to $191,802.

### (2)   C. D. B.

C. D. B., who was 14 years old at the time of the collision, was also trapped underneath the M/V MISS IDA on the bow of the M/V SUPER STRIKE and, as his father, he was quickly being submerged in the frigid Mississippi River water that the fishing boat took on after the collision. His legs were observed to be shaking. Eventually, other passengers were able to free him from being pinned under the M/V MISS IDA. C. D. B. then witnessed the ordeal with his father, watched him cough up blood, water, and broken teeth, and saw the other visible injuries to Mr. Beck. On the trip to the Coast Guard station, C. D. B. had to be wrapped in blankets because he was "freezing."

C. D. B. was initially treated at University Medical Center – New Orleans where he was found to have a fracture of the left frontal sinus wall and other facial fractures, including an orbital fracture. He has been seen by the Becks' family physician, and he has also received counseling from pastors at his church for the emotional distress he suffered from this traumatic event. C. D. B.'s medical expenses to date total $4,558.

### (3)   Justin McCarthy

When Mr. McCarthy noticed that the M/V MISS IDA was going to strike the M/V SUPER STRIKE, he "dove to the back of the boat." He has no recollection of the time from when he took that evasive action to when he got up. At that point, all he could see was Mr. Beck

underneath the M/V MISS IDA at the bow of the fishing boat, and Mr. Beck was not moving. He first assisted Mr. Siria and Captain Boudreau in trying to push the M/V MISS IDA off the M/V SUPER STRIKE, and then he helped in rescuing Mr. Beck.  When questioned about how this casualty has affected him, Mr. McCarthy responded: "as far as myself personally, I just don't know that I've really just kind of taken it all in yet.  I don't really think – I think of still to this day don't even grasp the – the severity of the situation on what could have happened.  Glad to be alive, and that's all about I can really sum that up in."  After the incident, Mr. McCarthy missed a week from his job, and during that time, he went to see his family physician to whom he reported that during the incident he had been "knocked unconscious" and did not remember the impact.  He complained that he had neck stiffness and back pain, for which he was prescribed anti-inflammatory medication.  Mr. McCarthy incurred medical bills in the sum of $262.

### (4)    Michael Harrell

Immediately following the collision, Mr. Harrell, who served in the military in Iraq,  was "shocked" and "very shook up."  He described the collision as "the most horrific experience that [he has] been a part of since [he] was in Iraq."  Mr. Harrell reflected on the collision, lamenting that carelessness nearly caused his friend's death, a notion that "really screwed [him] up."  Mr. Harrell's colleagues have observed a difference in his personality, noting that he often appears "melancholy," and they have encouraged him to seek psychological help. Mr. Harrell testified that the joy he once derived from being on boats has been replaced with fear and anxiety.

### b)    **Plaintiff, Captain Boudreau**

Captain Boudreau, in his capacity as a claimant into this limitation of liability proceeding, adopts by reference the summary of material facts, uncontested facts, contested issues of fact and contested issues of law submitted by attorney Jedd Malish of the law firm King

& Jurgens, LLC. Mr. Malish represents Captain Boudreau in a defensive capacity in this proceeding and is co-counsel to Captain Boudreau.

As a supplement to the summary of material facts submitted by co-counsel, Captain Boudreau suffered mental anguish, emotional distress, loss of enjoyment of life, nervousness, depression and anxiety as a result of the collision at issue.

c)   **Defendants, Captain Boudreau, GEICO, St. Clair**

   **(1) Liability**

   **a.  St. Clair**

M/V SUPER STRIKE is a 32' twin vee catamaran equipped with two 300 horsepower Yamaha engines.  On February 11, 2017, St. Clair demise chartered his vessel to Extreme Fishing.   Prior to this demise charter, M/V SUPER STRIKE experienced a cracked powerhead on its starboard engine.   Both the port and starboard engines were under warranty.   St. Clair took M/V SUPER STRIKE to Outcast Marine for servicing.    Outcast Marine replaced the powerhead on the starboard engine.   Additionally, Outcast Marine serviced both the port and starboard engines "top to bottom."   After Outcast Marine serviced both engines, St. Clair took M/V SUPER STRIKE on one offshore fishing trip.

St. Clair operated M/V SUPER STRIKE for approximately 100 hours between the time Outcast Marine serviced the engines and when he demise chartered the vessel to Extreme Fishing.   St. Clair did not experience any problems with either the port or starboard engines during this time period.   St. Clair felt comfortable with the mechanics of M/V SUPER STRIKE prior to entering into the demise charter with Extreme Fishing.   St. Clair had no reason to think that Extreme Fishing would have any issues with the vessel when it demise chartered the vessel.

### b.  Boudreau

Andre Boudreau adopts the Summary of Material Facts of demise charterer Extreme Fishing.

### (2)    Coverage

5 days after this collision, Wetzel wrote to his insurance agent: "Andre Boudreau was taking an Extreme Fishing charter fishing trip to go out fishing on St. Clair's vessel, Superstrike."  After the Claimants filed suit against Wetzel and Extreme Fishing, however, Wetzel submitted a first notice of loss to AGCS stating that he had given away the Beck trip to Captain Boudreau and was therefore not liable as demise charterer for this collision.  AGCS agreed with Wetzel's misrepresentation that he "gave away" the Beck charter to Captain Boudreau and denied coverage to Captain Boudreau on this and other bases.  The Court found Wetzel and AGCS's claim that Wetzel gave away the charter to Captain Boudreau to be "self-serving and implausible" which "makes economic sense only as a post-collision argument to escape liability".  The Court ruled that Extreme Fishing is, as a matter of law, the demise charterer of M/V SUPER STRIKE.  R. Doc. No. 186.  The Court has also ruled that Captain Boudreau, like Extreme Fishing and Wetzel, is an insured under the AGCS policy.  R. Doc. No. 191.

AGCS denied coverage to Captain Boudreau, but not Extreme Fishing or Wetzel, on several other grounds.  AGCS still disputes that there is coverage for Captain Boudreau, but not Extreme Fishing or Wetzel, under its policy because 1)  Captain Boudreau (but not Wetzel or Extreme Fishing) failed to give timely notice to AGCS of both KINGFISH's lost prop and the collision; 2) KINGFISH's lost prop is not a covered loss under its policy; and 3) M/V SUPER STRIKE is not of a similar type, value and length as M//V KINGFISH and therefore does not

meet the definition of a temporary substitute watercraft under its policy. There can only be coverage for Captain Boudreau, Extreme Fishing and Wetzel under the AGCS policy if M/V SUPER STRIKE is a temporary substitute watercraft.

AGCS sought leave of court to amend its Answer to file a counter crossclaim against GEICO for defense and indemnity on July 16, 2018, approximately one month before the Court ruled that Wetzel did not give away the Beck charter to Captain Boudreau and that Extreme Fishing is the demise charterer of M/V SUPER STRIKE. Extreme Fishing has never sought coverage under the GEICO policy. GEICO objected to AGCS's attempt to amend its Answer to assert this claim because AGCS is not an insured, additional insured or third-party beneficiary of the GEICO policy and therefore has no valid claim against GEICO for defense and indemnity. The Court granted AGCS's motion.

AGCS claims that, pursuant to a subrogation clause in its policy, it is subrogated to the right of Extreme Fishing and Wetzel to recover its costs expended in the defense of these insureds (while still denying coverage to Captain Boudreau). AGCS maintains that because the Court ruled that Extreme Fishing is the demise charterer of M/V SUPER STRIKE, and the GEICO policy provides coverage for the demise charterer of M/V SUPER STRIKE, it has stepped into the shoes of Extreme Fishing and can assert its claim for defense and indemnity under that policy. The policy language does not support AGCS's position that payment of defense costs a "loss" it paid under the policy. Therefore, the subrogation clause relied upon by AGCS to assert this claim is inapplicable. GEICO submits that AGCS has failed to assert a claim for defense and indemnity against GEICO.

d)     **Defendant, Extreme Fishing**

These consolidated actions involve two separate Complaints for Exoneration From or Limitation of Liability (Nos. 17-01545 and 17-03657), a Complaint for Damages filed outside of the original limitation proceeding in a separate action (No. 17-02446), and multiple claims, cross-claims, and Rule 14(c) tenders filed within the Limitation Proceedings that all arise out of a vessel collision between the M/V MISS IDA and the M/V SUPER STRIKE that occurred on the Mississippi River on February 12, 2017, during a period of restricted visibility.  At the time of the collision, Plaintiffs were passengers aboard the M/V SUPER STRIKE while the boat was heading out to the Gulf of Mexico for a charter fishing trip.  Of the two vessels involved in the collision, the M/V MISS IDA was owned and operated by TK Boat Rentals and the M/V SUPER STRIKE was owned by St. Clair and operated by Captain Boudreau.  This Court has also previously found that Extreme Fishing was the demise or bareboat charterer of the M/V SUPER STRIKE at the time of the collision.

Former Defendant, Wetzel,[3] in his individual capacity, owns three boats:  KINGFISH, KINGFISH II, and K3.  Approximately fifteen years ago, Mr. Wetzel formed a single member limited liability company named Extreme Fishing.  Mr. Wetzel is the only member of Extreme Fishing.  The sole business of Extreme Fishing is to conduct charter fishing trips out of Venice, Louisiana.   In conducting its fishing trips, Extreme Fishing charters Mr. Wetzel's three boats on a bareboat or demise charter basis.

Extreme Fishing has no employees, but rather uses six or seven independent contractor captains to operate the boats that it charters from Mr. Wetzel.  In this respect, Defendant, Captain Boudreau, was one of the independent-contractor captains that Extreme Fishing used to operate

---

[3] This Court has previously dismissed all claims against Wetzel in his individual capacity.

the chartered boats.  These independent-contractor captains generally move from boat to boat working for many different charter fishing companies in Venice, as demand requires.

In early February of 2017, Plaintiff Patrick Beck telephoned Wetzel on short notice to schedule a charter fishing trip for February 12, 2017.   Wetzel informed Mr. Beck that he had a boat available, and that Mr. Beck's fishing trip would be on the vessel KINGFISH.  Because Wetzel was caring for his parents at the time of Mr. Beck's trip, Captain Boudreau was going to be the captain for Mr. Beck's charter fishing trip.

On February 11, 2017—the day before Mr. Beck's fishing trip—the KINGFISH had a mechanical issue and was no longer available to be used for Mr. Beck's trip.   Captain Boudreau, who was the Captain aboard the KINGFISH at the time of the engine casualty, informed Mr. Wetzel of the extent of the problem with the KINGFISH, and Mr. Wetzel asked Captain Boudreau if he knew of any other boats that could be used for Mr. Beck's fishing trip the next morning.  Captain Boudreau then contacted St. Clair—who was the owner of the M/V SUPER STRIKE—to ask whether the M/V SUPER STRIKE would be available for Mr. Beck's fishing trip the next morning, and he was told that the vessel was available.   Captain Boudreau then informed Mr. Wetzel that the M/V SUPER STRIKE was available.  In turn, Wetzel contacted Mr. Beck to tell him that the KINGFISH had suffered a mechanical problem and was no longer available, but that another boat was available for use.   Mr. Beck agreed to the use of a different boat for his fishing trip, and Wetzel informed Captain Boudreau.   Captain Boudreau had a key to St. Clair's shed where the M/V SUPER STRIKE was stored, and he went and picked up the vessel and brought the vessel to Venice.

On February 12, 2017, the M/V SUPER STRIKE departed Venice Marina in Venice, Louisiana, at approximately 6:40 a.m., with Captain Boudreau, deckhand Mitchell Rogers, Mr.

Beck, and the other plaintiffs aboard, with visibility reduced to 50-75 yards due to fog.   The M/V SUPER STRIKE got underway with its masthead light (white light) and port and starboard sidelights (red and green lights, respectively) illuminated.   Because of the restricted visibility, Captain Boudreau posted deckhand Mitchell Rogers as a lookout, and closely monitored the boat's radar screen while the vessel was underway.   After departing Venice Marina, the M/V SUPER STRIKE headed toward the Mississippi River; however, prior to getting to the River, the vessel's port engine stalled briefly twice and later stalled briefly a third time upon reaching the River, but the engine was able to be restarted each time.   The M/V SUPER STRIKE did not have any further engine issues that day.

Ultimately, the M/V SUPER STRIKE exited an area known as the "Jump" and entered the Mississippi River heading downriver and proceeding about 75 yards away from the right descending bank (the West Bank).   Because of possible dredging activity along the West Bank further downriver, Captain Boudreau proceeded just south of Andres Pond and then crossed the Mississippi River over to the East Bank, and ultimately planned to exit the Mississippi River and enter the Gulf of Mexico through Pass A Loutre.

When the M/V SUPER STRIKE was about halfway across the river proceeding from the West Bank to the East Bank, Captain Boudreau picked up an object on his radar and immediately reduced his speed.   Shortly thereafter, while continuing to cross the river, and when the M/V SUPER STRIKE was approximately three-quarters of the way across, Captain Boudreau detected another radar contact, which turned out to be the M/V MISS IDA.   The two vessels were about one-half mile apart.   Captain Boudreau maintained radar contact with the M/V MISS IDA up until the time of collision.   Based upon his initial observations of the M/V MISS IDA on

radar, Captain Boudreau determined that no risk of collision[4] existed with the M/V MISS IDA because the M/V MISS IDA was tracking west on his radar and appeared to be crossing the Mississippi River from the East Bank to the West Bank.   At this point, visibility was approximately 15 yards and the M/V SUPER STRIKE was proceeding at a speed of roughly 20 miles per hour.

As Captain Boudreau continued to observe the M/V MISS IDA on radar, however, the M/V MISS IDA suddenly changed course to the north towards the M/V SUPER STRIKE, and Captain Boudreau immediately placed his engines in neutral, which effectively brought the vessel to a stop.   Captain Boudreau estimated that the M/V SUPER STRIKE traveled approximately 75 feet from the time he put the engines in neutral until the time the vessel came to a stop.   At this point, Captain Boudreau did not turn or otherwise maneuver the M/V SUPER STRIKE, but instead kept monitoring the M/V MISS IDA on radar and evaluating the situation to determine the best course of action.   Approximately thirty seconds later, before Captain Boudreau could take any evasive action, the M/V MISS IDA broke through the fog at high speed and collided with the M/V SUPER STRIKE.   Captain Boudreau first sighted the M/V MISS IDA visually when the M/V MISS IDA broke through the fog approximately 20-30 yards away from the M/V SUPER STRIKE.   At the time of the collision, the M/V SUPER STRIKE was stopped and merely drifting with the current.   On the other hand, the M/V MISS IDA was "on-plane and moving" at 4000 RPMs (between 15-20 miles per hour) at the time of the collision. This Court has previously held that "a trier of fact could not reasonably infer that Extreme Fishing knew or had reason to know that Captain Boudreau was likely to use the M/V SUPER STRIKE in a dangerous manner."   Order & Reasons at pp. 21–22 (Doc. 186 in No. 17-01545).

---

[4] Generally, a risk of collision is "deemed to exist if the compass bearing of an approaching vessel does not appreciably change."  33 C.F.R. §83.07(d)(i).

With respect to the M/V MISS IDA, she was en route from an oil rig to Venice through Main Pass and the Mississippi River with Captain LeBlanc aboard.  Although the visibility was approximately 100 yards when the M/V MISS IDA departed the rig, and although Captain LeBlanc knew that the visibility would probably be much less near the Mississippi River, Captain LeBlanc was by himself and he did not have a separate lookout for the transit to Venice. In fact, TK Boat Rentals did not require the use of a lookout in restricted visibility.  Also, Captain LeBlanc was operating the M/V MISS IDA with the wheelhouse door closed.  The M/V MISS IDA transited Main Pass at a speed of 30 miles per hour.  His radar, with a screen the size of an iPhone, was set to a distance of three-quarters of a mile.

Before the M/V MISS IDA entered the Mississippi River from Main Pass, the visibility dropped to approximately 15 feet, and the M/V MISS IDA was operating at a speed of 25 miles per hour.  As the M/V MISS IDA began a wide right turn into the Mississippi River, however, LeBlanc slowed to idle speed or approximately 5 miles per hour, once he detected on radar two small fishing boats north of him close to the East Bank.  Captain LeBlanc admitted that he was not surprised by the fact that there were small vessels operating close to the East Bank because it was common for recreational fishermen to operate in those waters.  The M/V MISS IDA passed the two small fishing boats off the M/V MISS IDA's starboard side and then increased speed in order to get back on plane.  Captain LeBlanc then detected the M/V SUPER STRIKE on radar approximately one-half mile away.  At this time, the M/V MISS IDA was operating at a speed of 15-20 miles per hour, and LeBlanc believed that the M/V SUPER STRIKE was heading directly towards his vessel.   LeBlanc detected the presence of the M/V SUPER STRIKE on radar three times leading up to the collision.   Each time LeBlanc saw the M/V SUPER STRIKE on radar, the M/V SUPER STRIKE appeared to be getting closer to the M/V MISS IDA.  When the two

vessels were one-quarter mile apart, the M/V MISS IDA was still operating at a speed of 15-20 miles per hour. At this point, Captain LeBlanc felt that there was a risk of collision between the M/V MISS IDA and the M/V SUPER STRIKE, and although Captain LeBlanc could not visually see the M/V SUPER STRIKE, he insignificantly veered the M/V MISS IDA to the right, but he never slowed down believing that this was a head-on or meeting situation. When LeBlanc looked up again from his radar, he visually saw the M/V SUPER STRIKE about 10 feet away, and the M/V MISS IDA collided with the starboard bow of the M/V SUPER STRIKE and ended up on top of the M/V SUPER STRIKE. At the time of the collision, the M/V MISS IDA was traveling at a speed of 15-20 miles per hour. After the collision, LeBlanc told Captain Boudreau, he did not think they were that close.

Immediately following the collision, Plaintiff Patrick Beck and his minor son C. D. B. were taken to University Medical Center where they received treatment for their injuries. Subsequent medical procedures at the University of Arkansas at Little Rock have limited any significant long-term care issues and economic damages with respect to Patrick Beck. Plaintiffs Justin McCarthy and Michael Harrell lack any significant medical treatment for their purported injuries that calls into question their compensability.

This Court has approved an Ad Interim Stipulation for Value for the M/V SUPER STRIKE in the amount of $12,500.00 as the post-casualty value of the M/V SUPER STRIKE and her freight then pending, and this is the amount to which Extreme Fishing seeks the right to limit its liability under applicable law.

The collision at issue was caused solely by the negligent actions and complete disregard of applicable Rules of the Road by Captain LeBlanc on the M/V MISS IDA. In particular, the failure of Captain LeBlanc to operate the M/V MISS IDA at a speed that was appropriate for the

prevailing circumstances and conditions, the failure to have a look-out, the failure to have an adequately-sized radar screen, and LeBlanc's failure to operate the M/V MISS IDA in accordance with applicable Rules of the Road effectively placed the M/V SUPER STRIKE in extremis, and directly led to the collision for which TK Boat Rentals should be found singularly at fault.   To the extent that it is determined that the stalling of the M/V SUPER STRIKE's port engine was somehow a cause of the collision, which is specifically denied, then St. Clair, as the owner of the bareboat chartered vessel, is solely at fault.

e)    **Defendant, TK Boat Rentals**

On February 11, 2017 – the day before the accident – Captain Boudreau tried to take customers out fishing. He hadn't been out on the river since November of the previous year. As usual, he was up around 5 a.m. and left the dock by about 6 a.m. After he exited the mouth of the Mississippi River, he had a problem he needed to fix. To do so, he pulled into some cane. When he tried to pull off the cane, he spun off a propeller. He says it was unavoidable but his boss, Wetzel, suggests it was Captain Boudreau's error. In either event, he did not get paid for his work, and he had to get a tow back into the dock. He did not get into the dock until late, and then he had to secure another vessel because he was working again the next day. His head was on the pillow by about midnight.

When Captain Boudreau woke up again around 5:30, he had committed his first violation of federal regulations because he hadn't had adequate sleep. He picked up his crew and they departed. Problems started immediately: The new vessel's port engine kept stalling. He pulled over to check it and then proceeded. Captain Boudreau made it into the thick fog in the river, he continued at about 25 miles an hour, passing boats and getting passed by boats in the armada that would leave Venice every February to go catch tuna.

Then the engine stalled again. Captain Boudreau claims he had two working engines, and he decided to cross the river at about 25 miles per hour. He then slowed to a crawl because he was approaching another vessel, though he had passed any number of vessels without slowing just prior. Captain Boudreau claims he wanted to proceed down the east bank. He was worried about a dredge on the west bank that is sometimes in the river – never mind that it wasn't there the day before when he was getting towed in late in the day.

In the meantime, the M/V MISS IDA, an aluminum hull barge boat, had left living quarters and was proceeding down Main Pass into the river. Captain LeBlanc radioed his intentions: he was proceeding out of Main Pass into the river with the intention to proceed northbound up the east bank. He picked up two objects on radar and went around them at a crawl, then began, close to the east bank, to proceed north.

Captain Boudreau did not radio his intentions to cross the river. He picked up a radio communication from the M/V MISS IDA, but because he had two channels open and there was a separate communication on the second channel, he did not hear what the M/V MISS IDA said. He expected the M/V MISS IDA to proceed up the west bank. Captain Boudreau assumed the M/V MISS IDA would do something even he acknowledges a boat should never do without express agreement: pass starboard-to-starboard. Captain Boudreau claims he was done crossing by the time of the collision; the vessels were in a head-on situation. But Captain Boudreau admits he never actually finished crossing, so this was not a head-on circumstance. The crossing vessel (Captain Boudreau's) was the burdened vessel – the give-way vessel. It was required to avoid the M/V MISS IDA. Captain Boudreau expected the M/V MISS IDA to alter its course to port to avoid the collision, but the M/V MISS IDA could not do that under the Inland Rules. The "never deviate to port to avoid a collision" rule is consistently followed by mariners and

enshrined in the inland rules, whether vessels are in sight of one another or not. Captain LeBlanc on the M/V MISS IDA could not alter his course to port to avoid a collision.

When he was studying for his captain's license, Captain Boudreau twice wrote in his notes: "if you're on the right, you're in the right." The M/V MISS IDA was on the right. The M/V MISS IDA, properly steering to starboard to avoid a collision, collided with the M/V SUPER STRIKE because the M/V SUPER STRIKE expected the M/V MISS IDA to violate Inland Rule 16 and move to port to avoid a collision.

The version above is the best version for the M/V SUPER STRIKE, and it incorporates all Captain Boudreau's testimony as true. However, Captain Boudreau was not accurate. He did not cross the river on two engines because he wanted to proceed down the east bank. He crossed the river on one engine because the port engine had failed him again. He was looking for a cove to pull into to examine the engine. All four passengers agree that Captain Boudreau put a crippled vessel in the middle of the Mississippi River, without telling anyone his vessel was crippled. He never altered his course before the collision, nor his speed. Though he was the burdened vessel under the rules, he never took any evasive action.

Captain Boudreau complains that the M/V MISS IDA was traveling too quickly, without noting that the M/V MISS IDA was going more slowly than Captain Boudreau was when he was able to travel faster. He complains the M/V MISS IDA did not have a lookout, but the M/V MISS IDA is not required to have a lookout under the federal rules. He complains the M/V MISS IDA didn't have lights on, but it did have lights on. Captain Boudreau wrote a list of faults he claims the M/V MISS IDA suffered from, but neglected to mention the lights. In the hours after the collision, as they were riding back to the Coast Guard station, Captain Boudreau admitted the truth to one of his clients: he crossed the river wrong.

f)      **Defendant, AGCS**

AGCS incorporates and adopts Extreme Fishing's summary of material facts regarding the collision of February 12, 2017, made the subject of this litigation. AGCS offers the following summary of material facts relevant to the insurance coverage dispute:

Prior to the incident, AGCS issued a policy of insurance to Wetzel bearing Policy No. OHL92005573-WETZELTR01 ("AGCS Policy"). The AGCS Policy includes a "Temporary Substitute Watercraft" provision which extends coverage to a vessel used as a substitute while the insured vessel (in this case, the KINGFISH) is down for a covered loss, so long as the substitute vessel is of similar "type, value, and length" as the insured vessel. Also prior to the incident, GEICO issued a Charter Boat Policy to St. Clair covering the M/V SUPER STRIKE bearing Policy No. CBT1008950-00 (the GEICO Policy). Contained in the GEICO Policy is a General Bareboat Charter Endorsement, that extends coverage to charterers operating the M/V SUPER STRIKE under a bareboat charter.

The Plaintiffs named AGCS as an additional defendant in this litigation on January 2, 2018, based on the policy issued to Mr. Wetzel. On February 15, 2018, GEICO, Captain Boudreau, and St. Clair filed a Cross-Claim against AGCS alleging that the AGCS Policy provided coverage to Captain Boudreau under the Temporary Substitute Watercraft provision. The filing of the Cross-Claim was the first notice AGCS received that Captain Boudreau was making a claim under the AGCS Policy.

On September 5, 2018, AGCS filed a Cross-Claim against GEICO seeking a ruling that Extreme Fishing is entitled to coverage under the GEICO Policy by virtue of the Court's decision of August 21, 2018, that Extreme Fishing was a demise charterer of the M/V SUPER STRIKE at the time of the incident.

The Court granted summary judgment to AGCS finding that AGCS and GEICO provide co-primary insurance to Mr. Wetzel and Extreme Fishing. The Court, however, found fact questions regarding whether the KINGFISH and M/V SUPER STRIKE are of similar type, value, and length, which precluded summary judgment in favor of Captain Boudreau and GEICO on their claims for coverage under the AGCS Policy. Captain Boudreau and GEICO's claim for coverage under the AGCS Policy is the only remaining coverage issue for trial.

7.   **UNCONTESTED MATERIAL FACTS**

   a)   On February 12, 2017, a collision occurred between the M/V SUPER STRIKE and the M/V MISS IDA on the Mississippi River.

   b)   Plaintiffs were passengers on the M/V SUPER STRIKE on February 12, 2017, when the vessel departed from Venice Marina until the time of the collision.

   c)   Captain Boudreau was operating the M/V SUPER STRIKE at the time of the collision.

   d)   Mitchell Rogers was serving as the deckhand on the M/V SUPER STRIKE at the time of the collision.

   e)   At some point after reaching the Mississippi River, Captain Boudreau made the decision to cross the River from the west bank to the east bank.

   f)   Captain LeBlanc was operating the M/V MISS IDA as an employee of TK Boat Rentals on February 12, 2017, and at the time of the collision.

   g)   There was no additional crewmember on board the M/V MISS IDA to serve as a lookout at the time of the collision.

   h)   Patrick Beck and C. D. B. were trapped beneath the bow of the M/V MISS IDA as the M/V SUPER STRIKE began to take on water until they were freed by other passengers and crewmembers.

   i)   St. Clair owned the M/V SUPER STRIKE at the time of the collision.

   j)   TK Boat Rentals owned and operated the M/V MISS IDA at the time of the collision.

   k)   AGCS issued a Charter Value Vessel Policy to Wetzel bearing Policy No. OHL92005573-WETZELTR01.

l)      GEICO issued a Charter Boat Policy to St. Clair bearing Policy No. CBT1008950-00.

m)     The AGCS Policy includes a "Temporary Substitute Watercraft" provision that states:

> If your Watercraft is out of normal use because of a covered loss, we will cover damages you are legally obligated to pay for **bodily injury** or **property damage** arising from the maintenance, use, or control of a temporary substitute Watercraft. The temporary substitute Watercraft must be of a similar type, value, and length as the Watercraft that is out of normal use. But we do not cover temporary substitute Watercraft being used for any purpose other than replacing your Watercraft while it is out of normal use due to a covered loss.[5]

n)     The KINGFISH is 40 feet in length.

o)     The M/V SUPER STRIKE is 32 feet in length.

p)     The insured value of the M/V SUPER STRIKE under the GEICO Policy was $95,000.

q)     M/V SUPER STRIKE was declared a constructive total loss as a result of the collision with M/V MISS IDA.

r)     GEICO paid St. Clair $82,500 for the loss of M/V SUPER STRIKE.

s)     This Court has previously held that Extreme Fishing was the demise or bareboat charterer of the M/V SUPER STRIKE at the time of the collision.

t)     Captain Boudreau has been licensed by the U.S. Coast Guard since 2014 as an Operator of Uninspected Passenger Vessel (OUPV 6-Pack) of less than 100 gross tons and limited to six or less passengers for hire.

u)     Prior to starting commercial fishing and obtaining his Coast Guard license, Captain Boudreau had over five years of experience privately fishing offshore using the same type of boat, the same type of equipment, and traveling the same area.

v)     Between 2009 and 2014, when he received his Coast Guard license, Captain Boudreau had navigated the Mississippi River approximately 65 to 100 times per year.

---

[5] Emphasis in original.

w)  Captain Boudreau has attended and successfully passed various schools and courses, including The Captain School, and the Boater Safety Course in 2013 prior to getting his license.

x)  Mr. Wetzel had the opportunity for several years to closely observe Captain Boudreau captain a fishing boat prior to Captain Boudreau operating boats for Extreme Fishing.

y)  Prior to the collision at issue, Captain Boudreau had operated the M/V SUPER STRIKE approximately nine times while running charter fishing trips for a company called Intensity Outfitters that was owned by Josh Bodenheimer.

z)  This Court has previously dismissed, on summary judgment, TK Boat Rentals' claim that Extreme Fishing negligently entrusted the M/V SUPER STRIKE to Captain Boudreau.

aa)  The M/V MISS IDA was en route from an oil rig to Venice through Main Pass and the Mississippi River.

bb)  Captain LeBlanc was operating the M/V MISS IDA with the wheelhouse door closed.

cc)  LeBlanc detected the presence of the M/V SUPER STRIKE on radar three times leading up to the collision.

dd)  Each time LeBlanc saw the M/V SUPER STRIKE on radar, the M/V SUPER STRIKE appeared to be getting closer to the M/V MISS IDA.

ee)  The Court has previously determined that Extreme Fishing, LLC owed no duty of seaworthiness to Plaintiffs.

ff)  The Court has previously ruled that Extreme Fishing and Mr. Wetzel are owed coverage under the GEICO Policy, AGCS holds a valid assignment from Extreme Fishing against GEICO for any amounts paid or to be paid under the AGCS Policy, and that the GEICO Policy and the AGCS Policy provide co-primary coverage on a 50/50 basis as to any parties covered under both policies with respect to this loss.

gg)  TK Boat Rentals did not require the use of a lookout in restricted visibility.

hh)  Captain LeBlanc then detected the M/V SUPER STRIKE on radar approximately one-half mile away.

ii)  The Court has approved an Ad Interim Stipulation for Value for the M/V SUPER STRIKE in the amount of $12,500.00 as the post-collision value of the vessel.

8.   **CONTESTED MATERIAL FACTS**

a)   Facts and circumstances surrounding the collision in which Plaintiffs were injured on February 12, 2017;

b)   Whether Defendant, Captain Boudreau, was negligent or otherwise at fault;

MATERIAL FACTS RELIED UPON BY PLAINTIFFS TO SHOW NEGLIGENCE OR FAULT OF CAPTAIN BOUDREAU:

(1)   Choosing to depart from the safe harbor of the Venice Marina in "shutout fog" conditions with Plaintiffs as passengers on the morning of February 12, 2017;

(2)   Failing to inspect the M/V SUPER STRIKE, particularly the motors, for defective conditions prior to departing from Venice Marina for Plaintiffs' charter fishing trip on February 12, 2017;

(3)   Failing to place the M/V SUPER STRIKE's horn within his reach in the wheelhouse prior to departing from Venice Marina for Plaintiffs' charter fishing trip on February 12, 2017;

(4)   Failing to terminate the charter fishing trip and return to the Venice Marina after one of the M/V SUPER STRIKE's motors failed multiple times before reaching the Mississippi River;

(5)   Choosing to cross the Mississippi River in heavy morning traffic through dense fog with only one fully functioning motor;

(6)   Failing to signal other vessels of the M/V SUPER STRIKE's crossing;

(7)   Failing to radio his intentions prior to and while crossing the Mississippi River;

(8)   Failing to signal the approaching object, which was ultimately the M/V MISS IDA, of the M/V SUPER STRIKE's presence in the Mississippi River prior to the collision;

(9)   Failing to notify nearby vessels that the M/V SUPER STRIKE was in distress;

(10)   Violating the United States Coast Guard Navigation Rules and Regulations/Inland Rules of the Road, including but not limited to Rule 2-Responsibility, Rule 6-Safe Speed, Rule 8-Action to Avoid Collision, Rule 15-Crossing Situation, Rule 19-Conduct of Vessels in Restricted Visibility, and Rule 34-Maneuvreing and Warning Signals;

(11)   Violating 46 U.S.C. § 8104(a) by operating the M/V SUPER STRIKE with only 5.5 hours of rest after working 18.5 hours the day before;

c)   Whether Extreme Fishing had privity or knowledge of Captain Boudreau's negligence and/or defective conditions of the M/V SUPER STRIKE;

d)   Whether Defendant, Extreme Fishing was negligent or otherwise at fault;

MATERIAL FACTS RELIED UPON BY PLAINTIFFS TO SHOW NEGLIGENCE OR FAULT OF EXTREME FISHING (which Plaintiffs submit also establish this Defendant's privity or knowledge):

(1)   Failing to implement a policy or otherwise instructing captains to inspect vessels for defective conditions before departing with passengers for charter fishing trips;

(2)   Allowing Captain Boudreau to operate vessels on behalf of Extreme Fishing in violation of Coast Guard regulations by not moving vessel horns within reach before departure;

(3)   Allowing Captain Boudreau to operate a vessel on behalf of Extreme Fishing in violation of the rest requirements prescribed by 46 U.S.C. § 8104(a);

(4)   Failing to have policies or procedures in place for its captains operating vessels in fog;

(5)   Failing to have policies or procedures in place for what its captains should do if they experience engine problems during a charter fishing trip

e)   Whether Defendant, St. Clair, had privity or knowledge of the defective conditions of the M/V SUPER STRIKE;

f)   Whether Captain LeBlanc was negligent or otherwise at fault;

MATERIAL FACTS RELIED UPON BY PLAINTIFFS TO SHOW NEGLIGENCE OR FAULT OF CAPTAIN LeBLANC:

(1)   Failing to have another crewmember on board the M/V MISS IDA to serve as a lookout given the extremely foggy conditions at the time of the collision;

(2)   Operating the M/V MISS IDA at a fast and excessive rate of speed under the severely reduced visibility conditions;

(3)   Failing to reduce the speed of the M/V MISS IDA at any point prior to the collision;

(4)     Failing to use the M/V MISS IDA's radar to avoid the risk of a collision by acquiring targets and tracking the targets with the MARPA capabilities of the radar equipment;

(5)     Failing to reduce the speed of the M/V MISS IDA after locating an object on the radar, which was ultimately the M/V SUPER STRIKE;

(6)     Failing to reduce the speed of the M/V MISS IDA when it was clear that a close-quarters situation was developing with the M/V SUPER STRIKE and the risk of collision was imminent;

(7)     Violating the United States Coast Guard Navigation Rules and Regulations/Inland Rules of the Road, including but not limited to Rule 5-Look-out, Rule 6-Safe Speed, Rule 7-Risk of Collision, Rule 8-Action to Avoid Collision, and Rule 19-Conduct of Vessels in Restricted Visibility;

(8)     Failing to properly use radar;

(9)     Failing to sound the danger signal before the collision;

(10)     Failing to take evasive action to avoid the collision;

(11)     Failing to make radio calls announcing his intentions with respect to the M/V MISS IDA prior to the collision;

g)     Whether Defendant, TK Boat Rentals, had privity or knowledge of Captain LeBlanc's negligence and/or the defective conditions of the M/V MISS IDA;

h)     Whether Defendant, TK Boat Rentals as owner and operator of the M/V MISS IDA, was negligent or otherwise at fault;

MATERIAL FACTS RELIED UPON BY PLAINTIFFS TO SHOW NEGLIGENCE OR FAULT OF TK BOAT RENTALS, LLC (which Plaintiffs submit also establish this Defendant's privity or knowledge):

(1)     Failing to implement a policy of or otherwise requiring its captains to use a second crewmember as a lookout during dense fog or other conditions of reduced visibility;

(2)     Equipping the M/V MISS IDA with inadequate and/or undersized radar and GPS equipment;

(3)     Failing to train Captain LeBlanc in operating the M/V MISS IDA in restricted visibility;

(4)     Failing to train Captain LeBlanc in the proper use of radar;

> (5)    Failing to train Captain LeBlanc with respect to the United States Coast Guard Navigation Rules and Regulations/Inland Rules of the Road;
>
> (6)    Allowing Captain LeBlanc to operate the M/V MISS IDA in restricted visibility conditions when he was unaware of fundamental navigational principles with respect to the operation of vessels in these conditions;

i)    Whether the negligence or fault of Defendants was a legal cause of the collision and Plaintiffs' injuries;

j)    The nature, extent, and duration of Plaintiffs' injuries, impairments, and damages:

Plaintiffs described their injuries in Sections 6(a)(i–iv) above. Plaintiffs also described in those sections the treatment, including surgeries for Patrick Beck, that Plaintiffs required as a result of their injuries. In further support of Mr. Beck's claims, Plaintiffs provide the following itemization of his cranial facial and other injuries with sequalae that he suffered as a result of this casualty:

- Traumatic brain injury/concussion
- Subarachnoid hemorrhage
- CSF fluid leak via otorrhea (drainage from ears)
- Hyponatremia
- Fracture left temporal bone involving the mastoids
- Fractures left sphenoid bone and sphenoid sinus with extension anterior clinoid, posteriod clinoid and sella turcica (comminuted)
- Fracture left temporal bone with extension into mastoid
- Fracture left maxillary sinus (comminuted with medially displaced)
- Fracture left orbit (lateral aspect of inferior wall)
- Fractures left pterygoid (lateral and medial)
- Fracture left external auditory canal (roof)

- Hematoma left maxillary sinus

- Hematoma left sphenoid sinus

- Dislocation left malleus/incus

- Fracture left scutum (involving the tympanic membranes)

- Fracture right temporal bone involving the mastoids

- Fractures right sphenoid bone and sphenoid sinus with extension anterior clinoid, posteriod clinoid and sella turcica (comminuted)

- Fracture right anterior wall external auditory canal with extension into the temporal articular surface of the right TMJ (comminuted/near tympanic membrane)

- Fracture right medial sphenoid (posterior aspect)

- Fracture right maxillary sinus (posterior wall)

  - Hematoma right sphenoid sinus

- Right cranial nerve VI palsy/Right abducens palsy

- Right cranial nerve VII palsy/facial paralysis

  - Restricted lateral gaze right eye

  - Lagophthalmos right eye (inability to close eyelid completely)

  - Exposure keratopathy right eye

  - Anisocoria right eye (unequal pupil-resolved)

  - Crocodile tears syndrome and Marcus Gunn jaw wink syndrome

  - Diplopia left eye

- Left facial nerve weakness

- Profound mixed sensorineural and conductive hearing loss left ear

- Mild hearing loss right ear

32

- Tinnitus (ringing) in left ear

- Broken teeth

- Bilateral otitis externa (ear infection)

- Fracture right first rib

- Right lung contusion

Mr. Beck's treating physicians have opined that the residuals of his injuries that are probably **permanent** include:  tinnitus (although it may improve with the Cochlear implant) and loss of hearing in his left ear; diplopia in his right eye; right 7th nerve palsy; right 6th nerve palsy; crocodile tears; and, Marcus Gunn jaw wink.

k)  Whether M/V MISS IDA was unseaworthy for failing to have a dedicated lookout in the wheelhouse when operating in restricted visibility;

l)  Whether one of the motors on the M/V SUPER STRIKE died multiple times before reaching the Mississippi River;

m)  Whether the M/V MISS IDA was traveling northbound up the Mississippi River near the east bank before the collision;

n)  Whether the M/V MISS IDA hit the M/V SUPER STRIKE at a perpendicular angle with enough force to travel onto the bow of the M/V SUPER STRIKE;

o)  Whether TK was negligent for failing to have a dedicated lookout in the wheelhouse of M/V MISS IDA in restricted visibility;

p)  Whether the M/V SUPER STRIKE got underway with its masthead light (white light) and port and starboard running lights (red and green lights, respectively) illuminated;

q)  Whether the M/V SUPER STRIKE ultimately exited an area known as the "Jump" and entered the Mississippi River heading downriver and proceeding approximately 75 yards off of the right descending bank (the West Bank);

r)  Whether Captain LeBlanc was negligent for operating M/V MISS IDA at an excessive rate of speed under the prevailing conditions;

s)    Whether the visibility lessened to approximately 15 feet, and the M/V MISS IDA was operating at a speed of 25 miles per hour just prior to the M/V MISS IDA entering the Mississippi River from Main Pass;

t)    Whether LeBlanc slowed to idle speed or approximately 5 miles per hour as the M/V MISS IDA began a wide right turn into the Mississippi River and once he detected on radar two small fishing boats north of him close to the East Bank;

u)    Whether the M/V MISS IDA was operating at a speed of 15-20 miles per hour when the M/V MISS IDA and the M/V SUPER STRIKE were approximately one-quarter mile apart;

v)    Whether the M/V MISS IDA was traveling at a speed of 15-20 miles per hour at the time of the collision;

w)    Whether Captain Boudreau detected another radar contact, which ultimately turned out to be the M/V MISS IDA, while continuing to cross the river, and when the M/V SUPER STRIKE was approximately three-quarters of the way across;

x)    Whether Captain Boudreau estimated that the M/V SUPER STRIKE traveled approximately 75 feet from the time he put the engines in neutral until the time the vessel came to a stop;

y)    Whether Captain Boudreau first sighted the M/V MISS IDA visually when the M/V MISS IDA broke through the fog approximately 20-30 yards away from the M/V SUPER STRIKE;

z)    Whether AGCS had in full force and effect a policy of marine liability insurance (Policy No. OHL92005573-WETZEL TR01) issued to Wetzel and/or Extreme Fishing, which provided liability coverage to Captain Boudreau and Extreme Fishing at the time of the collision;

aa)    Whether TK was negligent for failing to train Captain LeBlanc in to operate M/V MISS IDA in restricted visibility;

bb)    Whether Captain LeBlanc was negligent for failing to properly use radar;

cc)    Whether TK was negligent for failing to train Captain LeBlanc in the proper use of radar;

dd)    Whether Captain LeBlanc was negligent for failing to make radio calls announcing his intentions prior to the collision;

ee)    Whether Captain LeBlanc was negligent for failing to sound the danger signal before the collision;

ff)     Whether Captain LeBlanc was negligent for failing to take evasive action to avoid the collision;

gg)     Whether Captain LeBlanc was negligent for failing to know and apply the proper Inland Rules of Navigation;

hh)     Whether M/V MISS IDA was unseaworthy for having inadequate radar and GPS;

ii)     Whether TK Boat Rentals was negligent for failing to train Captain LeBlanc in the Inland Rules of Navigation;

jj)     Whether any negligence of Captain LeBlanc is within the privity and knowledge of TK;

kk)     Whether the loss of KINGFISH's propeller on February 11, 2017 is a covered loss under the AGCS policy;

ll)     Whether the AGCS policy required Captain Boudreau to notify AGCS of the loss of KINGFISH's propeller on February 11, 2017;

mm)     Whether Wetzel timely notified AGCS of the loss of KINGFISH's propeller on February 11, 2017;

nn)     Whether Wetzel's failure to notify AGCS of the loss of KINGFISH's propeller on February 11, 2017 prejudiced AGCS;

oo)     Whether Captain Boudreau's failure to notify AGCS of the loss of KINGFISH's propeller on February 11, 2017 prejudiced AGCS;

pp)     Whether the AGCS policy required Captain Boudreau to notify AGCS of the collision with M/V MISS IDA on February 12, 2017;

qq)     Whether Wetzel timely notified AGCS of the collision with M/V MISS IDA on February 12, 2017;

rr)     Whether Wetzel's failure to notify AGCS of the collision with M/V MISS IDA on February 12, 2017 prejudiced AGCS;

ss)     Whether Captain Boudreau's failure to notify AGCS of the collision with M/V MISS IDA on February 12, 2017 prejudiced AGCS;

tt)     Whether M/V SUPER STRIKE is of a similar type, value and length as KINGFISH under the AGCS policy;

uu)     Whether M/V SUPER STRIKE can be of a similar type, length and value for Extreme Fishing and Wetzel under the AGCS policy, but not Captain Boudreau;

vv)     Whether AGCS had a basis in fact or under the terms and conditions of its policy to deny coverage to Captain Boudreau but not Wetzel and Extreme Fishing;

35

ww)  Whether AGCS had a basis in fact or under the terms and conditions of its policy to not provide a defense to but Captain Boudreau but to provide a defense to Wetzel and Extreme Fishing;

xx)  Whether AGCS continues to defend Extreme Fishing under a reservation of rights;

yy)  The amount of AGCS's policy limits after claim expenses, including defense costs, are deducted;

zz)  The nature and extent of Patrick Beck's traumatic brain injury;

aaa)  The nature and extent of Patrick Beck's tinnitus after undergoing a double cochlear implant;

bbb)  The extent to which Patrick Beck's injuries affect his future earnings and/or earning capacity;

ccc)  The nature and extent of C. D. B.'s injuries, general and special damages;

ddd)  The nature and extent of Michael Harrell's injuries, general and special damages;

eee)  The nature and extent of Justin McCarthy's injuries, general and special damages;

fff)  The extent of future medical care Patrick Beck will need, if any;

ggg)  The amount of future medical care Patrick Beck will need, if any;

hhh)  Any questions of fact implicit in the Contested Issues of Law;

iii)  What types of vessels are the KINGFISH and M/V SUPER STRIKE?

jjj)  What are the values of the KINGFISH and the M/V SUPER STRIKE?

kkk)  Whether as of January 10, 2016, the KINGFISH had a fair market value of $250,000;

lll)  Whether visibility was reduced to 50-75 yards due to fog on February 12, 2017, when the M/V SUPER STRIKE got underway from Venice Marina in Venice, Louisiana, at approximately 6:40 a.m., with Captain Boudreau, deckhand Mitchell Rogers, Mr. Beck, and the other plaintiffs aboard;

mmm)  Whether because of the restricted visibility, Captain Boudreau posted deckhand Mitchell Rogers as a lookout, and whether Captain Boudreau closely monitored the boat's radar screen while the vessel was underway;

nnn)  Whether Captain Boudreau proceeded just south of Andres Pond and then crossed the Mississippi River over to the East Bank because of possible dredging activity

36

along the West Bank further downriver, and ultimately planned to exit the Mississippi River and enter the Gulf of Mexico through Pass A Loutre;

ooo) Whether Captain Boudreau immediately reduced his speed when the M/V SUPER STRIKE was approximately halfway across the river proceeding from the West Bank to the East Bank, and he picked up an object on his radar;

ppp) Whether, according to Captain Boudreau, the two vessels were about one-half mile apart;

qqq) Whether Captain Boudreau maintained radar contact with the M/V MISS IDA up until the time of collision;

rrr) Whether, based upon his initial observations of the M/V MISS IDA on radar, Captain Boudreau determined that no risk of collision[6] existed with the M/V MISS IDA because the M/V MISS IDA appeared to be tracking west on his radar, and Captain Boudreau further believed that the M/V MISS IDA was crossing the Mississippi River from the East Bank to the West Bank;

sss) Whether visibility was approximately 15 yards and the M/V SUPER STRIKE was proceeding at a speed of roughly 20 miles per hour at the point Captain Boudreau detected the M/V MISS IDA on radar;

ttt) Whether Captain Boudreau immediately placed his engines in neutral, which effectively brought the vessel to a stop, as he continued to observe the M/V MISS IDA on radar and saw the M/V MISS IDA suddenly changed course to the north towards the M/V SUPER STRIKE;

uuu) Whether Captain Boudreau turned or otherwise maneuvered the M/V SUPER STRIKE while he continued monitoring the M/V MISS IDA on radar and evaluating the situation to determine the best course of action;

vvv) Whether the vessels would have passed off of each other's starboard side by the time the M/V MISS IDA turned to the north the M/V SUPER STRIKE was already across the river, and the M/V SUPER STRIKE was located closer to the East Bank than the M/V MISS IDA;

www) Whether the M/V MISS IDA broke through the fog and collided with the M/V SUPER STRIKE before Captain Boudreau could take any evasive action approximately thirty seconds later;

xxx) Whether Captain Boudreau had ever been involved in a reportable incident to the U.S. Coast Guard before this collision,

---

[6] Generally, a risk of collision is "deemed to exist if the compass bearing of an approaching vessel does not appreciably change." 33 C.F.R. §83.07(d)(i).

yyy) Whether Captain Boudreau has ever had his license revoked or suspended by the Coast Guard;

zzz) Whether the stalling of the M/V SUPER STRIKE's port engine was a contributory cause of the collision;

aaaa) Whether the alleged problem with the M/V SUPER STRIKE's port engine was reasonably discoverable through an inspection prior to getting underway;

bbbb) Whether the M/V SUPER STRIKE was stopped at the time of the collision;

cccc) Whether the M/V MISS IDA complied with Inland Rule 19 (33 C.F.R. §83.19);

dddd) The number of times the M/V SUPER STRIKE's port engine stalled prior to the collision;

eeee) Whether both engines on the M/V SUPER STRIKE were operational when the vessel crossed the Mississippi River;

ffff) The extent of the visibility on the day of the collision;

gggg) The distance from the M/V SUPER STRIKE at which the M/V MISS IDA broke through the fog and became visible;

hhhh) Whether the M/V MISS IDA turned toward the M/V SUPER STRIKE prior to visually sighting the M/V SUPER STRIKE;

iiii) Whether any alleged acts of negligence on the part of Captain Boudreau in operating the M/V SUPER STRIKE caused or contributed to the collision;

jjjj) Whether Extreme Fishing had privity or knowledge of any alleged acts of negligence of Captain Boudreau in operating the M/V SUPER STRIKE that caused or contributed to the collision;

kkkk) Whether a visual inspection of a 4-stroke engine could have determined in advance the cause of the stalls;

llll) Whether TK Boat Rentals failure to require a look-out in restricted visibility conditions caused or contributed to the collision;

mmmm) Whether Captain LeBlanc's operation of the M/V MISS IDA at a high rate of speed in restricted visibility caused or contributed to the collision;

nnnn) Whether the reduced and inadequate size of the M/V MISS IDA's radar screen caused or contributed to the collision;

oooo) Whether Captain LeBlanc told Captain Boudreau after the collision that he did not think that the M/V SUPER STRIKE was located that close to the M/V MISS IDA;

pppp)   Whether Captain LeBlanc's failure to reduce the speed of the M/V MISS IDA upon detecting the M/V SUPER STRIKE on radar caused or contributed to the collision;

qqqq)   Whether Captain Boudreau was negligent in the following regards:

MATERIAL FACTS RELIED UPON BY TK BOAT RENTALS, LLC TO SHOW NEGLIGENCE OR FAULT OF CAPTAIN BOUDREAU:

(1)   Inadequate training and experience as a captain;

(2)   Inadequate familiarity with the M/V SUPER STRIKE;

(3)   Inadequate experience navigating in the fog of the Mississippi River;

(4)   Inadequate rest;

(5)   Failing to turn around after having engine problems before reaching the River;

(6)   Failing to turn around after having engine problems during the River;

(7)   Crossing the Mississippi River without radioing his intentions;

(8)   Crossing the Mississippi River on one engine;

(9)   Failing to notify nearby vessels that his vessel was in distress;

(10)  Choosing to proceed down the east bank;

(11)  Violating the inland navigational rules;

(12)  Expecting Captain LeBlanc and the M/V MISS IDA to steer to port to avoid a collision;

rrrr)   Whether Extreme Fishing had privity or knowledge of Captain Boudreau's negligence;

ssss)   Whether Extreme Fishing was independently negligent in the following regards:

MATERIAL FACTS RELIED UPON BY TK BOAT RENTALS, LLC TO SHOW THE NEGLIGENCE OR FAULT OF EXTREME FISHING:

(1)   Failing to monitor Captain Boudreau's rest adequately;

(2)   Failing to implement any fog policy;

tttt)   Whether St. Clair is negligent in failing to provide a vessel that was suitable for its intended purpose in that the engine failed

39

uuuu)   Whether the captain of the M/V MISS IDA, Captain LeBlanc, testified during his deposition that the M/V MISS IDA was traveling at a speed between 15-20 knots at the time of the collision

vvvv)   The first notice AGCS received of Captain Boudreau claiming coverage under the AGCS Policy was service of the Cross-Claim filed on February 15, 2018 (more than one year after the incident made the subject of this litigation;

wwww)   The M/V MISS IDA passed the two small fishing boats off the M/V MISS IDA's starboard side and then increased speed in an attempt to get back on plane;

xxxx)   LeBlanc visually saw the M/V SUPER STRIKE when the M/V SUPER STRIKE was about 10 feet away, and the M/V MISS IDA collided with the starboard bow of the M/V SUPER STRIKE and ended up on top of the M/V SUPER STRIKE;

yyyy)   Between the time that the M/V MISS IDA and the M/V SUPER STRIKE were one-quarter mile apart and the time of the collision, the M/V MISS IDA never slowed down;

zzzz)   Although the visibility was approximately 100 yards when the M/V MISS IDA departed the rig, and despite the fact that Captain LeBlanc knew that the visibility would probably be much less near the Mississippi River, Captain LeBlanc was by himself and did not have a separate lookout for the transit to Venice;

aaaaa)   The M/V MISS IDA's radar, with a screen the size of an iPhone, was set to a distance of three-quarters of a mile;

bbbbb)   Captain LeBlanc could not visually see the M/V SUPER STRIKE and began veering the M/V MISS IDA to the right, but did not slow down at all;

ccccc)   Any liability of AGCS is limited by the applicable terms, conditions, and limits set forth in the AGCS Policy.

## 9.   CONTESTED ISSUES OF LAW

a)   The amount of Captain Boudreau's fault in causing the February 12, 2017 collision;

b)   The amount of Extreme Fishing's fault in causing the February 12, 2017 collision;

c)   The amount of St. Clair's fault in causing the February 12, 2017 collision;

d)   The amount of Captain LeBlanc's fault in causing the February 12, 2017 collision;

e)   The amount of TK Boat Rentals' fault in causing the February 12, 2017 collision;

f)     The legal cause of the February 12, 2017 collision and Plaintiffs' subsequent injuries;

g)     The extent to which St. Clair is entitled to limit his liability for the collision, if any;

h)     The extent to which TK Boat Rentals, LLC is entitled to limit its liability for the collision, if any;

i)     Whether Captain Boudreau is entitled to limit his liability for the collision;

j)     Whether the GEICO or AGCS policy provides primary, co-primary or excess coverage for Captain Boudreau;

k)     Whether AGCS is subrogated to Extreme Fishing and Wetzel for the defense costs expended on their behalf;

l)     Whether AGCS has a valid claim against GEICO to recover defense costs paid for Extreme Fishing and Wetzel;

m)     Whether the payment of claim expenses is the payment of a "loss" under the AGCS policy;

n)     Whether AGCS denied coverage to Captain Boudreau in bad faith;

o)     Whether GEICO can recover attorney's fees incurred in pursuing coverage under the AGCS policy if it is determined that AGCS denied coverage to Captain Boudreau in bad faith;

p)     Whether any costs expended in the defense of Captain Boudreau can be deducted from AGCS's policy limits;

q)     Any legal issues implicit in the Contested Issues of Fact;

r)     Whether Captain Boudreau provided AGCS with timely notice of his claim for coverage under the AGCS policy;

s)     Whether the M/V SUPER STRIKE qualifies as a Temporary Substitute Watercraft under the AGCS Policy;

t)     Whether St. Clair breached the demise charter party with Extreme Fishing by failing to provide Extreme Fishing with a vessel that was seaworthy at the inception of the voyage;

u)     Whether Extreme Fishing is entitled to limit its liability to the post-collision value of the M/V SUPER STRIKE and her freight then pending;

v)     Whether Extreme Fishing was negligent in failing to discover a problem with the M/V SUPER STRIKE's port engine prior to the vessel getting underway;

w)    Whether, at the time of the collision, the M/V MISS IDA was operating at a speed that was safe for the prevailing circumstances and conditions;

x)    Whether the personal injury claimants can meet their burden of proving what acts of negligence caused or contributed to the collision;

y)    Whether Extreme Fishing exercised reasonable care in selecting Captain Boudreau to be a vessel master;

z)    Whether the two vessels were in extremis when they first came within visual sight of one another;

aa)    Whether Inland Rules 11 through 18 and Inland Rule 34 apply to vessels not in sight of one another operating in restricted visibility;

bb)    Whether TK Boat Rentals was negligent in permitting the M/V MISS IDA to get underway in restricted visibility conditions without a separate look-out posted;

cc)    Whether Captain LeBlanc was negligent in continuing to operate the M/V MISS IDA at a high rate of speed after detecting the M/V SUPER STRIKE on radar;

dd)    Whether Captain LeBlanc was negligent in failing to slow down the M/V MISS IDA and navigate with caution after detecting the M/V SUPER STRIKE on radar;

ee)    The portion of attorneys' fees incurred by counsel for Captain Boudreau that AGCS is responsible for under the Court's Order and Reasons of September 6, 2018, given that Captain Boudreau's counsel also represents two other defendants and performed a significant amount of coverage work in addition to defending Captain Boudreau on the merits; and the starting point for AGCS's responsibility for such defense costs;

ff)    Whether the *Pennsylvania* Rule applies to any statutory and regulatory violations committed by the vessels

## 10.   EXHIBITS

a)    **Plaintiffs may introduce the following exhibits without objection:[7]**

(1)    TK Boat Rentals, LLC, Summary Report by Employee – Overview: Captain LeBlanc;

(2)    TK Towing Crew Change and Safety Meeting Logs (January 2016 – March 2017);

(3)    TK Towing, Inc. Boat Logs for the M/V MISS IDA (2/2/17 – 3/6/17);

---

[7] The parties will attempt to agree to a joint list of exhibits to which there are no objections.

(4)     TK Towing, Inc. Crew Boat Maintenance Logs for the M/V MISS IDA (01-16-17 through 02-16-17);

(5)     TK Towing, Inc. Health, Safety & Environmental (HSE) Policies and Procedures Manual;

(6)     Photographs of the M/V MISS IDA;

(7)     Photographs of the M/V SUPER STRIKE;

(8)     Photographs of Claimants/Plaintiffs;

(9)     Photographs of the Simrad/GPS equipment that was removed from the M/V SUPER STRIKE;

(10)    Google Maps of the waterways, including the Mississippi River, in the area of and at the scene of the incident;

(11)    NOAA Map of the waterways, including the Mississippi River, in the area of and at the scene of the incident;

(12)    Aerial photographs of the waterways;

(13)    Scully's Metal Fabrication, Drawing No. Hull 10460 (M/V MISS IDA);

(14)    The Captain School Final Exam of Captain Boudreau;

(15)    Garmin GPS Map 4000/5000 Series Owner's Manual;

(16)    Garmin website printout, GPS Map 5208;

(17)    Medical, hospital, ambulance, therapy, medication and related bills incurred by Patrick A. Beck;

(18)    Medical and hospital bills incurred for the treatment of C. D. B.;

(19)    Medical bills incurred by Justin McCarthy;

(20)    Plaquemines Parish Government Ambulance Department records relating to Patrick A. Beck;

(21)    Medical/hospital records of University Medical Center – New Orleans relating to Patrick A. Beck;

(22)    Medical/hospital records of University Medical Center – New Orleans relating to C. D. B.;

43

(23) Medical records of Jeffrey C. Carfagno, M.D. relating to Patrick A. Beck;

(24) Dental records of Bryan A. Austin, D.D.S. relating to Patrick A. Beck;

(25) Medical/hospital records of University of Arkansas for Medical Sciences (UAMS) relating to Patrick A. Beck;

(26) Medical records of Arkansas Children's Hospital relating to Patrick A. Beck;

(27) Medical records of Sherwood Urgent Care relating to Patrick A. Beck;

(28) Records of Jeffrey C. Carfagno, M.D. relating to C. D. B.;

(29) Films of MRIs, CT scans, x-rays, and other diagnostic tests relating to Patrick A. Beck;

(30) Records of Lawrence Family Medical relating to Justin McCarthy;

(31) Neuropsychological testing results of Gary T. Souheaver, Ph.D. relating to Patrick A. Beck;

(32) Income tax returns of Patrick and Amber Beck for the years 2010 – 2018;

(33) Patrick A. Beck's personnel records at Southwestern Energy Co.;

(34) Pay stubs from Southwestern Energy Co.;

(35) Correspondence (Nexstreem Corporation, Rob L. Soni, Chairman & CEO) dated November 6, 2018;

(36) Pay stubs from Nexstreem Corporation;

(37) Any exhibit listed by the other parties.

b) **<u>Plaintiffs may introduce the following exhibits to which there is an objection:</u>**

(1) Department of Homeland Security, United States Coast Guard Navigation Rules and Regulations Handbook/Inland Rules of the Road;

  OBJECTION: Defendant, Extreme Fishing, objects on cumulative and relevance grounds.

    c)    **Defendants, Boudreau, GEICO, and St. Clair may introduce the following exhibits without objection:**

    (1)    Louisiana department of Wildlife and Fisheries Operator Boating Incident Report completed by Captain Boudreau;

    (2)    Medical records and invoices from University of Arkansas for Medical Sciences for Patrick Beck;

    (3)    Medical records and invoices from University Medical Center New Orleans for Patrick Beck;

    (4)    Medical records and invoices from Dr. Gary T. Souheaver for Patrick Beck;

    (5)    Medical records and invoices from Dr. Jeffrey J. Carfagno for Patrick Beck;

    (6)    Medical records and invoices from Dr. Joseph G. Chacko for Patrick Beck;

    (7)    Medical records from and invoices of Anndi E. Cranford, APRN for Patrick Beck;

    (8)    Medical records and invoices from Plaquemines Parish Government Ambulance Department;

    (9)    AGCS Marine Insurance Company Charter Value Vessel Policy, Policy No. 92005573, issued to Wetzel and declaration sheet;

    (10)    GEICO Marine Insurance Company Boating Liability Policy, Policy No. CBT1008950-00 NEW, issued to St. Clair and declaration sheet;

    (11)    WM-3 Installation Guide;

    (12)    Lowrance Limited Warranty;

    (13)    Mounting Template for VHF's – Type C;

    (14)    Navico Declaration of Conformity;

    (15)    Lowrance Link-8 VHF Installation Instructions;

    (16)    Lowrance Link-8 VHF User Guide;

    (17)    Lowrance Ling-8VHF Warning Sticker;

(18)    Lowrance Limited Warranty;

(19)    Transducer Adapter Cable diagram;

(20)    Navico Declaration of Conformity;

(21)    SiriusXM Features Supported by Navico WM-3;

(22)    GPS Heading Sensor Installation Template;

(23)    SIMRAD Limited Warranty;

(24)    SIMRAD NSS evo2 QuickStart Guide;

(25)    SIMRAD Broadbank 3G Radar Packing List;

(26)    Broadband 3G-4G Radar Installation Guide;

(27)    GPS Antenna Installation Guidry;

(28)    SIMRAD NSS evo2 series Installation Manual;

(29)    Certificate of Documentation for M/V SUPER STRIKE;

(30)    Employment application of Captain LeBlanc;

(31)    Personnel file of Captain LeBlanc;

(32)    Photographs of M/V MISS IDA;

(33)    Photographs of M/V SUPER STRIKE;

(34)    TK Boat Rentals, LLC HSE Policies and Procedures Manual;

(35)    Crewboat Maintenance Logs for the M/V MISS IDA;

(36)    General Arrangement diagram of M/V MISS IDA;

(37)    TK Crew Change and Safety Meeting Records;

(38)    M/V MISS IDA Boat Registration Certificate;

(39)    Garmin GPSMAP owner's manual;

(40)    Delta Outboard records and invoice for port engine of M/V SUPER STRIKE;

(41)   Income tax returns for Patrick Beck;

(42)   Patrick Beck's employment records from Southwestern Energy;

(43)   Captain Boudreau's materials from The Captain's School;

(44)   Captain Boudreau's Boat U.S. Safety Course Certificate;

(45)   Captain Boudreau's diploma from The Captain's School;

(46)   Captain Boudreau's Merchant Mariner credentials;

(47)   Simrad unit on M/V SUPER STRIKE on February 12, 2017;

(48)   Maps and diagrams of Venice, the Mississippi River and Main Pass;

(49)   Reservation of Rights letters issued to Wetzel;

(50)   Any exhibit listed by any other party;

(51)   Any and all answers to interrogatories provided by any party in this lawsuit.

d)   **Defendants, Boudreau, St. Clair, and GEICO, may introduce the following exhibits to which there is an objection:**

(1)   USCG 2692 Report completed by Captain Boudreau;

OBJECTION:  Plaintiffs object on cumulative grounds as it is part of Louisiana Department of Wildlife and Fisheries (sometimes hereinafter "LDWF") report.

(2)   Text messages between Captain Boudreau and St. Clair;

OBJECTION:  Plaintiffs object on hearsay and relevance grounds.

(3)   Text messages between Captain Boudreau and Claimants;

OBJECTION:  Plaintiffs object on hearsay and relevance grounds.

(4)   AGCS's Claims Manual;

OBJECTION: Defendant, AGCS, objects on hearsay and relevance grounds.  Additionally, AGCS notes that this exhibit is covered by a protective order which requires a party move the court for permission

prior to using a protected document at trial.

 (5) AGCS's Claim file;

  OBJECTION: Defendant, AGCS, objects on hearsay and relevance grounds.

 (6) February 17, 2017 letter from Wetzel to The Hogans Agency;

  OBJECTION: Defendant, Extreme Fishing, objects on relevance grounds.

 (7) First Notice of Loss Wetzel submitted to AGCS;

  OBJECTION: Defendant, Extreme Fishing, objects on relevance grounds.

e) **Defendant, Extreme Fishing, may introduce the following exhibits without objection:**

 (1) Employment Records of Patrick Beck including but not limited to: Southwestern Energy;

 (2) Records of Patrick Beck's earnings including, but not limited to: W-2 and Tax Returns;

 (3) Medical Records of Patrick Beck from Plaquemines Parish Government, Ambulance Department;

 (4) Medical Records of Patrick Beck from University Medical Center – New Orleans;

 (5) Medical Records of Patrick Beck from University of Arkansas Medical Sciences;

 (6) Medical Records of Patrick Beck from Dr. John Pemberton;

 (7) Medical Records of Patrick Beck from Dr. Joseph Chacko;

 (8) Medical Records of Patrick Beck from Dr. Joshua Page;

 (9) Medical Records of Patrick Beck from Dr. Matthew D. Cox;

 (10) Medical Records of Patrick Beck from Dr. John L. Dornhoffer;

 (11) Medical Records of Patrick Beck from Dr. Jeffrey J. Carfagno;

 (12) Medical Records of Patrick Beck from Austin Family Dentistry, PA;

(13)   Medical Records of Patrick Beck from Gary Souheaver;

(14)   Medical Records of Patrick Beck from Dr. Jennings Boyette;

(15)   Medical Records of Patrick Beck from Dr. Karthika Veerapaneni;

(16)   Medical Records of C. D. B. from Plaquemines Parish Government, Ambulance Department;

(17)   Medical Records of C. D. B. from University of Medical Center – New Orleans;

(18)   Medical Records of Justin McCarthy from Dr. B. Brooks Lawrence, Lawrence Family Medicine;

(19)   Drawing hand-written by Charles "Nick" Siria at his deposition showing position of Plaintiffs on vessel;

(20)   Diagram hand-written by Charles "Nick" Siria at his deposition regarding the location of vessels;

(21)   Photograph of M/V SUPER STRIKE used at deposition of Michael Harrell with hand-written notes indicating position of Plaintiffs on vessel;

(22)   Diagram hand-written by Justin McCarthy at deposition regarding location of the vessels;

(23)   Extreme Fishing check dated 2/20/17 for $125.00;

(24)   Various photographs of the M/V SUPER STRIKE;

(25)   The Captain School, Diploma of Captain Boudreau;

(26)   The Captain School, Final Exam – OUPV;

(27)   Louisiana Offshore Fishing Charters (website printout);

(28)   Captain Boudreau's Answers to First Set of Interrogatories propounded by Plaintiffs;

(29)   Captain Boudreau's Answers to First Set of Interrogatories propounded by TK Boat Rentals;

(30)   Photographs of the SIMRAD;

(31)   Two (2) Google Maps used by Captain Boudreau during his deposition discussing accident and position of the vessels;

(32)   NOAA Map Excerpt used by Captain Boudreau during his deposition discussing accident and route of the vessels;

(33)   Bird's-eye view photographs used by Captain Boudreau during his deposition discussing accident and route of the vessels;

(34)   Louisiana Department of Wildlife and Fisheries Operator Boating Incident Report by Captain Boudreau;

(35)   United States of America, Merchant Mariner Credentials for Captain Boudreau;

(36)   Boat U.S. Foundation Certificate for Captain Boudreau;

(37)   Merchant Mariner Credential Medical Evaluation Report of Captain Boudreau;

(38)   Hand-written diagram by Captain Boudreau used at his deposition;

(39)   GEICO Marine Insurance Company Charter Boat Policy (Policy No.: CBT1008950-00 NEW);

(40)   United States Coast Guard Certificate of Documentation for the M/V SUPER STRIKE;

(41)   Delta Outboard records and invoice for port engine of M/V SUPER STRIKE;

(42)   SIMRAD unit on M/V SUPER STRIKE on 2-12-2017;

(43)   Diagram hand-written by Mitchell Rogers at his deposition showing position of Plaintiffs on M/V SUPER STRIKE;

(44)   (Photographs) – M/V SUPER STRIKE (Boudreau Ex. 31);

(45)   (Photographs) – M/V MISS IDA (Boudreau Ex. 37);

(46)   (Diagram) (Boudreau Ex. 45);

(47)   Various photographs of the M/V MISS IDA;

(48)   Scully's Metal Fabrication, Drawing No. Hull 10460;

(49)     Three (3) Google Maps used by Captain LeBlanc during his deposition discussing accident and position of the vessels;

(50)     TK Towing, Inc.'s (HSE) Health, Safety & Environmental Policies and Procedures Manual, Safe Navigation Plan;

(51)     TK Towing, Inc.'s Crew Change & Safety Meeting;

(52)     Louisiana Department of Wildlife and Fisheries Operator Boating Incident Report completed by Captain LeBlanc;

(53)     NOAA Map Excerpt – Referenced as "GPS Map" in Captain LeBlanc deposition;

(54)     TK Towing, Inc.'s Employee Handbook/Part 10.0/Employee Acknowledgment signed by Captain LeBlanc on March 18, 2013;

(55)     TK Towing, Inc. Crew Maintenance Logs for the M/V MISS IDA (1/16/2017 through 2/16/2017);

(56)     Boat Logs of the M/V MISS IDA dated February 2, 2017 through March 6, 2017;

(57)     TK Boat Rentals, LLC's Summary Report by Employee – Overview by Captain LeBlanc, 2017;

(58)     Drawing which reflects the radar screen size of the GPS utilized on the M/V MISS IDA;

(59)     Captain LeBlanc's vessel license and personnel file;

(60)     Employment Application of Captain LeBlanc;

(61)     Garmin GPS Map 4000/5000 series owner's manual (excerpt);

(62)     General Arrangement diagram of M/V MISS IDA;

(63)     M/V MISS IDA Boat Registration Certificate;

(64)     Scully's Aluminum Boats, Specification Request;

(65)     Scully's Marine, Inc. Invoice, No. 35;

(66)     Garmin Website printout, GPS Map 5208;

(67)     Certificate of Title for TK Boat Rentals;

(68)     TK Towing, Inc. (website printout);

(69)     TK, Employee HSE Orientation Handbook;

(70)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Defensive Driving Safety Program;

(71)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Water Survival & Offshore Transportation Safety;

(72)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Performance Evaluation & Development Program;

(73)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Management of Change;

(74)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Disciplinary Action Policy;

(75)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Behavior Biased Safety Program;

(76)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Hazard Identification & Risk Assessment (JSEA);

(77)     TK Towing, Inc., (HSE) Health Safety & Environmental Policies and Procedures Manual, Accident Reporting and Investigation;

(78)     Trident Marine Managers, Inc. Policy (TRM-407068);

(79)     Trident Marine Managers, Inc. Policy (TRM-407069);

(80)     TK Towing, Inc., (HSE) Health, Safety & Environmental Policies and Procedures Manual, Safety Management System;

(81)     TK Towing, Inc., (HSE) Health, Safety & Environmental Policies and Procedures Manual, Stop Work Authority (SWA);

(82)     Scully Metal Fabrication, Drawing No. Hull 10460 (LeBlanc Ex. 1);

(83)     Photograph of the M/V MISS IDA Helm (LeBlanc Ex. 2);

(84)     Photograph of the M/V MISS IDA profile (LeBlanc Ex. 3);

(85)     Google Map LeBlanc Drawing (LeBlanc Ex. 4);

(86)    Google Maps Drawing (LeBlanc Ex. 5);

(87)    Google Maps – LeBlanc Drawing (LeBlanc Ex. 6);

(88)    Google Maps – LeBlanc Drawing (LeBlanc Ex. 7);

(89)    TK Towing, Inc. Safe Navigation Plan (LeBlanc Ex. 8);

(90)    TK Towing, Crew Change & Safety Meeting (LeBlanc Ex. 9);

(91)    Chart (LeBlanc Ex. 12);

(92)    Captain LeBlanc vessel license (LeBlanc Ex. 13);

(93)    TK Towing, Inc. (HSE) Health, Safety & Environmental Policies and Procedures Manual, Safety Management System (LeBlanc Ex. 14);

(94)    TK Towing, Inc. (HSE Health, Safety & Environmental Policies And Procedures Manual, Stop Work Authority (SWA) (LeBlanc Ex. 15);

(95)    Part 10.0 Employee Acknowledgment, (signed by Captain LeBlanc, dated 3/18/13 (LeBlanc Ex. 16);

(96)    Photograph – M/V MISS IDA – VHF (LeBlanc Ex. 17);

(97)    Photograph – M/V SUPER STRIKE (LeBlanc Ex. 18);

(98)    Photograph – M/V MISS IDA (LeBlanc Ex. 19);

(99)    Boat Log, M/V MISS IDA, 2/2/17 – 3/6/17 (LeBlanc Ex. 20);

(100)    Drawing (I-Phone) (LeBlanc Ex. 22);

(101)    Garmin GPS Map 4000/5000 series owner's manual (excerpt) (LeBlanc Ex. 23);

(102)    AGCS Policy OHL92005573 re KINGFISH II;

(103)    Any exhibit for rebuttal purposes;

(104)    Any exhibit for impeachment purposes.

f) **Defendant, Extreme Fishing, may introduce the following exhibits to which there is an objection:**

(1)   U.S. Department of Homeland Security, U.S. Coast Guard, Report of Marine Accident, Injury or Death;

OBJECTION: Plaintiffs and the other Defendants object on hearsay grounds.

(2)   Text Messages between Nick Siria and Captain Boudreau;

OBJECTION: Plaintiffs object on hearsay and relevance grounds.

(2)   Text Messages between Michael Harrell and Captain Boudreau;

OBJECTION: Plaintiffs object on hearsay and relevance grounds

(3)   Louisiana Offshore Adventures (website printout);

OBJECTION: The other Defendants object on relevance grounds.

(4)   St. Clair's Calendar;

OBJECTION: The other Defendants object on relevance grounds.

(5)   Text Messages between St. Clair and Captain Boudreau;

OBJECTION: Plaintiffs and the other Defendants object on hearsay and relevance grounds.

(6)   Text message from Captain Boudreau to Patrick Beck;

OBJECTION: Plaintiffs and the other Defendants object on hearsay and relevance grounds.

(7)   Drawing hand-written by Jedd Malish at deposition of William Constant, TK Boat Rentals representative, reflecting the screen size dimensions of the GPS Unit on the M/V MISS IDA.

OBJECTION: Plaintiffs object on the grounds that this exhibit impermissibly reflects attorney testimony.

(8)   TK Towing, Inc. – After Action Report;

OBJECTION: Plaintiffs object on hearsay grounds.

(9)   U. S. Coast Guard 2692 Completed by Captain Boudreau;

OBJECTION:  Plaintiffs object on cumulative grounds and it is part of the LDWF report.

(10)   Text Messages between Captain Boudreau and Tracy Edwards post-accident;

OBJECTION:  Plaintiffs object on hearsay and relevance grounds.

g)   **Defendant, TK Boat Rentals, LLC, may introduce the following exhibits without objection:**

(1)   Louisiana Department of Wildlife & Fisheries Operator Boating Incident Report (M/V SUPER STRIKE);

(2)   Louisiana Department of Wildlife & Fisheries Operating Boating Incident Report (M/V MISS IDA);

(3)   Boothville-Venice Volunteer Fire Department Assist EMS Report;

(4)   TK Towing Incident Report;

(5)   TK Towing, Inc. After Action Report;

(6)   TK Boat Rentals, LLC, Summary Report by Employee – Overview: Captain LeBlanc;

(7)   TK Towing Crew Change and Safety Meeting Logs (January 2016 – March 2017);

(8)   TK Towing, Inc. Boat Logs for the M/V MISS IDA (2/2/17 – 3/6/17);

(9)   TK Towing, Inc. Crew Boat Maintenance Logs for the M/V MISS IDA (01-16-17 through 02-16-17);

(10)   Marine Consulting, Inc. Report dated February 20, 2017;

(11)   AGCS Marine Insurance Company Policy (Policy No.:  OHL92005573 (KINGFISH I);

(12)   AGCS Marine Insurance Company Policy (Policy No.:  OHL92005573 (KINGFISH II);

(13)   Photographs of the M/V MISS IDA;

(14)   Photographs of the M/V SUPER STRIKE;

(15)   Photographs of Claimants/Plaintiffs;

(16)   Photographs of the Simrad/GPS equipment that was removed from the M/V SUPER STRIKE;

(17)   Google Maps and aerial photographs of the waterways, including the Mississippi River, in the area of and at the scene of the incident;

(18)   NOAA Maps and charts of the Mississippi River delta;

(19)   Scully's Metal Fabrication, Drawing No. Hull 10460 (M/V MISS IDA);

(20)   Scully's Aluminum Boats, Specification Request;

(21)   Scully's Marine, Inc. Invoice No. 35;

(22)   TK Towing, Inc. Health, Safety & Environmental (HSE) Policies and Procedures Manual;

(23)   U.S. Coast Guard Certificate of Documentation for the M/V SUPER STRIKE;

(24)   The Captain School Final Exam and testing materials of Captain Boudreau;

(25)   Website materials for Louisiana Offshore Fishing Charters;

(26)   Website materials for TK Towing, Inc.;

(27)   Website materials for Louisiana Offshore Adventures;

(28)   Captain LeBlanc's vessel license and personnel file;

(29)   Garmin GPS Map 4000/5000 Series Owner's Manual;

(30)   Garmin website printout, GPS Map 5208;

(31)   Medical, hospital, ambulance, therapy, medication and related bills incurred by Patrick A. Beck;

(32)   Medical and hospital bills incurred for the treatment of C. D. B.;

(33)   Medical bills incurred by Justin McCarthy;

(34)   Plaquemines Parish Government Ambulance Department records relating to Patrick A. Beck;

(35)   Medical/hospital records of University Medical Center – New Orleans relating to Patrick A. Beck;

(36)   Medical/hospital records of University Medical Center – New Orleans relating to C. D. B.;

(37)   Medical records of Jeffrey C. Carfagno, M.D. relating to Patrick A. Beck;

(38)   Dental records of Bryan A. Austin, D.D.S. relating to Patrick A. Beck;

(39)   Medical/hospital records of University of Arkansas for Medical Sciences (UAMS) relating to Patrick A. Beck;

(40)   Records of Jeffrey C. Carfagno, M.D. relating to C. D. B.;

(41)   Records of Lawrence Family Medical relating to Justin McCarthy;

(42)   Neuropsychological testing results of Gary T. Souheaver, Ph.D. relating to Patrick A. Beck;

(43)   Income tax returns of Patrick and Amber Beck for the years 2010 – 2017

h)   **Defendant, TK Boat Rentals, LLC, may introduce the following exhibits to which there is an objection:**

(1)   Statement of Larry Allemand;

OBJECTION: Defendants, Extreme Fishing and GEICO, Boudreau, and St. Clair, object on hearsay grounds.

(2)   Statement of Joey Davis;

OBJECTION: Defendants, Extreme Fishing and GEICO, Boudreau, and St. Clair, object on hearsay grounds.

(3)   USCG 2692 completed by Captain Boudreau;

OBJECTION:  Plaintiffs object on cumulative grounds as it  is part of the LDWF report.

(4)   USCG 2692 completed by TK Boat Rentals;

OBJECTION:  Plaintiffs object on cumulative grounds as it  is part of the LDWF report.

(5)   Statement of Captain LeBlanc;

OBJECTION:  Plaintiffs object on hearsay and cumulative grounds as it is part of the LDWF report.

(6)   Statement of Captain Boudreau;

OBJECTION:  Plaintiffs object on hearsay and cumulative grounds as it is part of the LDWF report.

(7)   Department of Homeland Security, United States Coast Guard Navigation Rules and Regulations Handbook/Inland Rules of the Road;

OBJECTION:  Defendant, Extreme Fishing, objects on cumulative and relevance grounds.

(8)   Text messages between Captain Boudreau and Tracy Edwards;

OBJECTION:  Plaintiffs object on hearsay and relevance grounds.

(9)   Captain Boudreau's post-accident drug screens.

OBJECTION:  The other Defendants object on relevancy grounds.

i)      **Defendant, AGCS, may introduce the following exhibits without objection:**

(1)   AGCS Policy No. OHL92005573-WETZELTR01;

(2)   GEICO Policy No. CBT1008950-00;

(3)   Photographs of the KINGFISH;

(4)   Photographs of the M/V SUPER STRIKE;

j)      **Defendant, AGCS, may introduce the following exhibits to which there is an objection:**

(1)   Survey of KINGFISH of January 10, 2016;

OBJECTION: The other Defendants object on hearsay and relevance grounds.

(2) AGCS Reservation of Rights Correspondence dated May 10, 2017 and June 14, 2017;

OBJECTION: Plaintiffs object on relevance grounds.

(3) Notice of Loss Correspondence dated May 2, 2017, May 8, 2017, and June 6, 2018;

OBJECTION: Plaintiffs object on relevance grounds.

(4) AGCS reserves the right to supplement this list with, including but not limited to, answers to interrogatories and pleadings (including any attachments thereto) produced/filed by any party, and any exhibit offered by any other party.

OBJECTION:  Defendants, Boudreau, GEICO, and St. Clair, object on the grounds that these documents are overly broad, vague, and not described with sufficient particularity.

k) Any party that believes it has good cause not to disclose exhibits to be used solely for the purpose of impeachment may ex parte request a conference with the Court and make its position known to the Court in camera.

l) As to any exhibits to which the parties cannot agree, they shall submit memoranda (with the contested exhibits attached) no later than **five (5)** business days before the trial.  The proponent of the exhibit shall explain why the exhibit is admissible, and the opponent shall explain why the exhibit is inadmissible.  Unless otherwise ordered by the Court, only exhibits included on the exhibit list shall be included for use at trial.

m) Each party shall submit to the Court on the day of trial a list of exhibits properly marked for identification which it desires to use at trial.

## 11.  DEPOSITION TESTIMONY

a) **<u>Plaintiffs will introduce the video deposition testimony of the following individuals:</u>**

(1) Jennings Russell Boyette, M.D.

(2) John L. Dornhoffer, M.D.

(3) Joseph G. Chacko, M.D.

(4) Brita S. Rook, M.D.

      (5)     Karthika Veerapaneni, M.D.

b)    **Defendant, Extreme Fishing, may/will introduce the deposition of the following individuals:**

      (1)     John L. Dornhoffer, M.D.;

      (2)     Brita S. Rook, M.D.

c)    **Defendant, TK Boat Rentals, may/will introduce the deposition of the following individuals:**

      (1)     John Sutton

d)    **Defendant, AGCS, may/will introduce the deposition testimony of the following individuals:**

At this time, AGCS is not aware of any witnesses it intends to call being unavailable for trial. Should a witness become unavailable, AGCS reserves the right to introduce the deposition testimony of any such witness pursuant to the Federal Rules of Civil Procedure.

e)    The parties may offer all or part of the deposition testimony of any witness who is not within the subpoena power of this court or who are otherwise unavailable or unable to attend the trial of this matter for good cause shown. The parties may also use the deposition testimony of any witness for rebuttal or cross-examination purposes. The parties further reserve the right to use deposition testimony for all purposes permissible under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

f)    The parties shall, prior to trial, meet and agree as to the elimination of all irrelevant and repetitive matter and all colloquy between counsel. In addition, the parties shall, in good faith, attempt to resolve all objections to testimony so that the Court will be required to rule only on those objections to which they cannot reach agreement as to their merit. As to all objections that cannot be amicably resolved, the parties shall submit memoranda on the unresolved objections no later than **five (5)** business days before trial. The parties shall provide specific reasons, beyond mere citation to the rule of evidence, in support of their positions.

## 12.   DEMONSTRATIVE EXHIBITS

a)    **Plaintiffs may use the following demonstrative exhibits at trial:**

      (1)     Google Maps, NOAA Maps, and aerial photographs of the waterways, including the Mississippi River, in the area of and at the scene of the incident;

      (2)     Multilayered three-dimensional (3D) digital models of Patrick Beck's injuries

based on the CT scans he underwent at University Medical Center – New Orleans;

    (3)    Anatomical models and medical illustrations; and

    (4)    Damage charts/summaries

b)    **Defendants, Boudreau, GEICO, and St. Clair, may use the following demonstrative exhibits at trial:**

    (1)    Navigation charts of the Venice area

c)    **Defendant, Extreme Fishing, may use the following demonstrative exhibits at trial:**

    (1)    NOAA Chart 11361 (showing the area of the River where the collision occurred); and

    (2)    Charts of Mississippi River area Head of Passes

d)    **Defendant, TK Boat Rentals, may use the following demonstrative exhibits at trial:**

    (1)    Navigation charts of the Venice area

e)    **Defendant, AGCS, may use the following demonstrative exhibits at trial:**

    (1)    Enlarged images of documents and excerpts of documents listed in its exhibit list, diagrams, and visual timelines in connection with opening statements and/or closing arguments.

f)    The parties have no objections to the use of the above described demonstrative exhibits.

13.    **WITNESSES**

a)    **Plaintiffs WILL CALL the following witnesses:**

    (1)    Plaintiff, Patrick A. Beck
    116 Waterside Drive
    Maumelle, Arkansas 72113

    Mr. Beck will testify about the facts and circumstances leading up to the collision in which he was injured on February 12, 2017, the personal injuries he sustained in this casualty, the medical treatment that he has required, his residuals, impairments, and disabilities resulting from the injuries, as to how he has been economically damaged, and as to how the casualty and his injuries have affected his life. Mr. Beck will also testify about the personal injuries his son, C. D. B., sustained in the collision, and

61

C. D. B.'s residuals, impairments, and disabilities from the injuries.

(2)     Amber Beck
        116 Waterside Drive
        Maumelle, Arkansas 72113

Mrs. Beck will testify about the injuries that her husband, Patrick Beck, and son, C. D. B., sustained in the casualty on February 12, 2017, the medical treatment they have required, their residuals, impairments, and disabilities resulting from their injuries, as to how Mr. Beck and his family have been economically damaged, and as to how the casualty and Mr. Beck's injuries have affected his life. In addition, Mrs. Beck will testify about how Mr. Beck's injuries have affected their marital relationship as well as his relationship with his minor children, C. D. B. and J. P. B.

(3)     Plaintiff, Justin McCarthy
        3100 Windsong Lane
        Conway, Arkansas 72034

Mr. McCarthy will testify about the facts and circumstances surrounding the collision in which he was injured on February 12, 2017, the personal injuries, mental anguish, and emotional distress the casualty caused him, the medical treatment he required, and as to how he has been economically damaged.

(4)     Plaintiff, Michael Harrell
        3330 Nicklaus Drive
        Conway, Arkansas 72034

Mr. Harrell will testify about the facts and circumstances surrounding the collision in which he was injured on February 12, 2017, and the keen mental anguish and emotional distress the collision has caused him.

(5)     Charles N. "Nick" Siria
        12404 Timber Bend Drive
        Little Rock, Arkansas 72211

Mr. Siria will testify about the facts and circumstances surrounding the collision on February 12, 2017, as he was a passenger on the M/V SUPER STRIKE at the time of the collision.

(6)     Patrick Greiffenstein, M.D.
        University Medical Center – New Orleans
        2000 Canal Street
        New Orleans, Louisiana 70112

Dr. Greiffenstein will be tendered as an expert in the field of trauma/critical care surgery and will testify about the injuries sustained by Patrick Beck in the collision on February 12, 2017, and the medical treatment he required while at University Medical Center – New Orleans.

(7)   Laura Pelaez, M.D.
      University Medical Center – New Orleans
      2000 Canal Street
      New Orleans, Louisiana 70112

Dr. Pelaez will be tendered as an expert in the field of otolaryngology and will testify about the injuries sustained by Patrick Beck in the collision on February 12, 2017, and the medical treatment he required while at University Medical Center – New Orleans.

(8)   Jennings Russell Boyette, M.D.
      University of Arkansas for Medical Sciences
      4301 W. Markham Street
      Little Rock, Arkansas 72205

Dr. Boyette will be tendered as an expert in the fields of otolaryngology and facial reconstructive surgery and will testify by video deposition about the injuries suffered by Mr. Beck in the casualty, including facial nerve paralysis, and the sequalae of those injuries.

(9)   John L. Dornhoffer, M.D.
      University of Arkansas for Medical Sciences
      4301 W. Markham Street
      Little Rock, Arkansas 72205

Dr. Dornhoffer will be tendered as an expert in the fields of otolaryngology and neurotology and will testify by video depositions about the temporal bone fractures and tinnitus Patrick Beck suffered as a result of his injuries from the February 12, 2017 collision, the sequalae of those injuries, the ear surgery and contra lateral routing of signals hearing aid Mr. Beck required, and the cochlear implant he placed in Mr. Beck.

(10)  Joseph G. Chacko, M.D.
      University of Arkansas for Medical Sciences
      4301 W. Markham Street
      Little Rock, Arkansas 72205

Dr. Chacko will be tendered as an expert in the fields of ophthalmology and neuro-ophthalmology and will testify by video deposition about the orbital fractures and facial nerve palsy Patrick Beck suffered as a result of

his injuries from the February 12, 2017 collision and the sequalae of those injuries.

(11)   Brita S. Rook, M.D.
       University of Arkansas for Medical Sciences
       4301 W. Markham Street
       Little Rock, Arkansas 72205

       Dr. Rook will be tendered as an expert in the field of ophthalmology and will testify by video deposition about the esotropia and diplopia Patrick Beck suffered secondary to his injuries from the February 12, 2017 collision and the eye surgery he required to treat these conditions.

(12)   Karthika Veerapaneni, M.D.
       University of Arkansas for Medical Sciences
       4301 W. Markham Street
       Little Rock, Arkansas 72205

       Dr. Veerapaneni will be tendered as an expert in the fields of neurology and neurophysiology and will testify by video deposition about the traumatic brain injury Patrick Beck sustained in the collision on February 12, 2017, and Mr. Beck's residuals and permanent impairments from this injury.

(13)   Gary T. Souheaver, Ph.D.
       6 Margeaux Court
       Little Rock, Arkansas 72223

       Dr. Souheaver will be tendered as an expert in the field of neuropsychology and will testify about the traumatic brain injury Patrick Beck sustained in the collision on February 12, 2017, his neuropsychological evaluations of Mr. Beck, and Mr. Beck's residuals and permanent impairments from this injury.

(14)   Tanya Rutherford Owen, Ph.D., CRC, CLCP
       1130 E. Millsap
       Fayetteville, Arkansas 72703

       Dr. Owen will be tendered as an expert in the fields of vocational rehabilitation and life care planning and will testify about how and why Patrick Beck has been vocationally damaged and how his permanent impairments as a result of his injuries from the February 12, 2017 collision will affect his future earning capacity. She will also testify about Mr. Beck's future medical costs.

(15)   G. Randolph Rice, Ph.D.
        7048 Moniteau Court
        Baton Rouge, Louisiana 70809

        Dr. Rice will be tendered as an expert in the field of economics and will testify about Patrick Beck's past and future economic losses and the present value cost of the future medical expenses plan that Dr. Tanya Rutherford Owen prepared for Mr. Beck.

b)      **Plaintiffs MAY CALL the following:**

(1)    Plaintiff, C. D. B.
        116 Waterside Drive
        Maumelle, Arkansas 72113

        C. D. B. may testify about the facts and circumstances surrounding the collision in which he was injured on February 12, 2017, his personal injuries, mental anguish, and emotional distress the casualty caused him, his observations of the injuries suffered by Patrick Beck, and how his family has been affected by this incident.

(2)    Defendant, Andre D. Boudreau
        402 St. Francis Street
        Madisonville, Louisiana 70447
        (985) 630-9827

        Plaintiffs may call Captain Boudreau under cross-examination to testify about his training, education, and employment history as a charter fishing captain, the facts and circumstances surrounding the collision between the M/V SUPER STRIKE and the M/V MISS IDA on February 12, 2017, and Extreme Fishing's policies and procedures for captains on charter fishing trips.

(3)    William Constant
        6700 Highway 90 East
        Morgan City, Louisiana 70380

        Plaintiffs may call William Constant under cross-examination to testify about the policies and procedures of TK Boat Rentals, LLC as the corporate representative and the employment history of Captain LeBlanc.

(4)    Shane A. LeBlanc
        1501 Bernice Street
        Morgan City, Louisiana 70380

Plaintiffs may call Captain LeBlanc to testify about his training, education, and employment history as a boat captain, the facts and circumstances surrounding the collision between the M/V SUPER STRIKE and the M/V MISS IDA on February 12, 2017, and TK Boat Rentals, LLC's policies and procedures for captains.

(5)     Mitchell Rogers
        4509 David Drive
        Kenner, Louisiana 70065

Plaintiffs may call Mitchell Rogers to testify about his training, education, and employment history as a boat captain and crewmember, the facts and circumstances surrounding the collision between the M/V SUPER STRIKE and the M/V MISS IDA on February 12, 2017, and Extreme Fishing's policies and procedures for captains and crewmembers.

(6)     Defendant, Chase B. St. Clair
        829 Eleonore Street
        New Orleans, Louisiana 70115

Plaintiffs may call Chase St. Clair under cross-examination to testify about the condition of the M/V SUPER STRIKE, previous charter arrangements made with Captain Boudreau and other Extreme Fishing captains, and the arrangement made with Boudreau and/or Extreme Fishing to use the M/V SUPER STRIKE on the day of the collision.

(7)     Troy Wetzel
        5566 Jacquelyn Court
        New Orleans, Louisiana 70124

Plaintiffs may call Troy Wetzel to testify about the arrangements made with Plaintiffs for a charter fishing trip on February 12, 2017, Mr. Wetzel's experience with Andre Boudreau as a captain, and Extreme Fishing's policies and procedures for charter fishing trips, captains, and, crewmembers.

(8)     Kathleen M. R. Jones, M.D.
        University Medical Center – New Orleans
        2000 Canal Street
        New Orleans, Louisiana 70112

Plaintiffs may tender Dr. Jones as an expert in the field of emergency medicine, and she may testify about the injuries C. D. B. sustained in the collision on February 12, 2017, and the treatment he required while at University Medical Center – New Orleans.

(9)    Emma R. Schachner
       Department of Cell Biology and Anatomy
       School of Medicine
       Louisiana State University Health Sciences Center
       New Orleans, Louisiana 70112

       Plaintiffs may call Ms. Schachner to authenticate the multilayered three-dimensional (3D) digital models of Patrick Beck's injuries based on the CT scans he underwent at University Medical Center – New Orleans.

(10)   Plaintiffs may call any witnesses listed by Defendants.

c)    **Defendants, Boudreau, GEICO, and St. Clair WILL CALL the following witnesses:**

(1)    Andre D. Boudreau
       P.O. Box 873
       Madisonville, LA  70447

       Will testify about the operation of M/V SUPER STRIKE on day of collision; issues concerning insurance coverage under AGCS policy

(2)    Chase St. Clair
       829 Eleonore Street
       New Orleans, LA  70115

       Will testify about the operation and maintenance of M/V SUPER STRIKE; damages sustained as a result of the total loss of the vessel

(3)    Mitchell Rogers
       4509 David Drive
       Kenner, LA  70065

       Will testify about operation of M/V SUPER STRIKE on day of collision

(4)    Troy Wetzel
       5566 Jacqueline Court
       New Orleans, LA  70124

       Will testify concerning Extreme Fishing's chartering of M/V SUPER STRIKE; Extreme Fishing's employment relationship with Captain Boudreau; issues involving insurance coverage under AGCS and GEICO policies

(5)    Mr. Andrew Minster
Marine Surveyor
Rivers & Gulf Marine
P.O. Box 869
Slidell, LA  70459

Expert on Inland Rules of the Road and vessel operations who will testify concerning the actions of the two vessel operators involved in the collision

(6)    Dr. Kevin Greve
Jefferson Neurobehavioral Group
2901 N. I-10 Service Road E., Suite 300
Metairie, Louisiana 70002

Expert neuropsychologist who will testify about the nature and extent of Patrick Beck's traumatic brain injury

(7)    William A. Kyle
Marine Consulting, Inc.
P.O. Box 10911
New Iberia, LA  70563

Expert marine surveyor who will testify concerning the damage to M/V SUPER STRIKE and the value of the vessel post-casualty

(8)    Keisha Pusey
GEICO Marine Insurance Company
5323 Port Royal Rd. North
Springfield, VA  22151

Representative of GEICO who will testify concerning the payment made to St. Clair for the total loss of M/V SUPER STRIKE

(9)    Rebecca Overton
AGCS Marine Insurance Company

Will testify regarding the interpretation of the marine insurance policy issued to Wetzel; basis(es) for AGCS's denial of coverage for Captain Boudreau; basis for providing defense and coverage to Extreme Fishing and Wetzel; any agreements entered into with Wetzel concerning assignment of rights to recover defense costs to AGCS

d) **Defendants, Boudreau, GEICO, and St. Clair MAY CALL the following witnesses:**

    (1)    Patrick Beck
            116 Waterside Drive
            Maumelle, AR  72113

            May testify concerning the facts and circumstances concerning the booking of the charter fishing trip with Extreme Fishing, the collision, injuries, medical treatment and damages

    (2)    C. D. B.
            116 Waterside Drive
            Maumelle, AR  72113

            May testify concerning the facts and circumstances concerning the collision, injuries, medical treatment and damages

    (3)    Charles N. "Nick" Siria
            12404 Timber Bend Drive
            Little Rock, Arkansas 72211

            May testify concerning the facts and circumstances concerning the collision, injuries, medical treatment and damages

    (4)    Justin McCarthy
            3100 Windsong Drive
            Conway, Arkansas 72034

            May testify concerning the facts and circumstances concerning the collision, injuries, medical treatment and damages.

    (5)    Michael Harrell
            3330 Nicklaus Drive
            Conway, Arkansas 72034

            May testify concerning the facts and circumstances concerning the collision, injuries, medical treatment and damages

    (6)    Tracey Edwards
            9116 Cherokee Trail
            Tyler, Texas 75703

            May testify concerning the facts and circumstances concerning the collision, injuries, medical treatment and damages.

(7)     William Constant
Corporate representative for TK Boat Rentals, LLC
Through attorney of record:
Harry Morse
650 Poydras Street, Suite 2710
New Orleans, LA  70130

May testify concerning TK's operations, training of Captain LeBlanc and post-accident investigation.

(8)     Shane A. LeBlanc
1501 Bernice Street
Morgan City, LA 70380

May testify concerning the facts and circumstances regarding the collision.

(9)     Dr. Gary T. Souheaver
Behavior Management Systems, Inc.
Neuropsychology Clinic7550 Hwy. 107/JFK Blvd.
N. Little Rock /Sherwood, AR 72120

May testify concerning the medical treatment for Patrick Beck

(10)    Dr. Jeffrey J. Carfagno
1900 Club Manor Drive, Suite 105
Maumelle, Arkansas 72113

May testify concerning the medical treatment for Patrick Beck.

(11)    Anndi E. Cranford, APRN
4301 W. Markham Street, Slot #547-05
Little Rock, AR  72205-01

May testify concerning the medical treatment for Patrick Beck.

(12)    Joseph G. Chacko, MD
University of Arkansas for Medical Sciences
4301 West Markham Street, Slot #524
Little Rock, AR  72205

May testify concerning the medical treatment for Patrick Beck

(13)    Jennings R. Boyette, MD
Jack T. Stephens Spine & Neurosciences Institute
4301 W. Markham Street, Slot #547-05
Little Rock, AR  72205-7101

May testify concerning the medical treatment for Patrick Beck

(14)     John L. Dornhoffer, MD
         4018 W. Capitol Avenue
         Little Rock, Arkansas 72205

         May testify concerning the medical treatment for Patrick Beck.

(15)     Mathew D. Cox, MD
         University of Arkansas for Medical Sciences
         4301 West Markham Street, Slot #524
         Little Rock, AR  72205

         May testify concerning the medical treatment for Patrick Beck

(16)     EMT Paramedic Keith Babin
         Plaquemines Parish Government Ambulance Department
         3706 Main Street
         Belle Chasse, Louisiana 70037

         May testify concerning the medical treatment for Patrick Beck

(17)     EMT Paramedic Samantha Clark
         Plaquemines Parish Government Ambulance Department
         3706 Main Street
         Belle Chasse, Louisiana 70037

         May testify concerning the medical treatment for Patrick Beck

(18)     Jeffrey Michael Elder, M.D.
         University Medical Center - New Orleans
         2000 Canal Street
         New Orleans, Louisiana 70112

         May testify concerning the medical treatment for Patrick Beck

(19)     Alan G. Marr, M.D.
         University Medical Center – New Orleans
         2000 Canal Street
         New Orleans, Louisiana 70112

         May testify concerning the medical treatment for Patrick Beck

(20)     Patrick Greiffenstein, M.D.
         University Medical Center – New Orleans
         2000 Canal Street
         New Orleans, Louisiana 70112

         May testify concerning the medical treatment for Patrick Beck

(21)   Richard S. Kueblar, M.D.
       University Medical Center – New Orleans
       2000 Canal Street
       New Orleans, Louisiana 70112

       May testify concerning the medical treatment for Patrick Beck

(22)   Elizabeth B. Bollman, M.D.
       University Medical Center – New Orleans
       2000 Canal Street
       New Orleans, Louisiana 70112

       May testify concerning the medical treatment for Patrick Beck

(23)   Christopher M. Harmon, M.D.
       University Medical Center – New Orleans
       2000 Canal Street
       New Orleans, Louisiana 70112

       May testify concerning the medical treatment for Patrick Beck

(24)   Bill Brooks Lawrence, M.D.
       Lawrence Family Medical
       3650 College Avenue
       Conway, Arkansas 72034

       May testify concerning the medical treatment for Patrick Beck.

(25)   Tanya Rutherford Owen, Ph.D., CRC, CLCP
       1130 E. Millsap
       Fayetteville, Arkansas 72703

       May testify concerning Patrick Beck's future lost earnings/lost earning
       capacity and cost of future medical treatment, if any

(26)   G. Randolph Rice, Ph.D.
       7048 Moniteau Court
       Baton Rouge, Louisiana 70809

       May testify concerning Patrick Beck's future lost earnings/lost earning
       capacity and cost of future medical treatment, if any.

(27)    Tim Anselmi[8]
        Central Maritime LLC
        5575 Highway 1 North
        PO Box 217
        Lockport, LA 70374

        May testify concerning the facts and circumstances concerning any information provided to AGCS concerning KINGFISH and/or M/V SUPER STRIKE

(28)    Any witness whose testimony may be used to impeach or contradict the testimony of any witness called by any other party in this lawsuit

(29)    Any witness necessary to introduce and/or to authenticate any document or exhibit, or piece of evidence.

(30)    Any witness listed by any other party.

(31)    This witness list was filed in compliance with prior court orders.  Expert reports have been exchanged in accordance with prior court orders.

e)    **Defendant, Extreme Fishing, WILL CALL the following witnesses:**

(1)    Troy Wetzel, Extreme Fishing, L.L.C.
        5566 Jacquelyn Court
        New Orleans, Louisiana 70124

        Facts and circumstances related to the incident which forms the basis of this lawsuit

(2)    Captain, Andre D. Boudreau
        P. O. Box 873
        Madisonville, Louisiana 70447

        Facts and circumstances related to the incident which forms the basis of this lawsuit.

(3)    William Kyle
        Marine Consulting, Inc.
        P. O. Box 10911
        New Iberia, Louisiana 70502

---

[8] AGCS objects to this witness on the grounds that he was never listed by GEICO/Boudreau/St. Clair in their prior witness lists, and he is a consulting expert of AGCS not subject to testify at trial.  GEICO/Boudreau/St. Clair respond that AGCS listed Tim Anselmi on its Witness List, R. Doc. No. 100.  He is therefore not a consulting witness and can be called as a testifying witness at trial.

Expert opinion regarding valuation of M/V SUPER STRIKE

 (4) Andrew Minster
    Marine Surveyor
    Rivers & Gulf Marine Surveying
    P. O. Box 869
    Slidell, Louisiana 70459

    Expert opinion regarding liability

**f)** **Defendant, Extreme Fishing, MAY CALL the following witnesses:**

 (1) Patrick Beck (Cross-Examination)
    116 Waterside Drive
    Maumelle, Arkansas 72113

    Facts and circumstances related to the incident which forms the basis of this lawsuit.

 (2) C. D. B. (Cross-Examination)
    116 Waterside Drive
    Maumelle, Arkansas 72113

    Facts and circumstances related to the incident which forms the basis of this lawsuit

 (3) Justin McCarthy (Cross-Examination)
    3100 Windsong Lane
    Conway, Arkansas 72034

    Facts and circumstances related to the incident which forms the basis of this lawsuit

 (4) Michael Harrell (Cross-Examination)
    3330 Nicklaus Drive
    Conway, Arkansas 72034

    Facts and circumstances related to the incident which forms the basis of this lawsuit

 (5) Tracy L. Edwards (Cross-Examination)
    9116 Cherokee Trail
    Tyler, Texas 75703

    Facts and circumstances related to the incident which forms the basis of this lawsuit

(6)    Charles N. "Nick" Siria (Cross-Examination)
12404 Timber Bend Drive
Little Rock, Arkansas 72211

Facts and circumstances related to the incident which forms the basis of this lawsuit

(7)    Mitchell Rogers
4509 David Drive
Kenner, Louisiana 70065

Facts and circumstances related to the incident which forms the basis of this lawsuit

(8)    Chase B. St. Clair (Cross-Examination)
829 Eleonore Street
New Orleans, Louisiana 70115

Facts and circumstances related to the incident which forms the basis of this lawsuit; condition of M/V SUPER STRIKE and post-accident actions related to the M/V SUPER STRIKE

(9)    William Constant, TK Boat Rentals (Cross-Examination)
6700 Highway 90 East
Morgan City, Louisiana 70380

Facts and circumstances related to the incident which forms the basis of this lawsuit; condition of M/V MISS IDA and post-accident investigation

(10)   Shane A. LeBlanc (Cross-Examination)
1501 Bernice Street
Morgan City, Louisiana 70380

Facts and circumstances related to the incident which forms the basis of this lawsuit

(11)   A representative of Southwestern Energy (Cross-Examination)

Employment of Patrick Beck

(12)   Deputy R. Shackelford
Plaquemine Parish Sheriff's Office
8022 Highway 23
Belle Chasse, Louisiana 70037

Post-accident investigation.

75

(13)  Deputy M. Morgan
      Plaquemines Parish Sheriff's Office
      8022 Highway 23
      Belle Chasse, Louisiana 70037

      Post-accident investigation

(14)  EMT Paramedic Keith Babin
      Plaquemines Parish Government Ambulance Department
      3706 Main Street
      Belle Chasse, Louisiana 70037

      Medical condition and treatment of Patrick Beck and C. D. B.

(15)  EMT Paramedic Samantha Clark
      Plaquemines Parish Government Ambulance Department
      3706 Main Street
      Belle Chasse, Louisiana 70037

      Medical condition and treatment of Patrick Beck and C. D. B.

(16)  Dr. Jeffrey Michael Elder (Cross-Examination)
      4301 West Markham Street
      Little Rock, Arkansas 72205

      Medical condition and treatment of Patrick Beck

(17)  Dr. Jennings R. Boyette (Cross-Examination)
      4301 West Markham Street
      Little Rock, Arkansas 72205

      Medical condition and treatment of Patrick Beck

(18)  Dr. Karthika Veerapaneni (Cross-Examination)
      4301 West Markham Street
      Little Rock, Arkansas 72205

      Medical condition and treatment of Patrick Beck

(19)  Dr. John Pemberton (Cross-Examination)
      Jones Eye Institute
      501 Jack Stephens Drive
      Little Rock, Arkansas 72205

      Medical condition and treatment of Patrick Beck

(20)   Dr. Joseph Chacko (Cross-Examination)
       Jones Eye Institute
       4301 West Markham Street
       Little Rock, Arkansas 72205

       Medical condition and treatment of Patrick Beck

(21)   Dr. Joshua Page (Cross-Examination)
       4301 West Markham Street
       Little Rock, Arkansas 72205

       Medical condition and treatment of Patrick Beck

(22)   Dr. Matthew D. Cox (Cross-Examination)
       4301 West Markham Street
       Little Rock, Arkansas 72205

       Medical condition and treatment of Patrick Beck

(23)   Dr. John L. Dornhoffer (Cross-Examination)
       4018 W. Capitol Avenue
       Little Rock, Arkansas 72205

       Medical condition and treatment of Patrick Beck

(24)   Dr. Jeffrey J. Carfagno (Cross-Examination)
       Carfagno Family Practice
       1900 Club Manor Drive, Suite 105
       Maumelle, Arkansas  72113

       Medical condition and treatment of Patrick Beck

(25)   Dr. B. Brooks Lawrence (Cross-Examination)
       Lawrence Family Medicine
       3650 College Avenue
       Conway, Arkansas  72034-7272

       Medical condition and treatment of Justin McCarthy

(26)   Kevin W. Greve, Ph.D.
       Jefferson Neurobehavioral Group
       2901 North I-10 Service Road – E300
       Metairie, Louisiana 70002

       Expert neuropsychological evaluation of Patrick Beck

   (27)   Keisha Pusey
           GEICO Marine Insurance Company
           880 S. Pickett Street
           Alexandria, Virginia 22304

           Coverage for involved vessels and their operators

g)    **<u>Defendant, TK Boat Rentals, LLC, WILL CALL the following witnesses:</u>**

   (1)    Shane A. LeBlanc
           1501 Bernice Street
           Morgan City, Louisiana 70380

           Will testify regarding his training; the facts and circumstances of the collision

   (2)    Andre D. Boudreau
           P. O. Box 873
           Madisonville, Louisiana 70447

           Will testify regarding his training; the facts and circumstances of the collision

   (3)    Will Constant
           6700 Highway 90 East
           Morgan City, Louisiana 70380

           Will testify regarding TK Boat Rentals' policies and procedures; his investigation into the accident

   (4)    Wade Crappel
           7810 LA-182,
           Morgan City, LA 70380

           May testify regarding TK Boat Rentals' policies and procedures

   (5)    John Sutton
           1439 Bowman Ln.
           Taylorsville, KY 40071

           Will testify regarding the inland navigational rules and the facts and circumstances of the collision

h)    **Defendant, TK Boat Rentals, LLC, MAY CALL the following witnesses:**

(1)    Patrick A. Beck
116 Waterside Drive
Maumelle, Arkansas 72113

May testify regarding the accident and his injuries

(2)    C. D. B.
116 Waterside Drive
Maumelle, Arkansas 72113

May testify regarding the accident and his injuries

(3)    Tracy L. Edwards
9116 Cherokee Trail
Tyler, Texas 75703

May testify regarding the accident and the events leading up to it

(4)    Justin McCarthy
3100 Windsong Lane
Conway, Arkansas 72034

May testify regarding the accident and the events leading up to it

(5)    Michael Harrell
3330 Nicklaus Drive
Conway, Arkansas 72034

May testify regarding the facts and circumstances leading up to, during, and following the collision

(6)    Charles N. "Nick" Siria
12404 Timber Bend Drive
Little Rock, Arkansas 72211

May testify regarding the accident and the events leading up to it

(7)    Mitchell Rogers
4509 David Drive
Kenner, Louisiana 70065

May testify regarding the accident and the events leading up to it

(8)     Chase B. St. Clair
        829 Eleonore Street
        New Orleans, Louisiana 70115

        May testify regarding his use of the M/V SUPER STRIKE and its use

(9)     Troy Wetzel
        5566 Jacquelyn Court
        New Orleans, Louisiana 70124

        May testify regarding his involvement in the hiring and training of
        Captain Boudreau

(10)    Larry Allemand
        20133 Walden Street
        Covington, Louisiana 70435

        May testify regarding the conditions on the morning of the accident
        and the actions of Captain Boudreau

(11)    Joey Davis
        c/o Relentless Sportfishing Charters
        235 Cypress Cove Road
        Venice, Louisiana 70091

        May testify regarding the conditions on the morning of the accident
        and the actions of Captain Boudreau

(12)    EMT Paramedic Keith Babin
        Plaquemines Parish Government Ambulance Department
        3706 Main Street
        Belle Chasse, Louisiana 70037

        May testify regarding medical treatment for Patrick Beck and C. D.
        B.

(13)    EMT Paramedic Samantha Clark
        Plaquemines Parish Government Ambulance Department
        3706 Main Street
        Belle Chasse, Louisiana 70037

        May testify regarding medical treatment for Patrick Beck; C. D. B.

(14)    Jeffrey Michael Elder, M.D.
University Medical Center - New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(15)    Alan G. Marr, M.D.
University Medical Center - New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(16)    Patrick Greiffenstein, M.D.
University Medical Center – New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(17)    Richard S. Kueblar, M.D.
University Medical Center – New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(18)    Elizabeth B. Bollman, M.D.
University Medical Center – New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(19)    Christopher M. Harmon, M.D.
University Medical Center – New Orleans
2000 Canal Street
New Orleans, Louisiana 70112

May testify regarding medical treatment for Patrick Beck

(20)    Jeffrey C. Carfagno, M.D.
1900 Club Manor Drive, Suite 105
Maumelle, Arkansas 72113

May testify regarding medical treatment for Patrick Beck

(21)   Jennings Russell Boyette, M.D.
       University of Arkansas for Medical Sciences
       4301 W. Markham Street
       Little Rock, Arkansas 72205

       May testify regarding medical treatment for Patrick Beck

(22)   John L. Dornhoffer, M.D.
       University of Arkansas for Medical Sciences
       4301 W. Markham Street
       Little Rock, Arkansas 72205

       May testify regarding medical treatment for Patrick Beck

(23)   Joseph G. Chacko, M.D.
       University of Arkansas for Medical Sciences
       4301 W. Markham Street
       Little Rock, Arkansas 72205

       May testify regarding medical treatment for Patrick Beck

(24)   Bryan A. Austin, D.D.S.
       Austin Family Dentistry, PA
       3201 Club Manor Drive, Suite A
       Maumelle, Arkansas 72113

       May testify regarding medical treatment for Patrick Beck

(25)   Mary Ann Difranco, M.D.
       University Medical Center – New Orleans
       2000 Canal Street
       New Orleans, Louisiana 70112

       May testify regarding medical treatment for Patrick Beck

(26)   Kathleen M. R. Jones, M.D.
       University Medical Center – New Orleans
       2000 Canal Street
       New Orleans, Louisiana 70112

       May testify regarding medical treatment for Patrick Beck

(27)   Gary T. Souheaver, Ph.D.
6 Margeaux Court
Little Rock, Arkansas 72223

May testify regarding medical treatment for Patrick Beck

(28)   Any witness whose testimony may be used to impeach or contradict the testimony of any witness called by any other party in this lawsuit

(29)   Any witness necessary to introduce and/or to authenticate any document or exhibit, or piece of evidence

(30)   Any witness listed by any other party

i)   **Defendant, AGCS, MAY CALL the following witnesses:**

(1)   Troy Wetzel, Extreme Fishing, L.L.C.
5566 Jacquelyn Court
New Orleans, Louisiana 70124

Facts and circumstances related to the incident that forms the basis of this lawsuit and characteristics of the KINGFISH

(2)   Chase B. St.Clair
829 Eleonore Street
New Orleans, Louisiana 70115

Facts and circumstances related to the incident that forms the basis of this lawsuit, and the characteristics and condition of M/V SUPER STRIKE and post-accident investigation

(3)   Andre D. Boudreau
P. O. Box 873
Madisonville, Louisiana 70447

Facts and circumstances related to the incident that forms the basis of this lawsuit, characteristics of the KINGFISH and the M/V SUPER STRIKE, and notification regarding the claim under the AGCS Policy

(4)   Rebecca Overton
AGCS Marine Insurance Company

Facts and circumstances pertaining to insurance coverage issues regarding involved vessels and their operators and authentication of AGCS documents

(5)     Kevin W. Greve, Ph.D.
        Jefferson Neurobehavioral Group
        2901 North I-10 Service Road – E300
        Metairie, Louisiana 70002

        Expert neuropsychological evaluation of Patrick Beck

(6)     Andrew Minster
        Marine Surveyor
        Rivers & Gulf Marine Surveying
        P.O. Box 869
        Slidell, Louisiana 70459

        Expert opinion regarding liability

(7)     William Kyle
        Marine Consulting, Inc.
        P.O. Box 10911
        New Iberia, Louisiana 70502

        Expert opinion regarding valuation of M/V SUPER STRIKE

(8)     Perry Beebe
        Perry Beebe & Associates, LLC[9]
        141 Hwy. 22 E, Unit A4
        Madisonville, Louisiana 70447

        Facts and circumstances of his January 10, 2016 survey of the
        KINGFISH, and the findings of his survey.

(9)     AGCS reserves the right to supplement this list with, including, but
        not limited to, the following:

        a. Any witness listed by any party.

        b. Any witness needed for rebuttal and/or authentication
           purposes.

---

[9] Boudreau, GEICO and St. Clair object to this witness on the grounds that he has never been disclosed on prior witness lists and has never issued an expert report concerning his opinions.

j)     Witness lists were filed in accordance with prior court orders.  No other witnesses shall be allowed unless their addition is agreeable to all parties and does not affect the trial date.  This restriction will not apply to rebuttal witnesses or documents whose necessity could not be reasonably anticipated.  Furthermore, expert reports were exchanged in accordance with prior court orders.  Experts will not be permitted to testify to opinions not included in their reports.

k)     Except for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the pretrial order and prior court orders.

l)     Counsel shall not be allowed to ask questions on cross-examination of an economic expert that would require the witness to make mathematical calculations in order to frame a response unless the factual  elements of such questions shall have been submitted to that expert witness at least three (3) full working days before trial.

## 14.   JURY TRIAL

This is a jury trial applicable to all issues of Plaintiffs' claims. Proposed jury instructions, special jury interrogatories, trial memoranda, and any special questions that the Court is asked to put to prospective jurors on *voir dire* shall be electronically filed with the Court not later than **five (5)** working days prior to the trial date.

The limitation actions or defenses filed by Defendants, Boudreau, St. Clair, TK Boat Rentals, and Extreme Fishing, will be decided by the Court. The insurance coverage issues will also be decided by the Court.  Suggested findings of fact and conclusions of law and a separate trial memorandum are to be electronically filed with the Court not less than **ten (10)** business days prior to trial, unless the Court enters an order that such is not required.

AGCS waives its jury demand as to the coverage issues.

## 15.   ISSUES OF LIABILITY AND QUANTUM

The issue of liability (will or will not) be tried separately from that of quantum.

16. **MATTERS TO EXPEDITE DISPOSITION OF CASE**

At this time, the parties know of no other matters that might expedite the disposition of this case.

17. **TRIAL**

Trial shall commence on September 30, 2019, at 9:00 a.m. A realistic estimate of the number of trial days required is five days for the case in its entirety.

18. **CERTIFICATION**

This pretrial order has been formulated after conference at which counsel for the respective parties have appeared in person. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

19. **SETTLEMENT**

Possibility of settlement of this case was considered.

Respectfully submitted,

**GAINSBURGH, BENJAMIN, DAVID, MEUNIER & WARSHAUER, L.L.C.**
BY: */s/ Irving J. Warshauer*
　　**IRVING J. WARSHAUER**
　　**BAR NO. 13252**
　　**BRITTANY R. WOLF**
　　**BAR NO. 36733**
　　**RACHEL M. NAQUIN**
　　**BAR NO. 37816**
　　2800 Energy Centre,
　　1100 Poydras Street
　　New Orleans, Louisiana 70163-2800
　　Telephone:  (504) 522-2304
　　E-mail:  iwarshauer@gainsben.com
　　E-mail:  bwolf@gainsben.com
　　E-mail:  rnaquin@gainsben.com

**KING & JURGENS, LLC**
BY: */s/ Jedd S. Malish*
　　**JEDD S. MALISH**
　　**BAR NO. 23846**
　　201 St. Charles Avenue, 45th Floor
　　New Orleans, Louisiana 70170
　　Telephone: (504) 582-3800
　　E-mail:  jmalish@kingjurgens.com

　　For Complainants/Defendants, Andre D. Boudreau, GEICO Marine Insurance Company, and Chase B. St. Clair

AND

**PPGMR LAW, PLLC**
     **G. ALAN PERKINS**
     **AR BAR NO. 91115**
     P.O. Box 251618
     Little Rock, Arkansas 72225
     Telephone: (501) 603-9000
     E-mail:alan@ppgmrlaw.com

     Attorneys For Claimants/Plaintiffs,
     Patrick A. Beck, individually and as the
     father and administrator of the estate of
     his minor son, C. D. B., Justin McCarthy,
     and Michael Harrell

**DAIGLE, FISSE & KESSENICH**
BY: */s/ Michael W. McMahon*
     **MICHAEL W. McMAHON**
     **BAR NO. 23987**
     **KIRK N. AURANDT**
     **BAR NO. 25336**
     227 Highway 21
     Madisonville, Louisiana 70447
     Telephone:  (985) 871-0800
     E-mail:  mmcmahon@daiglefisse.com
     E-mail:  kaurandt@daiglefisse.com

     For Defendant, Extreme Fishing, L.L.C.

**GALLOWAY, JOHNSON, TOMPKINS,
BURR & SMITH**
BY: */s/ Frederick W. Swaim, III*
     **FREDERICK W. SWAIM, III**
     **BAR NO. 28242**
     **EMMITT L. DuBOSE, III**
     **BAR NO. 35113**
     701 Poydras Street, 40th Floor
     New Orleans, Louisiana 70139
     Telephone: (504) 525-6802
     E-mail:  fswaim@gallowaylawfirm.com

     For Defendant, AGCS Marine Insurance
     Company

**ROSS F. LAGARDE, APLC**
BY: */s/ Ross F. Lagarde*
     **ROSS F. LAGARDE**
     **BAR NO. 27542**
     2250 Gause Boulevard East, Suite 301
     Slidell, Louisiana 70461
     Telephone:  (985) 605-0527
     E-mail:  ross@rlagardelaw.com

     For Plaintiff, Andre D. Boudreau

**BOHMAN MORSE, LLC**
BY: */s/ Harry E. Morse, VI*
     **HARRY E. MORSE, VI**
     **BAR NO. 31515**
     **MARTIN S. BOHMAN T/A**
     **BAR NO. 22005**
     650 Poydras Street, Suite 2710
     New Orleans, Louisiana 70130
     Telephone: (504) 930-4009
     E-mail:  harry@bohmanmorse.com

     For Complainant/Defendant, TK Boat
     Rentals, L.L.C. as the owner and
     operator of the M/V MISS IDA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Irving J. Warshauer*
**IRVING J. WARSHAUER**